RECORD NO. 14-1568

IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

### THE RADIANCE FOUNDATION, INC.
### and RYAN BOMBERGER,

*Plaintiffs-Appellants,*

v.

### NATIONAL ASSOCIATION FOR THE
### ADVANCEMENT OF COLORED PEOPLE,

*Defendant-Appellee.*

_____

**OPENING BRIEF OF PLAINTIFFS-APPELLANTS**
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA AT NORFOLK

Charles M. Allen
William F. Demarest III
GOODMAN, ALLEN
 & FILETTI, PLLC
4501 Highwoods Parkway
Suite 210
Glen Allen, Virginia 23060-6153
(804) 346-0600 (Telephone)
callen@goodmanallen.com
wdemarest@goodmanallen.com

Counsel for Plaintiffs-Appellants

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. _____     Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____
(name of party/amicus)

_____

 who is _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?      YES     NO

2.      Does party/amicus have any parent corporations?                               YES     NO
        If yes, identify all parent corporations, including grandparent and great-grandparent
        corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
        other publicly held entity?                                                  YES     NO
        If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?          YES      NO
         If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)      YES      NO
         If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?                      YES      NO
         If yes, identify any trustee and the members of any creditors' committee:

Signature: _____          Date: _____

Counsel for: _____

## CERTIFICATE OF SERVICE
**************************

I certify that on _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_____                    _____
            (signature)                                          (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __14-1568__      Caption: __The Radiance Foundation etal v. NAACP__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__The Radiance Foundation__
(name of party/amicus)

_____

who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                        ☐ YES ☑ NO
      If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐YES ☑NO
     If yes, identify entity and nature of interest:


5.   Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:


6.   Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
     If yes, identify any trustee and the members of any creditors' committee:


Signature: s/Charles M. Allen _____    Date: ____24 June 2014____

Counsel for: The Radiance Foundation _____

## CERTIFICATE OF SERVICE
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

I certify that on ____24 June 2014____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

David G. Barger, Esq.                    Steven Wadyka, Esq.
Greenberg Traurig, LLP                   Johnine Barnes, Esq.
1750 Tysons Boulevard, Suite 1200        Greenberg Traurig, LLP
McLean, VA  22102                        2101 L Street NW, Suite 1000
                                         Washington, DC  20037


s/Charles M. Allen _____         ____24 June 2014____
(signature)                                      (date)

- 2 -

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iv

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION.....1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ............................1

STATEMENT OF THE CASE...............................................................4

STATEMENT OF THE FACTS ............................................................7

STANDARD OF REVIEW .................................................................15

SUMMARY OF THE ARGUMENT ...................................................16

ARGUMENT .....................................................................................19

    I.    The District Court erred by finding that Radiance's noncommercial use of the NAACP's marks and "National Association for the Abortion of Colored People" in the January 2013 news article in order to communicate criticism of the NAACP were "in connection with the sale, offering for sale, distribution, or advertising of any goods or services." ...............................................................................19

        i.    Radiance did not use the NAACP's marks or "National Association for the Abortion of Colored People" as a source or product identifier of any goods or services and, therefore, the use of these was not "in connection with". .................................................. 20

        ii.    Radiance's noncommercial use of the NAACP's marks and "National Association for the Abortion of Colored People" in social commentary and criticism does not satisfy the "in connection with" requirement of the Lanham Act. .......................... 28

i

iii.  Radiance used the NAACP's marks and "National Association for the Abortion of Colored People" in noncommercial speech to criticize the NAACP's position on abortion and, accordingly, the First Amendment prohibits a claim for infringement or dilution. . 31

II.      The District Court erred in finding that Radiance's use of the NAACP's marks created a likelihood of confusion. ...............................................32

   i.  The District Court's finding of an intent to confuse as to the true name of the NAACP is irrelevant to the likelihood of confusion..33

   ii.  The anecdotal evidence of confusion does not demonstrate confusion as to source. ........................................................................ 34

   iii. The NAACP's survey of actual confusion was unreliable............. 35

   iv.The District Court improperly excluded the competent expert testimony of Tracy Tuten, Ph.D demonstrating the unreliability of the Ostberg Survey. ................................................................... 41

   v. The text of the January 2013 article demonstrates that Radiance's use of the NAACP's marks was to criticize the NAACP and prevents a likelihood of confusion.......................................................46

III.     The District Court erred by finding trademark dilution by tarnishment because Radiance's use of the NAACP's marks in the  January 2013 article was a noncommercial and nominative use, and because the article was a form of news reporting and news commentary. ...............47

   i.  Radiance's use of the NAACP's marks was noncommercial......... 48

   ii.  Radiance's use of the NAACP's marks was nominative................ 49

   iii. The January 2013 article was news reporting and commentary.... 51

CONCLUSION ....................................................................52

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*American Family Life Ins. Co. v. Hagan*,
  266 F.Supp.2d 682 (N.D. Ohio 2002)..................................................29

*Anheuser-Busch, Inc. v. L & L Wings, Inc.*
  962 F.2d 318 (4th Cir. 1992) ........................................... 27, 33, 46, 50

*Belk, Inc. v. Meyer Corp.*,
  679 F.3d 146 (4th Cir. 2012).................................................. 16, 44

*BidZirk, L.L.C. v. Smith*,
  2007 U.S. Dist. LEXIS 78481 (D.S.C.  2007)
  *aff'd* 2007 U.S. App. LEXIS 5227 (4th Cir. 2007)............................51

*Bolger v. Youngs Drug Prods. Corp.*,
  463 U.S. 60 (1983) .....................................................................48

*Bosley Med. Inst., Inc. v. Kremer*,
  403 F.3d 672 (9th Cir. 2005)..................................................... 28, 29

*CPC Int'l, Inc. v. Skippy, Inc.*,
  214 F.3d 456 (4th Cir. 2000) ..................................................... 29, 31

*Daubert v. Merrell Dow Pharms.*,
  509 U.S. 579 (1993)............................................................ 41, 44, 45

*Dick's Sporting Goods, Inc. v. Dick's Clothing & Sporting Goods, Inc.*,
  1999 U.S. App. LEXIS 19942 (4th Cir. 1999) ..................................36

*Dorr-Oliver, Inc. v. Fluid-Quip, Inc.*,
  94 F.3d 376 (7th Cir. 1996).....................................................33

*Dreyfus Fund, Inc. v. Royal Bank of Canada*,
  525 F.Supp. 1108 (S.D.N.Y. 1981) .................................................36

*Farah v. Esquire Magazine*,
   736 F.3d 528 (D.C.Cir. 2013) ...............................................................28

*Frisch's Restaurant v. Shoney's, Inc.*,
   759 F.2d 1261 (6th Cir. 1985) .............................................................37

*Greater Baltimore Center for Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore*,
   683 F.3d 539 (4th Cir. 2012) .................................................. 48, 49

*Griffith v. Fenrick*,
   486 F.Supp.2d 848 (W.D. Wisc. 2007) .............................................29

*Harolds Stores, Inc. v. Dillard Dept. Stores*, Inc.,
   82 F.3d 1533 (10th Cir. 1996) .............................................................36

*In re Primus*,
   436 U.S. 412 (1978) ............................................................................49

*Jews for Jesus v. Brodsky*,
   993 F.Supp. 282 (D.N.J. 1998) ..........................................................21

*King of the Mt. Sports, Inc. v. Chrysler Corp*,
   185 F.3d 1084 (10th Cir. 1999) ..........................................................38

*L.L. Bean, Inc. v. Drake Publishers, Inc.*,
   811 F.2d 26 (1st Cir. 1987) .......................................................... 29, 31

*Lamparello v.Falwell*,
   420 F.3d 309 (4th Cir. 2005).............................. 20, 27, 33, 35, 36, 46, 47, 48, 50

*Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*,
   507 F.3d 252 (4th Cir. 2007)...........................................................32

*Lucasfilm, Ltd. v. High Frontier*,
   622 F.Supp. 931 (D.D.C. 1985) .........................................................20

*Mastercard Int'l Inc. v. Nader 2000 Primary Comm., Inc.*,
   2004 U.S. Dist. LEXIS 3644 (S.D.N.Y. Mar. 8, 2004) .....................29

*Mattel, Inc. v. MCA Records, Inc.,*
  296 F.3d 894 (9th Cir. 2002) ...............................................................29

*Morris v. Wachovia Sec., Inc.,*
  448 F.3d 268 (4th Cir. 2006)...............................................................15

*NAACP v. Button,*
  371 U.S. 415 (1963)............................................................... 29, 48

*New Kids on the Block v. News Am. Publ'g, Inc.,*
  971 F.2d 302 (9th Cir. 1992)...............................................................47

*New York Times Co. v. Sullivan,*
  376 U.S. 254 (1964)............................................................... 29, 48

*OBH, Inc. v. Spotlight Magazine, Inc.,*
  86 F.Supp.2d 176 (W.D. N.Y. 2000).......................................... 22, 24

*People for Ethical Treatment of Animals v. Doughney,*
  263 F.3d 359 (4th Cir. 2001) ........................................ 21, 22, 36, 50

*Petro Stopping Ctrs, L.P. v. James River Petroleum, Inc.,*
  130 F.3d 88 (4th Cir. 1997)..................................................................15

*Planned Parenthood Federation of America, Inc. v. Bucci,*
  1997 U.S. Dist. LEXIS 3338 (S.D.NY. Mar. 24, 1997) ........................ 21, 22

*Rosetta Stone Ltd. v. Google, Inc.,*
  676 F.3d 144 (4th Cir. 2012)...............................................................32

*Stop the Olympic Prison v. U.S. Olympic Comm.,*
  489 F.Supp. 1112 (S.D.N.Y. 1980) ....................................................30

*Sun Yung Lee v. Zom Clarendon, LP.,*
  453 Fed. Appx. 270 (4th Cir. 2011)......................................................15

*Swatch AG v. Beehive Wholesale, LLC,*
  739 F.3d. 150 (4th Cir. 2014).......................................................... 15, 16

*Taubman Co. v. Webfeats*,
319 F.3d 770 (6th Cir. 2003)................................................................28

*United States ex rel Ubl v. IIF Data Solutions*,
650 F.3d 445 (4th Cir. 2011)..............................................................15

*United States v. Crisp*,
324 F.3d 261 (4th Cir. 2003) ....................................................... 41, 44

*United We Stand America, Inc. v. United We Stand, America New York, Inc.*,
128 F.3d 86 (2nd Cir. 1997) ......................................................... 20, 21

*Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*,
618 F.3d 417 (4th Cir. 2010)..............................................................15

*Utah Lighthouse Ministry v. Found. For Apologetic Info & Research*,
527 F.3d 1045 (10th Cir. 2008) ................................................... 20, 28

*Village of Schaumberg v. Citizens for a Better Environment*,
444 U.S. 620 (1980)...........................................................................30

*Water Pik, Inc. v. Med-Systems, Inc.*,
726 F.3d 1136 (10th Cir. 2013) ........................................................37

*Wehling v. Sandoz Pharms. Corp.*,
162 F.3d 1158 [full text format at 1998 U.S. App. LEXIS 38866 (4th Cir. 1998)
........................................................................................................45

*Westberry v. Gislaved Gummi AB*,
178 F.3d 257, 261 (4th Cir. 1999) ....................................................16

*Yankee Publishing, Inc. v. News America Publishing, Inc.*,
809 F.Supp. 267 (S.D.N.Y. 1992) ....................................................31

**Statutes**

15 U.S.C. § 1114(1)(a)................................................................. 19, 20, 48

15 U.S.C. § 1114(1)(b)...........................................................................19

15 U.S.C. § 1121....................................................................................1

15 U.S.C. § 1125(a)(1),.........................................................................20

15 U.S.C. § 1125(c)(1)..........................................................................48

15 U.S.C. § 1125(c)(3)..........................................................................48

15 U.S.C. § 1125(c)(3)(a) .....................................................................52

15 U.S.C. § 1125(c)(3)(b) .....................................................................52

15 U.S.C. §1125(a)(1)(A) ......................................................................28

15 U.S.C. §1125(a)(1)(B) ......................................................................28

28 U.S.C. § 1291....................................................................................1

28 U.S.C. § 1331....................................................................................1

28 U.S.C. § 1337....................................................................................1

28 U.S.C. § 1338....................................................................................1

28 U.S.C. § 2201....................................................................................1

**Rules**

Federal Rule of Appellate Procedure 4(a)(1)(A) ....................................1

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

This is an appeal from a final judgment of the United States District Court for the Eastern District of Virginia in a declaratory judgment action, pursuant to 28 U.S.C. § 2201, relating to a trademark dispute. The District Court had subject matter jurisdiction pursuant to 15 U.S.C. § 1121 (Trademark) and 28 U.S.C. §§ 1331 (Federal Question), 1337 (Commerce), and 1338 (Trademark and Copyrights). This Court has jurisdiction over this appeal pursuant to 15 U.S.C. § 1121 and 28 U.S.C. § 1291.

The District Court entered its final order on April 24, 2014, which was amended on June 10, 2014[1]. (JA 797A-797ZZ, 803-855). Appellants The Radiance Foundation, Inc. and Ryan Bomberger (collectively, "Radiance") timely filed their Notice of Appeal with the District Clerk on May 23, 2014, within the time allowed by Federal Rule of Appellate Procedure 4(a)(1)(A). (JA 801-802).

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.    Whether the District Court erred by finding that Radiance's noncommercial use of the NAACP's marks and "National Association for the Abortion of Colored People" in a January 2013 news article in order to communicate criticism of the NAACP were "in connection with the sale, offering

---

[1] All references and citations to the District Court's Memorandum Opinion hereafter refer to the Amended Memorandum Opinion entered on June 10, 2014.

1

for sale, distribution, or advertising of any goods or services" and, therefore, actionable under the Lanham Act.

    a.   Whether the District Court erred by finding that Radiance's use of the NAACP's marks and the expression "National Association for the Abortion of Colored People" other than as a source or product identifier of Radiance's goods or services is "in connection with" goods and services.

    b.   Whether the District Court erred by finding that Radiance's noncommercial use of the NAACP's marks and the expression "National Association for the Abortion of Colored People" in social commentary and criticism can be the basis for a Lanham Act claim.

    c.   Whether the District Court erred by finding that the First Amendment does not prohibit the NAACP's Lanham Act claims where Radiance used the NAACP's marks exclusively to refer to the NAACP and the expression "National Association for the Abortion of Colored People" to communicate criticism of the NAACP's position on abortion.

2.     Whether the District Court erred in finding that Radiance's use of the NAACP's marks and "National Association for the Abortion of Colored People" created a likelihood of confusion.

     a.  Whether the District Court erred by finding that confusion as to the true name of the NAACP, as opposed to the source of goods and services, demonstrates likelihood of confusion for a Lanham Act claim.

     b.  Whether the District Court erred by finding that anecdotal evidence that some people who read Radiance's news article complained to the NAACP about its policies in regard to abortion demonstrates likelihood of confusion for a Lanham Act claim.

     c.  Whether the District Court erred by admitting the Ostberg Survey as reliable evidence of actual confusion and dilution.

     d.  Whether the District Court erred in excluding testimony Radiance's expert, Tracy Tuten, Ph.D. on the basis of her lack of trademark litigation specific survey experience.

     e.  Whether the District Court erred by failing to find that a review of the entire content and context of Radiance's use of the NAACP's marks and the expression "National Association for the Abortion of Colored People" precludes a finding of likelihood of confusion.

3.      Whether the District Court erred by finding trademark dilution by tarnishment because in the January 2013 article Radiance made only noncommercial and nominative use of the NAACP's mark and because the article was a form of news reporting and news commentary.

        a.  Whether the District Court erred by failing to find that NAACP's dilution claim was precluded because Radiance's use of the NAACP's famous marks and "National Association for the Abortion of Colored People" was a noncommercial use.

        b.  Whether the District Court erred by failing to find that that NAACP's dilution claim was precluded because Radiance's use of the NAACP's famous marks and "National Association for the Abortion of Colored People" was nominative fair use.

        c.  Whether the District Court erred by failing to find that that NAACP's dilution claim was precluded because it was predicated on the use of the marks and the expression in a form of news reporting and news commentary.

## STATEMENT OF THE CASE

This case involves a dispute regarding The Radiance Foundation and Ryan Bomberger's use of the National Association for the Advancement of Colored People's ("NAACP") trademarks.  In January 2013, Bomberger wrote a news

4

article sharply critical of the NAACP's support of Planned Parenthood and its unwillingness to stand against abortion. (JA 869, 899). The article was titled, "NAACP: National Association for the Abortion of Colored People" and was posted at two of Radiance's internet websites. Upon receiving a cease and desist letter from the NAACP (JA 58), The Radiance Foundation and Ryan Bomberger filed a complaint against the NAACP seeking declaratory judgment that their use of the trademarks of the NAACP and the expression "National Association for the Abortion of Colored People" did not constitute trademark infringement and was privileged under the First Amendment. (JA 17-64). The NAACP answered and counterclaimed asserting trademark infringement and trademark dilution. (JA 65-111).

At a bench trial, Radiance contended that neither "National Association for the Abortion of Colored People" nor any of the NAACP's marks had been used by Radiance in connection with the sale, offering for sale, distribution, or advertising of goods and service. It further claimed that because it had used the NAACP's marks and the expression "National Association for the Abortion of Colored People' in noncommercial, ideological and political speech to communicate criticism of the NAACP, the use was protected under the First Amendment. It also asserted that no dilution claim was viable because a) any use of the NAACP's famous marks had been a fair use, b) the use of the marks and "National

5

Association for the Abortion of Colored People" had been a non-commercial use, and c) such use was in news reporting and news commentary. Finally, it claimed no trademark infringement existed because there was no likelihood of confusion of the marks.

The NAACP contended that Radiance's fundraising and solicitation of assistance from readers of its web sites news articles, rendered use of the marks and the expression "in connection with the sale, offering for sale, distribution, or advertising of goods and services." Further, it claimed, on the basis of survey evidence and complaints to the NAACP about its pro-abortion policies, that the use caused a likelihood of confusion. Finally, it asserted that Radiance's published criticism that it was pro-abortion constituted dilution by tarnishment.

At trial, Radiance proffered the testimony of Tracy Tuten, Ph.D., an expert in consumer survey methodology who had reviewed the NAACP's survey evidence, to render opinions regarding the methodology employed and the impact on the reliability of the survey evidence proffered by the NAACP. (JA 774:13 – 774:23, 911-928). Specifically, Dr. Tuten was prepare to testify that the survey suffered from "five fatal flaws" with the result that the "findings of the Ostberg study [could not] be relied upon for the purposes for which they [were] proffered." (JA 912, 927). The District Court excluded this evidence. (JA 788-797).

At the conclusion of the bench trial, the District Court held that the NAACP had established trademark infringement and dilution through the January 2013 article. (JA 803-855). It entered a permanent injunction against Bomberger and Radiance, but noted that the NAACP had failed to prove monetary damages or to establish that it was entitled to attorney's fees. (JA 798-800, 849-853).

## STATEMENT OF THE FACTS

In 2009, Ryan Bomberger, who is bi-racial, and his wife, Bethany Bomberger, formed The Radiance Foundation. (JA 359:24-360:15, 363:13-364:3, 359:21-359:23, 368:4-368:8). Ryan Bomberger serves as the group's Chief Creative Officer. (JA 359:21-359:23). Radiance is a non-profit corporation (501(c)(3)) dedicated to educating people about social issues from a Christian perspective. (JA 859, 862). Among other things, Radiance provides informational, educational, and community outreach services related to race relations, diversity, adoption, fatherlessness, pop culture, pluralism, and the impact of abortion on the black community. (JA 352, 364:4-364:12, 365:1-365:5, 365:16-365:19).

Radiance owns and maintains a number of websites including the "Radiance site"[2] and the "TooManyAborted site"[3] at issue in this case. (JA 374:2-374:7). It has never owned or operated a website with "NAACP", "National Association for the Advancement of Colored People", "National Association for the Abortion of

[2] Located at www.theradiancefoundation.org.
[3] Located at www.TooManyAborted.com.

7

Colored People" or any of the NAACP's marks in the domain name. (JA 374:8-374:20). When a viewer visits the Radiance webpages, the domain name is presented to the viewer in the address bar at the top of the web browser. Additionally, at the top of every page in the site there appears the logo and the name of either "The Radiance Foundation" or "TooManyAborted.com". On the bottom of every page on both websites is the copyright information identifying The Radiance Foundation as the copyright holder. (JA 375:16-376:2, 377:23-378:14, 857-859; 861-862; 863-870, 873, 404:17-405:2, 405:13-405:24, 874-891, 902-907). Through these websites, Radiance provides information about itself, its founders, and its mission. Additionally, Radiance provides media messages, including news articles, regarding various social issues addressed by Radiance. (JA 386:6-387:8, 390:11-392:7, 861-862).

To support its efforts, Radiance solicits donations through its websites. The Radiance site includes a specific "Donate Today" subpage and a "Donate" button in the side bar on various pages. (JA 379:2-379:21). A viewer wishing to make a donation is ultimately redirected to PayPal where the actual donation transaction occurs. (JA 384:5-385:14, 860, 872). For a brief period of time, the TooManyAborted.com site also included a "Donate" button and a "Donate: Your Gift is Tax Deductible" menu option. Both of these redirected the viewer to the PayPal site. Neither the "Donate Today" page on the Radiance site nor the PayPal

page contained any of the NAACP's marks or the phrase "National Association for the Abortion of Colored People".  (JA 858, 860, 872).  The "Donate" button on the Radiance site includes the words "Click here to give one-time gift to the Radiance Foundation."  Both pages identify the Radiance Foundation as the recipient of the donation.  (JA 379.2-380:25, 385:23-386:5, 415:4-415:25, 858-860, 861-862, 863-871, 872- 873,899, 902-904, 990).

Through the TooManyAborted.com "Take Action" page, Radiance also provides a viewer with the opportunity to support and participate in the TooManyAborted.com anti-abortion billboard campaign.  (JA 902-906).  The TooManyAborted.com billboard campaign was launched in 2010 to educate the public about the impact of abortion on the black community. (JA 352).   The billboard campaign began in Atlanta, Georgia and eventually spread to several other metropolitan areas.   The TooManyAborted.com site invited viewers to sponsor a billboard and provided a means for them to contact Radiance to arrange licensing of the billboard artwork and to arrange creation of state-specific webpage content for the TooManyAborted.com website. (JA 400:9-404:10, 416.8-418:21, 902-906).  None of the billboard artwork, billboards, or Take Action page on the TooManyAborted.com site has displayed any of the NAACP's marks or included the phrase "National Association for the Abortion of Colored People." (JA 415:4-417:5, 423:10-423:12. 902-906).

9

Radiance has not sold, and does not attempt to sell, merchandise through any of its sites, including the Radiance site and the TooManyAborted.com site.  It has, however, provided promotional items (e.g., onesies, stuffed lambs, stickers, etc.) to donors. (JA 368:12-369:17, 372:14-372:20, 420:5-420:24, 853).

The NAACP is the nation's oldest and largest civil rights organization.  It asserts that it does not take a position on abortion, but it admitted that the NAACP "supports a woman's right to choose."  (JA 556:4-556:25, 778:8-779:18).  In 2004, the NAACP issued a resolution stating "women of color seek abortion at rates higher than their percentage in the population" and that "a woman denied the right to control her own body is denied equal protection of the law, a fight the NAACP has fought and defended for nearly a 100 years." (JA 547:16-548:16, 910).  Hilary Shelton, the NAACP's senior vice president for policy and advocacy admitted that several commentators have been critical of the NAACP's policy – or lack of a policy – on the issue of abortion.  (JA 533:9-533:20, 545:24-526:3).

In January 2013, Ryan Bomberger wrote an article regarding the NAACP's annual Images Awards, bearing the headline "NAACP: National Association for the Abortion of Colored People".[4]  It was posted to the "News" sections of the

---

[4] Ryan Bomberger had previously used the phrase "National Association for the Abortion of Colored People" in a June 2011 article and speech in January 2012. (JA 425:15-430:13, 435:13-437:19, 891-898, 956-966).  Neither of these uses is at issue in this appeal as the NAACP based its counterclaim solely on the January

10

TooManyAborted.com and Radiance websites and also appeared at Lifenews.com.[5] (JA 437:19-438:11, 865-866, 869-871, 891-892, 899-901, 973-976). This article addressed the NAACP's Annual Image Awards. (JA 805, 811). In the article Ryan Bomberger used "NAACP" to refer to the Appellee. Specifically, he wrote:

> The NAACP's Annual Image Awards honor black imagery churned out by often racist, anti-Christian, perpetually sexist, violent and pornographic Hollywood.
> . . . .
> Django Unchained, with its graphic violence and 100 plus uses of the racially denigrating epithet, "nigger", gets praise and nominations from the NAACP.
> . . . .
> The NAACP's selective, and often feigned, outrage on a myriad of issues is befitting of a multiple personality disorder, with its stronger personality being one that embraces all things liberal, most things socialistic, and nothing pro-life.
> . . . .
> The NAACP would rather sleep with Planned Parenthood, the urban staple and instigator or sexual irresponsibility, regardless of what people say. The affair has been going on for decades. The NAACP, despite denials has publicly supported Planned Parenthood numerous times . . . . It's fought to prevent the abortion chain from being defunded while simultaneously fighting to ensure a massive influx of funding for its bellowed ally (and annual convention sponsor) . . . .
> . . . .
> The National Association for the Abortion of Colored People has no moral ground to stand upon, just quick sand oozing with the blood of those most discriminated against. The NAACP's covert and

---

2013 article and the District Court's finding of trademark infringement and dilution is limited to that article. (JA 805).

[5] Lifenews.com is an independent website not owned, operated, or controlled by Radiance or Ryan Bomberger. (JA 505:2-505:4, 506:11-506:20).

overt support of Planned Parenthood negates any other human rights they purport to defend.
    . . . .
    As our TooManyAborted.com initiative has shown, today's NAACP is a tragic example of civil rights gone wrong.

(JA 437:19-439:17, 869-871). The article was one of the more than 80 news articles posted in the "Latest News" section of the Radiance site and one of the 115 articles in the "News" section of the TooManyAborted.com site. (JA 389:2-390:8, 392:22-393:15, 411:18-412:14, 414:2-414:9, 863-868, 884-901).

No individual complained to Radiance, to Ryan Bomberger, or to the NAACP that he or she was confused by the use of the marks in the January 2013 article. On the contrary, the comments, emails, and other communications that Radiance received confirmed that readers universally understood that the use of the NAACP's marks and the "National Association for the Abortion of Colored People" was in reference to and in criticism of the NAACP. (JA 442:10-442:19, 471:3-471:22).

Eric Wingerter, the NAACP Vice President for Communications and Digital Media, testified (over Appellant's objection) that individuals contacted his office about "why [the NAACP is] supporting abortion of people of color" and "supporting the genocide of black babies." (JA 575:22-582:23). He did not testify that anyone was confused as to the correct name of the NAACP or that the caller concluded the NAACP was in some way affiliated with Radiance. Although other

12

commentators had criticized the NAACP for its position on abortion, only the criticism leveled by Radiance caused people to complain to the NAACP about its position. However, no one expressed confusion about who the NAACP was, what its real name was, or who the articles were criticizing. (JA 582:7-582:23, 583:3-583:18, 584:1-586:1).

In support of its assertion that the January 2013 article created a likelihood of confusion (and over Appellant's objection) the NAACP introduced a consumer survey prepared by Henry D. Ostberg, Ph.D. (hereafter "the Ostberg Survey"). The Ostberg Survey was a web-based consumer survey, attempting to investigate the potential confusion and dilution. (JA 624:25-625:4, 643:23 - 644:10, 1028-1123). The questionnaire used in the survey presented those surveyed with a copy of the January 2013 article from the Radiance site then asked a variety of questions. (JA 1164-1172). Dr. Ostberg split the potential, relevant respondents into two categories – those with "strong interest" in opposing abortion and those with a "strong interest" in ensuring racial equality. (JA 1124-1162). From the results, Dr. Ostberg concluded that there was evidence of confusion and dilution. (JA 640:23-642:24, 1040-1044).

To counter the Ostberg Survey evidence, Radiance proffered the testimony of Tracy Tuten, Ph.D, a Professor of Marketing at East Carolina University and an expert in consumer survey methodology with special focus on web-based

consumer surveys. (JA 710:15-710:19, 726:9-726:12).  Dr. Tuten's qualifications are extensive.  She was selected twice as a Fulbright scholar. She teaches courses in marketing, including advertising, marketing research, social media marketing, and consumer behavior.  In one of her two Fulbright assignments she taught consumer survey methodology to foreign faculty members.  (JA 709:24-709:25, 710:15-713:11, 715:3-715:12, 929-955).  Dr. Tuten also worked in both corporate and educational environments in the role of survey methodologist. As a survey methodologist, she has designed, executed, and analyzed the data from web-based consumer surveys.   Dr. Tuten designed web based surveys for Virginia Commonwealth University while serving as a Senior Research Associate and for Royal and Company while a Senior Survey Methodologist. She was also a guest scientist at the Center for Survey Research and Methodology in Mannheim, Germany where she researched web-based survey methodology.  (JA 713:12-713:15, 715:13-718:10, 929-955).

Dr. Tuten reviewed Dr. Ostberg's report to assess the survey methods used. She opined that certain "tools" or "methods" are necessary to ensure any consumer survey is scientifically reliable.  It was her opinion, and she was prepared to testify, that the Ostberg Survey suffered fatal flaws in methodology that rendered it unreliable.  (JA 729:5-730:10, 742:3-743:4, 747:19-748:3).  However, prior to trial, the District Court limited the permitted scope of Dr. Tuten's testimony.

14

While it permitted Dr. Tuten to testify about general consumer survey principles and methodologies, it precluded her from offering opinions related to trademark dilution and likelihood of consumer confusion or from applying her knowledge of general consumer survey principles and methodologies to the Ostberg Survey.  (JA 759:3-760:20, 764:10-765:4, 766:2-766:23, 788-797).

## STANDARD OF REVIEW

In this case, where judgment was entered following a bench trial, this Court must use a "mixed standard of review." *Sun Yung Lee v. Zom Clarendon, LP.,* 453 Fed. Appx. 270, 274 (4th Cir. 2011) (citing *Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.,* 618 F.3d 417, 427 (4th Cir. 2010)).  Under this mixed standard, this Court reviews the District Court's factual findings for clear error. *Swatch AG v. Beehive Wholesale, LLC,* 739 F.3d. 150, 154-55 (4th Cir. 2014). Likewise, a district court's decision to exclude expert testimony is reviewed for "abuse of discretion."  *United States ex rel Ubl v. IIF Data Solutions,* 650 F.3d 445, 454 (4th Cir. 2011) (citations omitted).  Clear error and abuse of discretion exist either when there is no evidence to support those findings or when this Court is "left with a definite and firm conviction that a mistake has been committed." *Petro Stopping Ctrs., L.P. v. James River Petroleum, Inc.,* 130 F.3d 88, 92 (4th Cir. 1997).  *See also Morris v. Wachovia Sec., Inc.,* 448 F.3d 268, 277 (4th Cir. 2006). Abuse of discretion may also be found where the trial court's "conclusion is guided

15

by erroneous legal principles." *Belk, Inc. v. Meyer Corp.,* 679 F.3d 146, 162 (4th Cir. 2012) (quoting *Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 261 (4th Cir. 1999)). The District Court's legal conclusions are reviewed *de novo. Swatch,* 739 F.3d at 154-55.

    With these principles in mind, this Court should review the District Court's errors as set forth in sections I(i), I(ii), I(iii), III(i), and III (iii) *de novo* as these errors rest on the District Court's incorrect legal conclusions. The Court should review the District Court's errors as set forth in sections II(i) through II(iv) for abuse of discretion as they pertain to the court's factual findings and exclusion of expert testimony. Finally, the Court must take a mixed approach when reviewing the errors addressed in sections II(v) and III(ii) as those errors are a mixed question of law and fact.

## SUMMARY OF THE ARGUMENT

    The District Court erred in finding that the NAACP had proved trademark infringement and dilution under the Lanham Act. For trademark infringement, the Lanham Act requires that the use of the accused mark be in connection with the advertising, sale or distribution of goods or services. Here, Radiance used the NAACP's marks exclusively to refer to the NAACP and it used the expression, "National Association for the Abortion of Colored People" to communicate its view that the NAACP supports abortion. Radiance did not use either as a source

identifier for itself or its goods and services.  Further, the speech in which the mark and expression were used was not commercial speech.  Rather, it was social criticism and commentary which did not propose a commercial transaction. Accordingly, the use of the marks and the expression does not satisfy the "in connection with" requirement of the Lanham Act and, moreover, is protected speech under the First Amendment.

The District Court also erred in admitting and crediting certain evidence regarding likelihood of confusion on the trademark infringement claims. Specifically, it erroneously credited evidence that consumers may have been confused as to the actual name of the NAACP as confusion relevant to trademark infringement.  It also credited testimony that readers called the NAACP after reviewing the article as anecdotal evidence of actual confusion when the evidence showed readers plainly were not confused about the source of the information.  It also accepted as reliable evidence of actual confusion a survey that assessed confusion from the wrong population, asked ambiguous and biased questions of the survey participants, and provided them with the stimulant, i.e. the article in question, in a manner in which it would not have been encountered by readers on the Internet.  The District Court erred by refusing to permit Radiance's expert in web-based consumer survey methodology to testify that the methodology employed by the NAACP's survey expert rendered the survey unreliable and

invalid, even though the court concluded she was an expert in web-based consumer survey methodology because the court concluded she was not sufficiently experienced in surveys done for trademark infringement litigation. Finally, the court erred by failing to consider Radiance's use of the marks and expression in the entirety. Had it done so, it would have found that the entirety of the text was so sharply critical of the NAACP that no rational reader would have been confused that it created, offered, approved or sponsored the creation of the article.

The District Court also erred by finding that the NAACP had proved a dilution claim under the Lanham Act. It erred by failing to find that Radiance's use of the NAACP's famous mark was a nominative use because it (and the expression "National Association for the Abortion of Colored People) was used to refer to the NAACP. Further, the use was also a noncommercial use because the article proposed no commercial transaction; it simply criticized the NAACP's position on abortion. Finally, although the court acknowledged that the article in question was a news article, it found dilution notwithstanding the Lanham Act's prohibition that any form of news reporting and news commentary may not be the basis for a dilution claim. In short, the District Court committed clear error by finding that Radiance was liable for dilution by tarnishment.

## **ARGUMENT**

I.  **The District Court erred by finding that Radiance's noncommercial use of the NAACP's marks and "National Association for the Abortion of Colored People" in the January 2013 news article in order to communicate criticism of the NAACP were "in connection with the sale, offering for sale, distribution, or advertising of any goods or services."**

Trademark infringement under the Lanham Act requires that the trademark be used "in connection with the sale, offering for sale, distribution, or advertising of any goods or services." 15 U.S.C. § 1114(1)(a) & (b). The District Court concluded that Radiance's use of NAACP's marks was "in connection" with "goods or services" for four reasons: 1) a Google Alert listed the Lifenews.com article as the number 2 search result, which the District Court concluded might divert internet users to the article, as opposed to the NAACP's website; 2) Radiance provided information through its websites to persuade users that abortion is wrong; 3) the article was part of social commentary and criticism for which they solicit donations and billboard sponsorship; 4) Bomberger solicited fundraising in relation to this dispute. (JA 824-827). This Court should reverse the District Court's finding as Radiance used the NAACP's marks and "National Association for the Abortion of Colored People" in First Amendment protected, communicative and noncommercial speech and neither was used "in connection with the sale, distribution, or advertising of any goods or services."

i.   *Radiance did not use the NAACP's marks or "National Association for the Abortion of Colored People" as a source or product identifier of any goods or services and, therefore, the use of these was not "in connection with".*

Both Sections 32 and 43a of the Lanham Act require that infringement claims must be predicated upon use of a mark as a source or product identifier of goods or services.  15 U.S.C. §§ 1114(1)(a), 1125(a)(1).  *See also Lamparello v. Falwell*, 420 F.3d 309, 314 (4th Cir. 2005) (stating that the sections "pertain only to the use of a mark 'in connection with the sale, offering for sale, distribution, or advertising of any goods or services,' 15 U.S.C. § 1114(1)(a), or 'in connection with any goods or services,' *id*. § 1125(a)(1).").  While this Court and others have been reluctant to narrowly construe the "goods and services" to which a mark's use might relate*, Id., United We Stand America, Inc. v. United We Stand, America New York, Inc.*, 128 F.3d 86, 90 (2nd Cir. 1997), use of a mark to communicate ideas rather than as an source or product identifier cannot be the basis for an infringement claim.  *Lucasfilm, Ltd. v. High Frontier,* 622 F.Supp. 931, 934 (D.D.C. 1985) (stating "Defendants use star wars in the body of their message in a descriptive manner to communicate ideas, rather than to create confusion as to sponsorship.  Such use of a trademark is not prohibited.")  As the Tenth Circuit notes in *Utah Lighthouse Ministry v. Found. For Apologetic Info & Research* "[u]nless there is a competing good or service labeled or associated with the . . . trademark, the concerns of the Lanham Act are not invoked." 527 F.3d 1045, 1054

(10th Cir. 2008). In the present case, there is no dispute that Radiance's use of the NAACP's marks and "National Association for the Abortion of Colored People" was not to identify the source of their goods and services or, in fact, to identify <u>any</u> goods and services. It was to communicate an idea. It was to express criticism of the NAACP's position and policies regarding abortion. As such, there is an insufficient nexus between Radiance's goods and services and its use of the NAACP's marks to find trademark infringement.

The District Court relies upon this Court's decision in *People for Ethical Treatment of Animals v. Doughney,* 263 F.3d 359 (4th Cir. 2001) (hereafter "*PETA*"); *United We Stand America, Inc.*, 128 F.3d 86; *Jews for Jesus v. Brodsky,* 993 F.Supp. 282 (D.N.J. 1998); and *Planned Parenthood Federation of America, Inc. v. Bucci,* 1997 U.S. Dist. LEXIS 3338, (S.D.NY. Mar. 24, 1997), to support its "in connection with" finding. In each of these cases*,* the alleged infringer used the mark of the markholder in the domain name of its website or in the organization's name. *PETA,* 263 F.3d at 362 (defendant "registered the domain name *peta.org*"); *United We Stand,* 128 F.3d at 88 (action by United We Stand America, Inc. to enjoin the use of its registered service mark "United We Stand America" by defendant United We Stand, America New York, Inc.); *Bucci,* 1997 U.S. Dist. LEXIS 3338, *1 (plaintiff seeking to prevent defendant "from using the domain name "plannedparenthood.com."). The necessary nexus between a name for a

21

business and the goods and services offered by that business exists because of the unremarkable and commonplace inference that a business' name identifies the source of the goods and services it offers.  In the same fashion, Internet users often rightly regard a domain name as indicative of the company or brand whose goods and services are offered at the site identified by the domain name.  *OBH, Inc. v. Spotlight Magazine, Inc.,* 86 F.Supp.2d 176, 180 (W.D. N.Y. 2000) ("Users often assume, as a rule of thumb, that the domain name of a particular company will be the company name followed by '.com.' . . . Sometimes, a trademark is better known than the company itself, in which case a user may assume that the domain address will be 'trademark'.com").  Thus, where a brand or company name is used in the domain name, the use "in connection with" requirement of the Lanham Act is satisfied, either because the alleged infringer "may have prevented users from obtaining or using" the markholder's goods and services," *PETA,* 263 F.3d at 365, or because the site itself offers competitive goods or services, *Bucci,* 1997 U.S. Dist. LEXIS at *14.

Here, however, "Radiance has never owned or operated a website with any of the NAACP Marks or 'National Association for the Abortion of Colored People' in the domain name." (JA 811).  Thus, the news article in question was located at a page plainly identified with either the URL theradiancefoundation.org or toomanyaborted.com.  (JA 869-871, 899-901).  And Radiance has also never

22

used the NAACP marks or "National Association for the Abortion of Colored People" to identify itself. These significant differences demonstrate that *PETA* and similar cases (i.e. where the alleged infringer used the mark in either the domain name or the organization name) are inapposite.

The District Court attempts to remedy this shortcoming by asserting that use "in connection with" was demonstrated because the article "could be accessed through a Google search for 'NAACP' diverting Internet users to Radiances' article as opposed to the NAACP's websites." (JA 825) There are two flaws in this conclusion. First, where an alleged infringer selects a domain name strikingly similar to another's mark, it may reasonably be said that the infringer's use of the similar mark as its own URL (i.e. Uniform Resource Locater) may cause consumer diversion and, therefore, demonstrate that the infringer is using the similar mark "in connection with" with its own goods and services. However, where a user makes inquiry from a third party (e.g. Google or any other search engine provider) and the third party provides information responsive to the inquiry, including the allegedly infringing material, it is unreasonable to conclude that the alleged infringer caused the diversion. This is particularly true where there is no evidence presented about the method used by the third party to discriminate between responsive and unresponsive information or to show that the alleged infringer knew that its use would provide access to persons attempting to reach its

competitor.  Here, while the NAACP received the Google alert in response to an inquiry about the "NAACP", no evidence was presented showing how responsive information was selected.  In fact, the NAACP's witness could not even say that the Google alert would return the same information as a Google search.  (JA 527:9-527:24).  More importantly, no evidence was presented to show that Radiance knew how the Google alert worked so as to divert the NAACP's consumers.

The second flaw is related to the first:  if the Google alert is presented to demonstrate that users searching for the NAACP would have been directed to NAACP sites but for Radiance's use of the marks, it fails on its face.  None of the entries on the exhibit reference an NAACP web site.  Rather, they show stories from a variety of news reporting entities, including the Santa Cruz Sentinel, the Gainesville Sun, the Mt. Vernon Register, and the Winston-Salem Journal.  (JA 1008-1010).  Furthermore, no testimony established that a user employing the Google alert would have, but for Radiance's alleged infringing use, received a report showing the NAACP's sites.  Finally, no evidence supported the conclusion that a user employing a Google alert would have reasonably concluded that the results returned for NAACP would have included only NAACP sites. *See OBH, Inc.,* 86 F.Supp.2d at 180-181 (discussing the reasons for a markholder's preference to employ a company or brand name in the domain name).

The District Court's conclusion that Radiance's fund-raising activities demonstrate use "in connection with" is similarly in error (whether such activities were contemporaneous with its publication of the news article in question or after the initiation of the dispute). To be sure, of the four bases the District Court cites for finding that use of the NAACP's marks was "in connection" with goods or services, only the presence of a "Donate" button even relates to the specific and limited location in which the marks were used. While the District Court correctly noted that Radiance included a "Donate" button on the same page as the article using the NAACP's mark, it overlooked the fact that that button clearly states in words above and below "DONATE", "Click here to give one-time gift to the Radiance Foundation." (JA 869). Moreover, clicking on the button redirects the user to a different page for the actual donation. (JA 384:5-384:8, 385:2-385:14, 872). Nowhere on any of the pages in which the actual donation takes place do any of the NAACP's marks appear. Instead the recipient is clearly identified as The Radiance Foundation. (JA 860, 872). Furthermore, on the news pages where the NAACP's marks are used in the January 2013 article, The Radiance Foundation, TooManyAborted.com, or LifeNews.com are clearly identified as the source of, and the organization responsible for, the website. (JA 863-971, 884-901).

Significantly, the fact that Radiances' websites may offer goods or services with Radiance identified as the source of those services in one section remote from the allegedly infringing text does not render the use of the NAACP's marks in social commentary and criticism on another portion of the website "in connection with" those goods or services. To hold otherwise would threaten the ability of newspapers, news websites, and magazines, which are inherently commercial enterprises, to offer editorials and commentary on social and political issues without fear of being hauled into court when a mark holder disagrees with the commentary.

Radiance did not use the NAACP marks or "National Association for the Abortion of Colored People" to identify itself or designate itself as the sponsor or origin of its websites, or its goods and services. Instead, it was used, as the text of the article itself plainly demonstrates, to identify the NAACP for purposes of criticism and commentary. (JA 869-871, 899-900). Indeed, in large, the District Court acknowledged this when it wrote:

> 1) "Bomberger wrote three news articles critiquing the NAACP's position on abortion" (JA 804);
>
> 2) "Bomberger used the term 'National Association for the Abortion of Colored People' in order to convey to people that the actual NAACP is pro-abortion." (JA 809);
>
> 3) "Bomberger wrote an article regarding the NAACP's Annual Image Awards." (JA 811);

4) "Plaintiffs . . . use[d] the NAACP's Marks as part of social commentary and criticism." (JA 826);

5) "The Court recognizes Radiance['s] . . . use of 'Image Awards' and the Scales of Justice Seal as nominative fair use." (JA 845), and;

6) "[T]he majority of instances [where] 'NAACP' appeared in the January 2013 Article was in reference to the NAACP. . ." (JA 846).[6]

Indeed, even as the District Court held that the juxtaposition of "NAACP" with "National Association for the Abortion of Colored People" was not nominative fair use because the latter term "is not the actual name of the NAACP" but a "fictitious organization" (JA 847), it was conceding that Radiance had not used the terms to identify itself or its goods or services.  In short, while Radiance contends that its use of the expression was a satirical nominative use, even accepting the District Court's conclusion that it was not, the court nevertheless recognized that the marks were not being used as a source identifier for Radiance or its goods and services.

The evidence here overwhelmingly demonstrated that Radiance used the NAACP's marks and "National Association for the Abortion of Colored People"

---

[6] The District Court's finding that the majority of uses of the NAACP's marks were nominative but others were not ignores this Court's guidance that the allegedly infringing work be considered "in its entirety."  *See Lamparello,* 420 F.3d at 316 (4th Cir. 2005)*; Anheuser-Busch, Inc. v. L&L Wings, Inc.,* 962 F.2d 316, 319 (4th Cir. 1992).

not to identify itself or to designate the source of its goods and services, but rather to identify the target of its criticism and to express that criticism.

> ii.  *Radiance's noncommercial use of the NAACP's marks and "National Association for the Abortion of Colored People" in social commentary and criticism does not satisfy the "in connection with" requirement of the Lanham Act.*

Use of marks in noncommercial speech which is social and political commentary does not constitute the type of use "in connection with" goods and services to which the Lanham Act was intended to apply.  At least four circuit courts of appeals have concluded that the fact that the speech is noncommercial alone renders a Lanham Act claim upon it unavailing.  *Taubman Co. v. Webfeats*, 319 F.3d 770, 774 (6th Cir. 2003); *Bosley Med. Inst., Inc. v. Kremer,* 403 F.3d 672, 674 (9th Cir.); *Utah Lighthouse Ministry v. Found. For Apologetic Info & Research*, 527 F.3d 1045, 1054 (10th Cir. 2008); *Farah v. Esquire Magazine*, 736 F.3d 528, 541 (D.C.Cir. 2013) (noting "Every circuit court of appeals to address the scope of [15 U.S.C. §1125(a)(1)(A) & (B)] has held they apply only to commercial speech.").  While this Court has been hesitant to adopt a *per se* rule regarding use in noncommercial speech, it should do so here.  *See Lamparello,* 420 F.3d at 313-14.

But even failing the adoption of such a rule the fact that the speech in question was noncommercial, social commentary and criticism should weigh heavily in favor of concluding that the Lanham Act's "in connection with"

28

requirement is not satisfied.  Indeed, this Court has recognized the concern that the Lanham Act should not be used to "enjoin the use of [a] mark in a noncommercial context found to be negative or offensive" so as to allow the trademark owner to "shield itself from criticism".  *CPC Int'l, Inc. v. Skippy, Inc*., 214 F.3d 456, 462 (4th Cir. 2000) (quoting *L.L. Bean, Inc. v. Drake Publishers, Inc.*, 811 F.2d 26, 33 (1st Cir. 1987)).

The speech at issue here is plainly noncommercial.  In *New York Times Co. v. Sullivan,* the Supreme Court clearly stated that speech is not commercial in nature where "[i]t communicated information, expressed opinion, recited grievances, protested claimed abuses, and sought financial support on behalf of a movement whose existence and objectives are matters of the highest public interest and concern." 376 U.S. 254, 266 (1964) (citing *NAACP v. Button,* 371 U.S. 415, 435 (1963)).  The Lanham Act and trademark law in general "do not entitle the owner to quash an unauthorized use of the mark by another who is communicating ideas or expressing points of view." *Bosley Med. Inst., Inc. v. Kremer,* 403 F.3d 672, 677 (9th Cir. 2005) (quoting *Mattel, Inc. v. MCA Records, Inc.,* 296 F.3d 894, 900 (9th Cir. 2002)).

The District Court recognized that Radiance was providing social commentary and criticism of the NAACP in the January 2013 article.  While Radiance did solicit donations, such solicitations do not render the social

commentary and criticism commercial in character. *See, e.g.*, *Mastercard Int'l Inc. v. Nader 2000 Primary Comm., Inc.,* 2004 U.S. Dist. LEXIS 3644 (S.D.N.Y. Mar. 8, 2004); *American Family Life Ins. Co. v. Hagan*, 266 F.Supp.2d 682 (N.D. Ohio 2002). As the court in *Griffith v. Fenrick* explained, "to the extent that defendant sought campaign contributions, any such solicitations were ancillary to his political campaign and protected speech." 486 F.Supp.2d 848, 853 (W.D. Wisc. 2007). Similarly, in *Stop the Olympic Prison v. U.S. Olympic Comm.*, the court found that contributions to an organization opposing the creation of a prison at the location of the Lake Placid Olympics did not make the use of the "Olympics" mark commercial. 489 F.Supp. 1112, 1121 (S.D.N.Y. 1980). As the Supreme Court explained in *Village of Schaumberg v. Citizens for a Better Environment*, "because charitable solicitation does more than inform private economic decisions and is not primarily concerned with providing information about the characteristics of goods and services, it has not been dealt with in our cases as a variety of purely commercial speech." 444 U.S. 620, 632 (1980). Thus, the "Donation" box next to Radiance's criticism of the NAACP's stand on abortion does not render the use of NAACP's mark commercial or "in connection with" the sale of goods or services.

The District Court plainly and correctly recognized that the speech in question was social commentary and criticism. It erred in concluding that the fact Radiance solicited donations for its mission and, on pages other than the pages

where the news article was presented, offered to license its artwork to others willing to present its viewpoint, rendered the use of the marks in the speech, "in connection with" goods and services.

> iii.   *Radiance used the NAACP's marks and "National Association for the Abortion of Colored People" in noncommercial speech to criticize the NAACP's position on abortion and, accordingly, the First Amendment prohibits a claim for infringement or dilution.*

The District Court found, as stipulated by the parties, that "Bomberger used the term 'National Association for the Abortion of Colored People' in order to convey to people that the actual NAACP is pro-abortion." (JA 809). The fact that the alleged infringing expression was used to communicate this message renders the use protected by the First Amendment.

> [T]he First Amendment confers a measure of protection for the unauthorized use of trademarks when that use is part of the expression of a communicative message.
>
> Because the trademark law regulates the use of words, picture, and other symbols, it can conflict with values protected by the First Amendment. The grant to one person of the exclusive right to use a set of words or symbols in trade can collide with the free speech rights of others. When another's trademark (or a confusingly similar mark) is used without permission *for the purpose of source identification*, the trademark law generally prevails over the First Amendment.
> . . . .
> However, when unauthorized use of another's mark is part of a communicative message and not a source identifier, the First Amendment is implicated in opposition to the trademark right.

*Yankee Publishing, Inc. v. News America Publishing, Inc.,* 809 F.Supp. 267, 275-76 (S.D.N.Y. 1992) (emphasis in original). This Court has acknowledged the

31

potential danger of permitting trademark owners to shield themselves from criticism by enjoining the use of its mark in noncommercial speech. *CPC Int'l, Inc.*, 214 F.3d at 462, *quoting L.L. Bean, Inc. v. Drake Publishers, Inc.* 811 F.2d 26, 33 (1st Cir. 1987).

Here, Radiance's use of the NAACP's marks and "National Association for the Abortion of Colored People" was simply to communicate its criticism of the NAACP and its policies and position on abortion.   The District Court found that the expression was used to communicate Radiance's view that the NAACP was pro-abortion and, without question, that intent is plain from the text of the article itself.  The speech was also non-commercial.  Nowhere, in the contents of the January 2103 news article is any commercial transaction proposed or contemplated.  On these facts, the District Court erred by concluding that the First Amendment did not prohibit Defendant's claims.

## II.     The District Court erred in finding that Radiance's use of the NAACP's marks created a likelihood of confusion.

This Court looks to nine (9) factors when considering whether there is a likelihood of confusion - 1) the strength or distinctiveness of the mark; 2) the similarity of the two marks to consumers; 3) the similarity of the goods or services that the marks identify; 4) the similarity of the facilities used by the markholders; 5) the similarity of advertising used by the markholders; 6) the defendant's intent; 7) actual confusion; 8) the quality of the defendant's product; and 9) the

32

sophistication of the consuming public. *See Rosetta Stone Ltd. v. Google, Inc.,* 676 F.3d 144, 153 (4th Cir. 2012). These factors are neither exhaustive nor mandatory. Nor are they weighted equally in every case. *See Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC,* 507 F.3d 252, 259-60 (4th Cir. 2007).

The District Court found that each factor favored a finding of a likelihood of confusion. However, in so finding, the court improperly relied upon alleged confusion in areas other than confusion as to the source. In fact, while the District Court found that confusion was likely, it did not relate that confusion as to either the source of the article or the source of the goods and services. In *Lamparello v. Falwell,* this Court made it clear that "[t]he use of a competitor's mark that does not cause confusion *as to source* is permissible." 420 F.3d at 314 (emphasis added) (quoting *Dorr-Oliver, Inc. v. Fluid-Quip, Inc.,* 94 F.3d 376, 380 (7th Cir. 1996)). *See also Anheuser-Busch, Inc. v. L & L Wings, Inc.,* 962 F.2d at 318 ("an unauthorized use of a trademark infringes the trademark holder's rights if it is likely to confuse an 'ordinary consumer' as to the source or sponsorship of the goods."). The evidence of confusion in this case does not support a finding of likelihood of confusion as to source or sponsorship.

> i.  *The District Court's finding of an intent to confuse as to the true name of the NAACP is irrelevant to the likelihood of confusion.*

The District Court found that Radiance intended to confuse the public. The court concluded that the title of the January 2013 article – "NAACP: National

Association for the Abortion of Colored People" – "impli[ed] that the acronym "NAACP" stood for its designation as opposed to the actual name of Defendant's organization." (JA 831). First, Radiance notes that there is no evidence of an intent to mislead or confuse in this way. Bomberger's uncontradicted testimony established that he did not intend to confuse people regarding the name of the NAACP but "to use a parody to highlight the pro-abortion position of the NAACP." (JA 445:3-445:16) Second, confusion as to the true name of the NAACP does not establish confusion as to source. Even if Bomberger intended to confuse in this way, he was not intending to confuse consumers as to the source of Radiance's goods or services.

> ii. *The anecdotal evidence of confusion does not demonstrate confusion as to source.*

The District Court concluded that there was anecdotal evidence of actual confusion. The court relied upon the testimony of Eric Wingerter, the NAACP's Vice President for Communications and Digital media. Mr. Wingerter testified that his office received a number of phone calls "asking us why we were supporting abortion of people of color" or stating that they "can't believe that you are supporting the genocide of black babies." (JA 582:7-582:23). The court concluded that this evidence demonstrated that the January 2013 article "confused the public regarding whether a pro-abortion position was represented by trademarks ascribed to the NAACP." (JA 833). Even accepting as true the

questionable proposition that the NAACP does not support abortion rights, a caller's confusion as to the policies of the NAACP after reading the January 2013 article is not the type of confusion implicated and protected against by trademark infringement. Certainly these individuals, who called the NAACP, not Radiance, to complain about its position on abortion, were not confused by the source of the article or confused into believing that Radiance was in some way affiliated with the NAACP. *See Lamparello,* 420 F.3d at 315. ("[T]he fact that people contacted Reverend Falwell's ministry to report that they found the content at www.fallwell.com antithetical to Reverend Falwell's views does not illustrate, as Reverend Falwell claims, that the website engendered actual confusion.")

     *iii.    The NAACP's survey of actual confusion was unreliable.*

The District Court also relied upon the survey evidence from NAACP's expert, Dr. Ostberg. However, the Ostberg Survey suffers from significant flaws that render its results unreliable and/or irrelevant to the issue of whether consumers would be confused as to source.

The court noted that approximately 8% of respondents believed there was an affiliation between "the people who use the term 'National Association for the Abortion of Colored People' and the NAACP". (JA 834). The court further noted that 5% of respondents believed that "the people who use the term ''National Association for the Abortion of Colored People' needed permission or approval"

35

from the NAACP. (JA 834). These finding are unreliable as they rely upon an improper universe of respondents, were prompted by presenting the article divorced from the manner in which it would normally be viewed, and were returned in response to ambiguous questions resulting in likely inflated numbers.

First, this part of Dr. Ostberg's survey relied upon an inapplicable universe of respondents. An actual confusion survey "should sample an adequate or proper universe of respondents." *Dick's Sporting Goods, Inc. v. Dick's Clothing & Sporting Goods, Inc*., 1999 U.S. App. LEXIS 19942, *14 (4th Cir. 1999) (quoting *Harolds Stores, Inc. v. Dillard Dept. Stores*, Inc., 82 F.3d 1533, 1544 (10th Cir. 1996)). "To be probative and meaningful, however, surveys…must rely upon responses by potential consumers of the products in question." *Dreyfus Fund, Inc. v. Royal Bank of Canada*, 525 F.Supp. 1108 (S.D.N.Y. 1981). Where a party has used another party's trademark for the purpose of offering opposing views and criticism, this Court has suggested that the proper group from which one should assess likelihood of confusion is the markholder's own potential "consumers." *See Lamparello,* 420 F.3d at 315 ("those searching for Reverend Falwell's site and arriving instead at Lamparello's site quickly realized that Reverend Falwell was *not* the source of the content therein."). *See also PETA,* 263 F.3d at 366. Thus, in this setting, the proper universe of respondents should have been those likely to be consumers of the NAACP, which Dr. Ostberg identified as those having a "strong

interest in ensuring racial equality."[7]  Instead, however, Dr. Ostberg only included people who self-identified as having a "strong interest in opposing abortion", which he concluded were Radiance's potential consumers, but excluded those identifying as having a "strong interest in ensuring racial equality."  (JA 1034, 1046-1084).

Even if it was not error to rely upon Radiance's universe of potential supporters, the exclusion of those identifying as having a "strong interest in ensuring racial equality" rendered the results unreliable.  As is undisputed, Radiance provides community outreach services to organizations and individuals, including outreach on educational, character development, social issues, and racism against the black community.  It is reasonable to assume that had individuals with a "strong interest in ensuring racial equality" been included in the actual confusion survey, the percentage of individuals actually confused would drop significantly.  Dr. Ostberg clearly selected the universe of respondents that rendered the results required by the NAACP.  Surveys demonstrating a bias that "reflect an advocate's point of view" are not reliable evidence of confusion. *See e.g., Frisch's Restaurant v. Shoney's, Inc.,* 759 F.2d 1261, 1268 (6th Cir. 1985).

_____

[7] Notably, the District Court relied upon the Google alert results for "NAACP" and the potential for viewers to be misdirected as evidence of use in connection with goods and services.  Such misdirected viewer is far more likely to identify as having a "strong interest in ensuring racial equality" than "strong interest in opposing abortion."

Second, respondents were shown the article without any context in which they would have accessed it. As numerous courts have recognized, "[m]arks should be compared 'as a whole as they are encountered by consumers in the marketplace." *Water Pik, Inc. v. Med-Systems, Inc*., 726 F.3d 1136, 1146 (10th Cir. 2013) (quoting *King of the Mt. Sports, Inc. v. Chrysler Corp*, 185 F.3d 1084, 1090 (10th Cir. 1999)). The January 2013 article was one of over 100 articles on the TooManyAborted.com site and one of over 80 articles on the Radiance site. (JA 388:9-390:5, 411:15-414:25, Pl. Ex. 2027 to 2043; Pl. Ex. 2094 to 2124). It is highly improbable that individuals with only a "strong interest in opposing abortion" would come upon the January 2013 article divorced of the greater context of Radiance's websites as a whole.

Third, Dr. Ostberg's questions were ambiguous and designed to overstate results. For example, the phrase "the people who use" does not clearly indicate whether Dr. Ostberg was asking about the possible author of the article, the Radiance Foundation, third parties who use the phrase, or a fictitious entity called the National Association for the Abortion of Colored People. (JA 1169). Notably, in response to both questions, a significant number of the respondents relied upon for evidence of confusion only identified "NAACP", not National Association for the Advancement of Colored People, as the affiliated organization or organization from whom permission was "needed" (5% and 7% of total respondents

38

respectively. (JA 1128, 1131). In light of the fact that 10% of respondents allegedly believed that "National Association for the Abortion of Colored People" is an actual entity and that 10% allegedly believed that the NAACP's full name was "National Association for the Abortion of Colored People" or otherwise included "abortion", these people could easily have been indicating that they thought this was the real name of the NAACP or a third entity. It does not demonstrate that those individuals thought that Radiance was in any way affiliated with the NAACP or that Radiance was required to get the real NAACP's permission.

Likewise, asking whether Radiance "needed permission or approval" does not limit the potential responses to those who actually believe permission was given. (JA 1169). The potential responses to this second question included people who, while not actually believing that Radiance received such permission, believe that it should have. Individuals who believe that Radiance should have (needed to) receive the NAACP's permission are not necessarily confused as to the sponsorship of the article, and are thus irrelevant to the issue of confusion. This is evidenced by the fact that Dr. Ostberg's follow up question for these individuals was "Why do you think the [NAACP] needed to give their permission?" (JA 1132-1133, 1169). He did not ask these individuals why they believed the NAACP *had*

given their approval. In fact, one respondent clearly responded that it "doesn't seem like NAACP would support it." *Id.*

The court also noted that 10% of respondents allegedly believed that "National Association for the Abortion of Colored People" is an actual entity and that 10% allegedly believed that the NAACP's full name was "National Association for the Abortion of Colored People" or otherwise included "abortion". Again, this statistic is misleading because Dr. Ostberg did not use a control group. (JA 690:11-690:23). Thus, we do not know what percentage of people would be unable to correctly state the full name of the NAACP prior to the survey. If a viewer is confused as to the correct name of the NAACP prior to viewing the Radiance article, then the article did not cause the confusion. More importantly, however, confusion about whether the NAACP is really the "National Association for the Abortion of Colored People" or whether such third party actually exists is not actionable as trademark infringement. Such confusion is not confusion as to the source of Radiance's goods or services. While this type of confusion might support a dilution by blurring claim, that is a distinct claim, with separate defenses,[8] that Dr. Ostberg did not test[9] and the District Court did not find applicable.

---

[8] See *infra* § III.

[9] Dr. Ostberg conceded that the proper population to assess a dilution claim would be those persons likely to encounter the senior user's mark (i.e. the NAACP

40

iv.    *The District Court improperly excluded the competent expert testimony of Tracy Tuten, Ph.D demonstrating the unreliability of the Ostberg Survey.*

The District Court excluded Radiance's expert, Tracy Tuten, Ph.D. from testifying to the limitations and defects in the Ostberg Survey because "Dr. Tuten is unfamiliar with basic trademark law concepts, commonly used trademark litigation survey methods, and interpretation of statistical tables to measure dilution and confusion." (JA 793). However, the court found Dr. Tuten qualified "as a general consumer survey methodologist." (*Id.*)  In so holding, the District Court created a false distinction between general scientific survey methodology and surveys created specifically for litigation.  This holding is in direct conflict with the principles of *Daubert v. Merrell Dow Pharms.,* 509 U.S. 579 (1993).

As this Court noted in *United States v. Crisp,* the *Daubert* Court

> announced five factors that may be used in assessing the relevancy and reliability of expert testimony: (1) whether the particular scientific theory ''can be (and has been) tested"; (2) whether the theory "has been subjected to peer review and publication"; (3) the "known or potential rate of error"; (4) the "existence and maintenance of standards controlling the technique's operation"; (5) and whether the technique has achieved "general acceptance" in the relevant scientific or expert community."

---

supporters). (JA 602:23-603:4).  However, these statistics come only from persons he asserted would be likely to encounter the junior user's mark – i.e. only persons who have a "strong interest" in "[o]pposing abortion". (JA 652:5-653:18).  Thus, these findings in his survey would not be evidence of dilution.

41

324 F.3d 261, 265-66 (4th Cir. 2003) (quoting *Daubert,* 509 U.S. at 593-94).
Dr. Tuten's qualifications and the basis of her opinions clearly satisfy these
requirements.

A review of Dr. Tuten's curriculum vitae demonstrates her substantial
qualifications for providing opinion testimony concerning the methodology
employed in the survey conducted by the NAACP's expert witness and the impact
of that methodology on the reliability and validity of it, and consequently, on the
opinions that he seeks to draw from it. First, she has substantial education in
consumer surveys, including an undergraduate degree in business administration,
with a concentration in marketing, an MBA, and a Ph.D. in Business
Administration. (JA 929). Second, she has been a faculty member at four
undergraduate institutions, including Randolph-Macon College, Virginia
Commonwealth University, Longwood University and East Carolina University
teaching, among other things, courses in marketing research. (JA 943-944).
Survey methods and statistical analysis were substantive areas studied in her
doctoral program. (JA 283). And the marketing research courses she teaches (and
has taught) include consumer surveys, including the design, execution and analysis
of these. (JA 284).

Dr. Tuten's qualifications to render testimony concerning consumer survey
methodology were not achieved only in academia. On the contrary, she has

42

substantial work experience as a survey methodologist. She was employed for a year as a Senior Survey Methodologist with Royall and Company, was a guest scientist for several summers at the Center for Survey Research and Methodology in Mannheim Germany, and served as a Senior Research Associate in the Survey and Evaluation Research Lab at Virginia Commonwealth University. (JA 944-945). As a Fulbright Senior Specialist at the Argentine University of Business, she "[o]ffered [a] faculty development seminar on web-survey marketing research methods". *Id.* Her research topics in Germany included "response behaviors and context effects in web-based surveys, and mode preferences among survey participants." *Id.*

Dr. Tuten's expertise in consumer survey methodology is further underscored by the plethora of publications she has authored or co-authored on that subject. While all of her publications, including journal articles, books and book chapters, and papers and presentations are listed in her curriculum vitae, (JA 929-943), those with particular applicability to consumer survey methodology, a total of 29, were identified by Dr. Tuten in her Declaration in support of Radiance's opposition to the motion to exclude her testimony. (JA 285). Virtually all of her publications have been peer-reviewed.

Dr. Tuten also has experience in trademark litigation surveys. The four matters where she provided expert witness services in relation to trademark

infringement-related consumer surveys are identified at page 25 of her curriculum vitae. In one matter she designed and executed a survey to assess likelihood of confusion. In another she assisted in the design and execution of such a survey, and in a third matter she reviewed the methodology and the results of the opposing expert's survey. (JA 953).

The District Court's conclusion that Dr. Tuten was qualified in general consumer surveys but unqualified in relation to trademark litigation surveys effectively flips the law on expert qualification on its head. Trademark surveys are not *sui generis*, as this Court recognized in *Belk, Inc. v. MeyerCorp.,* 679 F.3d at 162. In *Belk,* this Court found that an expert in generalized survey methods was qualified to testify regarding trade dress surveys. *Id.* By holding that her lack of knowledge regarding trademark laws rendered her testimony inadmissible the District Court effectively held that trademark surveys are *sui generis* and distinct from consumer surveys generally.

Furthermore, Dr. Tuten's testimony regarding the Ostberg Survey focused on the lack of controls and measures used in consumer surveys to ensure reliability. The District Court's conclusion that such measures are not relevant to trademark surveys ignores *Daubert's* requirement that "there exist the requisite 'standards controlling the technique's operation'" and the importance of "uniform standards . . . established 'through professional training, peer review, presentation

44

of conflicting evidence and double checking.'" *Crisp,* 324 F.3d at 269 (internal citations omitted). Instead of the general, scientific community guiding expert testimony in litigation (trademark litigation specifically), the District Court concluded that prior case law set the standard for expert testimony, even where the scientific standards have changed. As this Court has noted, opinion/techniques developed expressly for litigation, as opposed to flowing from scientific research weighs against the admission of such testimony. *See Wehling v. Sandoz Pharms. Corp.,* 162 F.3d 1158 [full text format at 1998 U.S. App. LEXIS 38866 (4th Cir. 1998) ("Another significant fact weighing against admitting the testimony is where, as here, the expert developed his opinions expressly for the purpose of testifying.").

Dr. Tuten's testimony was clearly admissible. She examined the Ostberg Survey to determine whether the "1) purpose and design, 2) population and sampling, 3) survey questions and structure, 4) interviewers, 5) data entry and grouping of responses, and 6) disclosure and reporting" were such that the survey was reliable and valid. This methodology, i.e. assessing the survey's characteristics and measuring it against what the scientific research in the field of consumer surveys reports about whether such characteristics permit valid and reliable conclusions, is a scientifically valid one, and therefore, Dr. Tuten's

opinions were admissible. *Daubert,* 509 U.S. at 594. Her opinions demonstrated that the Ostberg Survey was significantly flawed and unreliable. (JA 911-928).

> v.     *The text of the January 2013 article demonstrates that Radiance's use of the NAACP's marks was to criticize the NAACP and prevents a likelihood of confusion.*

Likelihood of confusion in this case is virtually impossible given the nature of the use at issue. When evaluating the likelihood of confusion, a court must "examin[e] the allegedly infringing use in the context in which it is seen by the ordinary consumer." *Lamparello,* 420 F.3d at 316 (quoting *Anheuser-Busch, Inc.* 962 F.2d at 319) (emphasis in original). The context in which Radiance used the NAACP's marks does not create a likelihood of confusion.

As noted above, the NAACP's marks were not used as a source identifier (such as the name of the organization or domain name). Instead, as the District Court recognized, and a review of the contents of the article demonstrates, the use of the NAACP's marks in the January 2013 article was to criticize the NAACP and its policies. (JA 823, 826, 839). Specifically, the article states:

> a.      "The NAACP's Annual Image Awards honor black imagery churned out by often racist, anti-Christian, perpetually sexist, violent and pornographic Hollywood."
> b.      "Django Unchained, with its graphic violence and 100 plus uses of the racially denigrating epithet, "nigger", gets praise and nominations from the NAACP."
> c.      "The NAACP's selective, and often feigned, outrage on a myriad of issues is befitting of a multiple personality disorder, with its stronger personality being one that embraces all things liberal, most things socialistic, and nothing pro-life."

d.     "As our TooManyAborted.com initiative has shown, today's NAACP is a tragic example of civil rights gone wrong."

(JA 869-870; 899-900).   No rational reader would conclude that the article was written by an author or entity sponsored by or affiliated with the NAACP or that the NAACP was the source of the goods and services proffered by the writer and publisher because the text is plainly, and sharply, critical of the NAACP.

This Court has recognized that when use of the mark is "dedicated to criticism of the markholder, [such use] will seldom create a likelihood of confusion." *Lamparello,* 420 F.3d at 315 n.3.  Paraphrasing this Court's finding in *Lamparello*, "[n]o one would believe that [the NAACP] sponsored a site criticizing [it and its] positions." *Id.* at 315 (citing *New Kids on the Block v. News Am. Publ'g, Inc.,* 971 F.2d 302, 308-09 (9th Cir. 1992)).

**III.    The District Court erred by finding trademark dilution by tarnishment because Radiance's use of the NAACP's marks in the January 2013 article was a noncommercial and nominative use, and because the article was a form of news reporting and news commentary.**

An action for trademark dilution is not permitted where the use of the mark constitutes:

(A)     Any fair use, including a nominative or descriptive fair use,… including use in connection with –
. . . .
         (ii)  Identifying and parodying, criticizing or commenting upon the famous mark owner or the goods or services of the famous mark owner.
(B)     All forms of news reporting and news commentary.

47

(C)    Any noncommercial use of a mark.

15 U.S.C. § 1125(c)(3).  Despite finding that Radiance used the NAACP's marks for nominative purposes in social commentary and criticism, the District Court paradoxically held that none of these exclusions and defenses applied in this case. However, Radiance's use of the NAACP's marks was clearly noncommercial, nominative, and part of news reporting and commentary.  Therefore, this Court should reverse the District Court's finding of trademark dilution.

>    *i.    Radiance's use of the NAACP's marks was noncommercial.*

The District Court explicitly found that the January 2013 article was "politically and ideologically charged". (JA 846).  However, it concluded that such speech was still "commercial" because it was offered in connection with goods or services.  This Court, however, has explained that "commercial" for purposes of 15 U.S.C. § 1125(c)(1) is not the same as 15 U.S.C. § 1114(1)(a)'s requirement that the use be in connection with goods or services.  *See Lamparello,* 420 F.3d at 313-14.  The use of the "commercial"/ "noncommercial" criteria in relation to the dilution statute protects the speaker's "free speech and protected uses of trademarked names for such things as parody, comment, criticism, comparative advertising, news reporting, etc." *Id.* at 314 (quoting S. Rep. No. 106-140 (1999)).

The January 2013 article constitutes noncommercial protected speech. Speech that "communicate[s] information, expresse[s] opinion, recite[s]

grievances, protest[s] claimed abuses, and [seeks] financial support on behalf of a movement whose existence and objectives are matters of the highest public interest and concern" is not commercial speech. *See New York Times Co.* 376 U.S. at 266 (citing *N.A.A.C.P.*, 371 U.S. at 435). "The hallmark of commercial speech is that it 'does no more than propose a commercial transaction.'" *Greater Baltimore Center for Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore,* 683 F.3d 539, 553 (4th Cir. 2012) (quoting *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983)).

Radiance and Bomberger did not propose any commercial transaction in their use of the NAACP's marks. (JA 869-870, 899-900). Rather, informed by their religious and political beliefs, they used the marks to comment on and criticize the NAACP's policies and support of abortion. "This kind of ideologically driven speech has routinely been afforded the highest levels of First Amendment protection, even when accompanied by offers of commercially valuable services." *Greater Baltimore*, at 554 (citing *In re Primus*, 436 U.S. 412 (1978)). The fact that Radiance may have also solicited charitable contributions in conjunction with that speech does not demand a different result. *See supra § I(ii).*

ii.    *Radiance's use of the NAACP's marks was nominative.*

As noted above, the District Court explicitly found that Radiance's use of the NAACP's marks was nominative. Specifically, the court stated "the majority of

49

instances "NAACP" appeared in the January 2013 Article was in reference to the NAACP. . ." (JA 846). Despite so finding, the District Court bewilderingly concluded that Radiance was not entitled to the defense of nominative fair use. The District Court concluded that the "particular use" of "NAACP: National Association for the Abortion of Colored People" in the title of the article was not nominative fair use because it "neither describes nor references the NAACP's services." (JA 846). The court's conclusion is mistaken.

This Court has repeatedly emphasized that an allegedly infringing work must be considered as a whole. *See Lamparello,* 420 F.3d at 316 (stating that "to determine whether a likelihood of confusion exists, a court should not consider how closely a *fragment* of a given use duplicates the trademark, but must instead consider *whether the use in its entirety creates a likelihood of confusion."*) (quoting *PETA,* 263 F.3d at 366) (emphasis in original)*; Anheuser-Busch, Inc.* 962 F.2d at 319. The juxtaposition of the NAACP's mark next to "National Association for the Abortion of Colored People" does not alter the fact that "NAACP" is being used in a nominative fashion. The District Court made a factual finding that "Bomberger wrote an article regarding the NAACP's Annual Image Awards". (JA 811). When taken as a whole, even the "particular use" of the NAACP's mark in the title was clearly nominative.

*iii.    The January 2013 article was news reporting and commentary.*

Just as the District Court found that use of the NAACP's marks was nominative but refused the fair use defense, it found that Radiance used the NAACP's marks in "news articles" and as part of its "social commentary and criticism." Even if the District Court's conclusion that the "particular use" of the NAACP's marks juxtaposed with "National Association for the Abortion of Colored People" rendered the use non-nominative; such a distinction does not apply to the news reporting and commentary defense.

The District Court noted that, "Bomberger wrote three news articles critiquing the NAACP's position on abortion employing the phrase "National Association for the Abortion of Colored People." (JA 804). This description was apt. The January 2013 article was a form of news reporting or news commentary. *See BidZirk, L.L.C. v. Smith,* 2007 U.S. Dist. LEXIS 78481, *16-17 (D.S.C. 2007), *aff'd* 2007 U.S. App. LEXIS 5227 (4th Cir. 2007) (holding blog posts were protected news reporting or news commentary). Inexplicably, notwithstanding, the acknowledgment that the article was a news article the District Court nonetheless found that the new article/news commentary defense did not apply.

The court's conclusion that the use of "NAACP" next to "National Association for the Abortion of Colored People" rendered this use outside the scope of news reporting is mistaken. Unlike the defense of fair use, the exclusion

51

of "news reporting and news commentary" does not address the use of the famous mark or of any mark. *Compare* 15 U.S.C. § 1125(c)(3)(a) *with* 15 U.S.C. § 1125(c)(3)(b). The plain language simply renders all news articles and news commentary unavailable as the basis for dilution claim. Thus, even if the court is correct that the use of "NAACP" in the title and "National Association for the Abortion of Colored People" were not nominative and were not used "to report or comment on news"; the placement of such use in what the court acknowledges was a news article prohibits a finding of dilution.

## CONCLUSION

For the foregoing reasons, this Court should reverse the Order granting judgment in favor of the NAACP, dissolve the Permanent Injunction entered and enter judgment in favor of The Radiance Foundation, Inc. and Ryan Bomberger.

For the Appellants:

/s/ Charles M. Allen
Charles M. Allen
William F. Demarest III
Goodman, Allen & Filetti, PLLC
4501 Highwoods Parkway, Suite 210
Glen Allen, VA  23060
(804) 346-0600
(804) 346-5954 (fax)
callen@goodmanallen.com
wdemarest@goodmanallen.com

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. <u>14-1568</u>        **Caption:** <u>The Radiance Foundation, Inc. v. NAACP</u>

### CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

   This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

   [✓]   this brief contains <u>12,144</u> [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

   [ ]    this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   [✓]   this brief has been prepared in a proportionally spaced typeface using <u>Microsoft Word 2010</u> [*identify word processing program*] in <u>Times New Roman 14 point font</u> [*identify font size and type style*]; **or**

   [ ]    this brief has been prepared in a monospaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*].

(s) <u>/s/ Charles M. Allen</u>

Attorney for <u>Appellants</u>

Dated: <u>October 6, 2014</u>

## CERTIFICATE OF SERVICE

I certify that on __10/06/2014__ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:


Ze-wen J. Chen
Anthony T. Pierce
Pratik A. Shah
James E. Tyrese
AKIN, GUMP, STRAUSS,
 HAUER & FELD, LLP

Robert S. Strauss Building
1333 New Hampshire Avenue, NW
Washington, DC 20036-1564
(202) 887-4475 (Telephone)

chenj@akingump.com
apierce@akingump.com
pshah@akingump.com
jtysse@akingump.com



_____s/_____          _____10/06/2014_____
        Charles M. Allen                              Date

# ADDENDUM



**BidZirk, LLC, Daniel G. Schmidt, III, and Jill Patterson, Plaintiffs, v. Philip J. Smith, Defendant.**

**C.A. No. 6:06-109-HMH**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF SOUTH CARO-LINA, GREENVILLE DIVISION**

*2007 U.S. Dist. LEXIS 78481*; **35 Media L. Rep. 2478**

**October 22, 2007, Decided**
**October 22, 2007, Filed**

**PRIOR HISTORY:** *BidZirk, LLC v. Smith, 2007 U.S. Dist. LEXIS 43927 (D.S.C., June 15, 2007)*

**COUNSEL:** [*1] For BidZirk LLC, Daniel G Schmidt, III, Jill Patterson, Plaintiffs: Kevin Morgan Elwell, LEAD ATTORNEY, KM Elwell PC, Greenville, SC.

Phillip J Smith, Defendant, Pro se, Greenville, SC.

Phillip J Smith, Counter Claimant, Pro se, Greenville, SC.

**JUDGES:** Henry M. Herlong, Jr., United States District Judge.

**OPINION BY:** Henry M. Herlong, Jr.

**OPINION**

**OPINION & ORDER**

This matter is before the court on Philip J. Smith's ("Smith") pro se motion for summary judgment and the court's sua sponte inquiry regarding sanctions against the Plaintiffs. After a review of the law and facts of this case, the court grants Smith's motion for summary judgment and sanctions Plaintiffs' counsel.

**I. FACTUAL BACKGROUND**

This case arises from the posting of a four-part article titled "Special Report: You Gotta Be Berserk to Use an eBay Listing Company! The Whole Story" ("article") on Smith's blog located at http://www.jackwhispers.blogspot.com ("blog"). (Pls.' Mem. Opp'n Summ. J. Ex. 2 (Article).) [1] The article concerns Smith's experience using BidZirk, an auction listing company, to sell items on eBay. (Id.) "An auction listing company is a business that accepts goods on consignment, and administers auction sales of consigned goods on web sites [*2] such as eBay." (Compl. P 6.) BidZirk is paid a fee for these services based on a percentage of the money received from an auction. (Id. P 7.)

> 1    In essence, this is a case in which the Plaintiffs have sued Smith because he published articles on the internet critical of the Plaintiffs' business.

In the article, Smith depicts BidZirk's trademark and details his interactions with Daniel G. Schmidt ("Schmidt"), BidZirk's president. (Pls.' Mem. Opp'n Summ. J. Ex. 2 (Article).) Smith relates the positive and mostly negative aspects of utilizing an eBay listing company, like BidZirk, and provides a checklist for his readers to utilize in deciding whether to use a listing company. (Id.)

On January 10, 2006, the Plaintiffs filed suit against Smith. BidZirk alleges a claim under the Lanham Act for damages and an injunction, alleging that Smith improperly placed BidZirk's trademark on his blog. In addition, Schmidt has sued for defamation alleging that Smith published false and derogatory statements about Schmidt on his blog. Finally, Schmidt and Jill Patterson ("Patterson") have sued for invasion of privacy alleging that Smith linked their picture to the blog. The link was an article with a picture [*3] of Schmidt and Patterson in it. Smith failed to answer and on February 16, 2006, a default was entered by the clerk. The court set aside entry of default on February 27, 2006, and allowed Smith time to answer.

Appeal: 14-1568    Doc: 16    Filed: 10/06/2014    Pg: 70 of 110

Page 2

2007 U.S. Dist. LEXIS 78481, *; 35 Media L. Rep. 2478

On February 13, 2006, BidZirk moved for a preliminary injunction. United States Magistrate Judge William M. Catoe issued a Report and Recommendation on March 21, 2006, recommending denying the motion. The Plaintiffs filed objections. The court adopted Magistrate Judge Catoe's Report and Recommendation and denied the Plaintiffs' motion for a preliminary injunction on April 10, 2006. The Plaintiffs appealed and the Fourth Circuit affirmed on March 6, 2007.

In addition, Smith asserted several counterclaims, but those were dismissed on the Plaintiffs' motion to dismiss for lack of jurisdiction on November 7, 2006. The Plaintiffs moved to amend the complaint, which was granted on January 29, 2007. [2] However, the Plaintiffs never filed an amended complaint. The Plaintiffs filed a motion for judgment on the pleadings (document number 33) and a motion for summary judgment (document number 72), which were denied on February 23, 2007, and May 30, 2007, respectively. At a status conference [*4] on September 17, 2007, Smith orally moved for summary judgment. The court allowed Smith fifteen days to submit a memorandum in support of his oral motion. Smith filed a supplemental memorandum on September 26, 2007. In addition, at the status conference, the court allowed the Plaintiffs fifteen days to submit a memorandum addressing why they should not be sanctioned for filing a lis pendens against Smith's condo and for asking abusive discovery requests. The Plaintiffs submitted their brief concerning sanctions on September 27, 2007, and their memorandum in opposition to summary judgment on October 15, 2007.

> 2   The Plaintiffs incorrectly state in their memorandum that this motion is still pending. Given that the Plaintiffs failed to file the second amended complaint, the court will not address any claims raised therein.

## II. DISCUSSION OF THE LAW

### A. Summary Judgment Standard

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c).* Rule 56(c) [*5] mandates entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).*

In deciding whether there is a genuine issue of material fact, the evidence of the non-moving party is to be

believed and all justifiable inferences must be drawn in his favor. See *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).* However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id. at 248.*

Moreover, "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." *Fed. R. Civ. P. 56(e).* With respect to this burden, "it is the responsibility of the plaintiff, not the court, to identify with particularity the [*6] evidentiary facts existing in the record which can oppose the defendant's summary judgment motion." *Malina v. Baltimore Gas & Elec. Co., 18 F.Supp. 2d 596, 604 (D. Md. 1998).*

### B. Smith's Summary Judgment Motion

#### 1. Defamation

"In order to prove defamation, the complaining party must show: (1) a false and defamatory statement was made; (2) the unprivileged statement was published to a third party; (3) the publisher was at fault; and (4) either the statement was actionable irrespective of harm or the publication of the statement caused special harm." *Fleming v. Rose, 350 S.C. 488, 567 S.E.2d 857, 860 (S.C. 2002).* "[L]ibel is a written defamation." *Holtzscheiter v. Thomson Newspapers, Inc., 332 S.C. 502, 506 S.E.2d 497, 501 (S.C. 1998).*

Whether the alleged defamatory statement is actionable per se "is always a question of law for the court." *Id. at 501.* "If a defamation is actionable *per se,* then under common law principles the law *presumes* the defendant acted with common law malice and that the plaintiff suffered **general** damages." Id. In the alternative, if a "defamation is not actionable *per se,* then at common law the plaintiff must plead and prove common law actual malice and **special** damages." *Id. at 501-02.*

Libel is [*7] actionable per se if it involves "written or printed words which tend to degrade a person, that is, to reduce his character or reputation in the estimation of his friends or acquaintances, or the public, or to disgrace him, or to render him odious, contemptible, or ridiculous." *Id. at 502* (internal quotation marks omitted). "In other words, if the trial judge can legally presume, because of the nature of the statement, that the plaintiff's reputation was hurt as a consequence of its publication, then the libel is actionable *per se.*" *Holtzscheiter, 506 S.E.2d at 502.*

Appeal: 14-1568     Doc: 16     Filed: 10/06/2014     Pg: 71 of 110

Page 3

2007 U.S. Dist. LEXIS 78481, *; 35 Media L. Rep. 2478

Schmidt alleges that Smith's statements that Schmidt was a "yes man" who over promised and under delivered is defamation per se. (Pls.' Mem. Opp'n Summ. J. Ex. 3 (Schmidt Aff. P 9).) The court has reviewed the article and the court finds that Smith's statements about Schmidt are patently not defamatory. Smith stated in the article as follows:

> From the beginning . . . I could tell the owner was a yes man. Of course, I have to be honest . . . eBay is; in and of itself a yes man paradise. Many sellers over promise and under deliver.
>
> Although the owner seemed like a yes man . . . I had done my home work . . . he had owned an ecommerce [*8] B2B company called ChannelLinx. Tech savvy? Possibly . . .

(Id. Ex. 2 (Article).) "Under the *First Amendment* there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries, but on the competition of other ideas. But there is no constitutional value in false statements of fact." *Gertz v. Robert Welch, Inc., 418 U.S. 323, 339-40, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974).*

An alleged defamatory statement "must be provable as false before there can be liability under state defamation law." *Milkovich v. Lorain Journal Co., 497 U.S. 1, 19, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990).* "[O]pinion statements, defamatory or otherwise, are not actionable unless they contain provably true or false factual connotations." *Woodward v. Weiss, 932 F. Supp. 723, 726 (D.S.C. 1996)* (alteration in original) (internal quotation marks omitted). The statement that "I could tell the owner was a yes man" is an opinion statement that cannot be characterized as true or false. The term "yes man" has different meanings to different people. See *McCabe v. Rattiner, 814 F.2d 839, 842 (1st Cir. 1987)* (finding that the term "scam" "means different things to different people . . . and there is not a single [*9] usage in common phraseology. While some connotations of the word may encompass criminal behavior, others do not. The lack of precision makes the assertion 'X is a scam' incapable of being proven true or false." (Alteration in original)); *Lauderback v. Am. Broad. Cos., Inc., 741 F.2d 193, 196 (8th Cir. 1984)* (insurance agent referred to as a "crook"). "Clearly, if the statement was not capable of being verified as false, there could be no liability for defamation." *Woodward, 932 F. Supp. at 726.* Based on the foregoing, calling Schmidt a "yes man" cannot give rise to liability for defamation.

Further, even if the term "yes man" could be verified as true or false, it is plainly not defamatory. Immediately after stating that Schmidt seemed like a "yes man," Smith describes Schmidt as possibly tech savvy, which is a positive statement about Schmidt. In addition, Smith stated that in the ebay industry many sellers commonly over promise and under deliver. However, Smith never said that Schmidt over promised and under delivered in this transaction. None of Smith's statements "reduce[d] [Schmidt's] character or reputation in the estimation of his friends or acquaintances, or the public, or to [*10] disgrace him, or to render him odious, contemptible, or ridiculous." *Holtzscheiter, 506 S.E.2d at 502* (internal quotation marks omitted). Based on the foregoing, the court finds that Smith's statements were patently not defamatory.

2. Invasion of Privacy

"In South Carolina, three separate and distinct causes of action can arise under the rubric of invasion of privacy: (1) wrongful appropriation of personality; (2) wrongful publicizing of private affairs; and (3) wrongful intrusion into private affairs." *Snakenberg v. Hartford Cas. Ins. Co., 299 S.C. 164, 383 S.E.2d 2, 5 (S.C. Ct. App. 1989).* In their complaint, Schmidt and Patterson allege a claim for wrongful appropriation. However, in their memorandum in opposition to Smith's summary judgment motion, Schmidt and Patterson concede that they have no invasion of privacy claim arising under the three causes of action listed above. (Pls.' Mem. Opp'n Summ. J. 21.) Instead, Patterson and Schmidt allege a claim for false light invasion of privacy. No South Carolina court has recognized a cause of action for false light invasion of privacy. Therefore, this claim fails as this cause of action does not exist under South Carolina law. Further, to the extent [*11] South Carolina would recognize this cause of action, the claim is wholly without merit.

The Restatement (Second) of Torts defines the tort of false light invasion of privacy as follows:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

Restatement (Second) of Torts § 625E. Schmidt and Patterson allege that Smith's

2007 U.S. Dist. LEXIS 78481, *; 35 Media L. Rep. 2478

linking to the photograph was accompanied by text in his posting that portrayed Schmidt and Patterson as irresponsible and overcommitted, because [Smith] presumed that the marriage would take time away from Schmidt's and Patterson's service of [Smith] as a customer of BidZirk.

(Pls.' Mem. Opp'n Summ. J. 24 & Ex. 6 (Patterson Aff.P3) & Ex. 3 (Schmidt Aff. P 12).) Smith's article stated as follows

He  [*12] explained to me how he had just gotten married and was planning his honeymoon in a week's time.

Wait! He was getting married, going on a honeymoon, and starting a (in his own words) 'multi-location business that will be national in 5 years time'?

(Id. Ex. 2 (Article).) The article with the picture was hyperlinked to the language "he had just gotten married and was planning his honeymoon in a week's time." (Id.) Smith's statements did not cast Schmidt and Patterson in a false light. Smith merely stated the fact that Schmidt and Patterson had much going on in their lives as they were getting married, going on a honeymoon, and starting a new business. Nothing about Smith's statements "would be highly offensive to a reasonable person." Restatement (Second) of Torts § 625E (emphasis added). Based on the foregoing, this claim is baseless.

To the extent Patterson and Schmidt continue to allege a claim for wrongful appropriation, this claim also is wholly without merit.

Wrongful appropriation of personality involves the intentional, unconsented use of the plaintiff's name, likeness, or identity by the defendant for his own benefit. The gist of the action is the violation of the plaintiff's exclusive  [*13] right at common law to publicize and profit from his name, likeness, and other aspects of personal identity.

*Id. at 5-6.*

This claim fails because Smith did not place Patterson and Schmidt's picture on his blog. In contrast, Smith's blog included a link that readers could click on that linked the reader to another website, www.communityjournals.com, which contained the article and picture. Notably, Patterson and Schmidt consented

to Community Journals' use of Schmidt and Patterson's picture. Schmidt and Patterson consented to the circulation of the article and picture in the Community Journal to publicize the opening of BidZirk. See *United States v. Gines-Perez, 214 F. Supp. 2d 205, 225 (D. Puerto Rico 2002)* ("[P]lacing information on the information superhighway necessarily makes said matter accessible to the public, no matter how many protectionist measures may be taken, or even when a web page is 'under construction.'" "[I]t strikes the Court as obvious that a claim to privacy is unavailable to someone who places information on an indisputably, public medium, such as the Internet, **without taking any measures to protect the information.**"), vacated on other grounds by, *90 Fed. Appx. 3, 2004 WL 528426 (1st Cir. 2004).*  [*14] Smith did not transport the picture to his blog. Instead, Smith's blog contained a link that readers could click on that takes the reader to the site where the article and picture are located, http://www.communityjournals.com/btc2005/html/2005 BTC049.jpg.

The court finds that "a person who places a photograph on the Internet precisely intends to forsake and renounce all privacy rights to such imagery, particularly under circumstances . . . where [Patterson and Schmidt] did not employ protective measures or devices that would have controlled access to the Web page or the photograph itself." *Gines-Perez, 214 F. Supp. 2d at 225.* Further, there is no evidence that Smith's link to the article containing the picture of Patterson and Schmidt was done to benefit Smith in any way. Based on the foregoing, the court finds that Schmidt and Patterson consented to the display of their picture on the internet.

3. Lanham Act

Under the Lanham Act,

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false  [*15] or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

2007 U.S. Dist. LEXIS 78481, *; 35 Media L. Rep. 2478

*15 U.S.C. § 1125(a)(1)(B)(1998)*. BidZirk alleges that it is entitled to damages under *15 U.S.C. § 1117(a)*, which provides that if the defendant violates *§ 1125(a)* then the plaintiff can "recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." Further, Bidzirk alleges that it is entitled to treble damages and reasonable attorney's fees under *§ 1117(b)*.

In addition, Bidzirk seeks a permanent injunction. The court has the power to grant injunctions "to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under *subsection (a)*, *(c)*, or *(d)* of [*15 U.S.C. § 1125*]." *15 U.S.C. § 1116(a) (West Supp. 2007)*. Section *1125(c)(1)* provides:

> Subject to the principles of equity, the owner of a famous mark that is [*16] distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

BidZirk alleges that its mark is famous and distinctive, that Smith's infringement is in connection with a commercial use, that Smith's infringement dilutes the mark, and that Smith's infringement is not excused by any statutory defense. Even if Smith has infringed BidZirk's mark, the court finds that this infringement is excused by a statutory defense. Under *§ 1125(c)(4)(C)*, no "forms of news reporting and news commentary" are actionable under *§ 1125*. These terms are not defined in the Lanham Act. Further, there is no published case deciding whether a blogger is a journalist.

However, in determining whether Smith was engaged in news reporting or news commentating, the court has applied the functional analysis suggested by commentators and the Plaintiffs in [*17] their memorandum in support of a preliminary injunction, which examines the content of the material, not the format, to determine whether it is journalism. See David L. Hudson, Jr., Blogging, http://www.firstamendmentcenter.org//press/topic.aspx?topic=blogging; (Pls.' Mem. Supp. Preliminary Injunction Ex. 34 (Hudson on Blogging).). In addition, the court has considered the intent of Smith in writing the article. The court agrees that not all bloggers are journalists. However,

some bloggers are without question journalists. See CNN BLOGS: YOUR SAY, http://www.cnn.com/exchange/blogs/.

Upon review of the content of the article, the court finds that Smith's use of the BidZirk mark in the article was in the context of news reporting or news commentary. The article posted by Smith concerning the Plaintiffs is written for the purpose of conveying information to the public. In the four installments of the article, Smith describes his experience with BidZirk in great detail. (Pls.' Mem. Opp'n Summ. J. Ex. 2 (Article).) In addition, Smith addresses the positive and negative aspects, in his opinion, of dealing with a an eBay listing company, such as BidZirk. (Id.) Further, Smith provides a checklist [*18] for using an eBay listing company and tips for selling items on eBay. (Id.) Smith felt that what he learned from his experience with BidZirk would be helpful to others in dealing with an eBay listing company. The fact that Smith reports negatively about his experience with BidZirk does not dictate that the article's function or intent was not news reporting or news commentary.

There is no evidence that the sole purpose of the article was to denigrate BidZirk. Smith's article was titled "Special Report: You Gotta Be Berserk to Use an eBay Listing Company! The Whole Story." (Id.) Smith plainly states at the beginning of the article as follows: "In this special report . . . I'll be telling my detailed story of using such a company and relate how my selling Apple parts on eBay for 9 years has given me unique insight into this matter." (Id.) Smith further states that he has done research in preparation for his article as follows:

> This is my story as experienced by me personally. I have dealt with a company called BIDZIRK, in my home town. I have also visited several competitors. In doing extensive Google research, I have found that my problems are almost universal . . . but that only larger [*19] clients really complain. At the end, I will offer a checklist for you to use when choosing a listing company that includes questions you may not have thought of before.

(Pls.' Mem. Opp'n Summ. J. Ex. 2 (Article).) Smith engaged in background research and provided consumers with a checklist for use in selecting a listing company. Smith's article evidences his intent to report what he believed was a newsworthy story for consumers. Based on the foregoing, no genuine issues of material fact exist and BidZirk's Lanham Act claim fails as a matter of law.

### III. Sanctions

Appeal: 14-1568    Doc: 16    Filed: 10/06/2014    Pg: 74 of 110

Page 6

2007 U.S. Dist. LEXIS 78481, *; 35 Media L. Rep. 2478

The Plaintiffs' attorney, Kevin Elwell ("Elwell"), filed a lis pendens against Smith's condo on October 23, 2006. Smith moved to strike the lis pendens on October 26, 2006. After a status hearing on May 2, 2007, Magistrate Judge Catoe ordered Elwell to withdraw the lis pendens on May 7, 2007. During the May 2, 2007 hearing, Elwell argued that this action is an action "affecting title to real estate," but had no law to support his point. At the status conference hearing on September 17, 2007, the court allowed Elwell to brief why the court should not issue sanctions against the Plaintiffs for filing the lis pendens. In the brief, [*20] the Plaintiffs allege that at the time the lis pendens was filed, they believed that they were entitled to judgment as a matter of law because Smith had failed to answer certain requests to admit. The Plaintiffs further allege that they were attempting to protect their ability to collect on a judgment. The Plaintiffs acknowledge that filing the lis pendens was wholly improper. (Pls.' Mem. Regarding Sanctions 3.)

A plaintiff may "[i]n an action affecting the title to real property . . . not more than twenty days before filing the complaint or at any time afterwards . . . with the clerk of each county in which the property is situated a notice of the pendency of the action, containing the names of the parties, the object of the action and the description of the property in that county affected thereby." *S.C. Code Ann. § 15-11-10* (2005). "Generally, the filing of a lis pendens places a cloud on title which prevents the owner from freely disposing of the property before the litigation is resolved." *Pond Place Partners, Inc. v. Poole, 351 S.C. 1, 567 S.E.2d 881, 889 (S.C. 2002)*. However, "[s]ince the filing of a lis pendens is an extraordinary privilege granted by statute, strict compliance with the [*21] statutory provisions is required." Id.

"[A]n action 'affecting the title to real property' clearly allows the filing of a lis pendens by an interested party in order to protect their ownership interest in the property subject to the litigation." *Id*. However, "[w]here no real property is implicated . . . a notice of pendency of action need not be filed." *Id. at 890*. Further, "[o]ne who places a lis pendens notice on property without a 'colorable claim' of right to or interest in the property subjects themselves to a claim for slander of title." *Ex parte Boykin, 656 So. 2d 821, 826 n.4 (Ala. Civ. App. 1994)*.

Without question, the instant matter is not an action affecting the title to real property. Therefore, the court will consider whether to impose sanctions. *Rule 11(b)* of the Federal Civil Procedure states that

> By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's

knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,--

> (1) it is not being presented for any improper purpose, such as to [*22] harass or to cause unnecessary delay or needless increase in the cost of litigation;

> (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

> (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

> (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

Several factors that should be considered when assessing sanctions include:

> (1) the degree of the wrongdoer's culpability; (2) the extent of the client's blameworthiness if the wrongful conduct is committed by his attorney, recognizing that we seldom dismiss claims against blameless clients; (3) the prejudice to the judicial process and the administration of justice; (4) the prejudice to the victim; (5) the availability of other sanctions to rectify the wrong by punishing culpable persons, compensating harmed persons, [*23] and deterring similar conduct in the future; and (6) the public interest.

*Sanderson v. Boddie-Noell Enter., Inc., 227 F.R.D. 448, 454 (E.D. Va. 2005)*.

The court finds that the degree of Plaintiffs' counsel's culpability weighs heavily in favor of sanctioning the Plaintiffs' counsel, Kevin Elwell ("Elwell"). Elwell is a competent attorney who knew or should have known with the most basic research that his actions were improper. In addition, after Smith moved to strike the lis pendens, Elwell argued in court that the lis pendens was proper. Elwell had no basis to support his position. (Mem. Regarding Sanctions 2.)

Appeal: 14-1568    Doc: 16    Filed: 10/06/2014    Pg: 75 of 110

Page 7

2007 U.S. Dist. LEXIS 78481, *; 35 Media L. Rep. 2478

Further, the court finds that Smith has been prejudiced by the filing of the lis pendens. The title to his property was clouded for over six months. Smith alleges that during that time he was attempting to sell his property. Moreover, the public interest in preventing legal counsel from filing improper lis pendens and encumbering property is great. A lis pendens is a very powerful document and the statute is strictly applied because a lis pendens clouds the title to property. There is no evidence that Elwell's client is responsible for Elwell's wrongful conduct. However, taking  [*24] into account the facts and the factors listed above, the court finds that based on Elwell's grossly improper conduct, he should be sanctioned in the amount of $ 1,000.00 payable immediately to the Defendant. [3]

> 3   The court has also considered *Rule 11* sanctions against the Plaintiffs and their attorney for

the bringing of this action. Although awarding sanctions is a close question, the court declines to do so.

Therefore, it is

**ORDERED** that Smith's motion for summary judgment, document number 125, is granted. It is further

**ORDERED** that Plaintiffs' counsel, Kevin Elwell, is sanctioned in the amount of $ 1,000.00.

**IT IS SO ORDERED.**

s/ Henry M. Herlong, Jr.

United States District Judge

Greenville, South Carolina

October 22, 2007



**DICK'S SPORTING GOODS, INCORPORATED, Plaintiff-Appellant, and GARY SHANK, d/b/a Dick's Sporting Goods, Incorporated, Plaintiff, v. DICK'S CLOTH-ING AND SPORTING GOODS, INCORPORATED; RICHARD'S CLOTHING AND SPORTING GOODS, INCORPORATED, d/b/a Dick's Clothing and Sporting Goods, Incorporated, Defendants-Appellees.**

No. 98-1653

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

*1999 U.S. App. LEXIS 19942*

**March 3, 1999, Argued**
**August 20, 1999, Decided**

**NOTICE:**    [*1]  RULES OF THE FOURTH CIR-CUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:**    Reported in Table Case Format at: *1999 U.S. App. LEXIS 28304*.

**PRIOR HISTORY:**    Appeal from the United States District Court for the District of Maryland, at Baltimore. Benson E. Legg, District Judge. (CA-96-320-L).

**DISPOSITION:**    AFFIRMED.

**COUNSEL:** ARGUED: Richard Michael McMahon, Sr., SCALLY, SCALLY & MCMAHON, P.C., Upperco, Maryland, for Appellant.

Steven Keith, Fedder, RUDNICK & WOLFE, Washing-ton, D.C., for Appellees.

ON BRIEF: Caroline E. Petro, RUDNICK & WOLFE, Washington, D.C., for Appellees.

**JUDGES:** Before TRAXLER, Circuit Judge, VOOR-HEES, United States District Judge for the Western Dis-trict of North Carolina, sitting by designation, and FA-BER, United States District Judge for the Southern Dis-trict of West Virginia, sitting by designation. Judge Voorhees wrote the opinion, in which Judge Traxler and Judge Faber joined.

**OPINION BY:** VOORHEES

**OPINION**

**OPINION**

VOORHEES, District Judge:

Plaintiff-Appellant, Dick's Sporting Goods, Inc. sued Defendant-Appellee Dick's Clothing & Sporting Goods, Inc. alleging trade name infringement and unfair compe-tition. [1] Dick's Clothing & Sporting Goods, Inc. filed [*2] a counterclaim against Dick's Sporting Goods, Inc. al-leging infringement of its federally licensed trade name, "Dick's Clothing & Sporting Goods, Inc." *See 15 U.S.C. § 1051, et seq.* The district court granted Dick's Clothing & Sporting Goods, Inc.'s motion for summary judgment on the complaint and on its counterclaim. We affirm.

> 1    Appellant also alleged intentional infliction of emotional distress and conversion. Upon motion of Appellee, the district court dismissed those claims. Appellant has not appealed those dismis-sals.

I. *FACTS*

Dick's Sporting Goods, Inc. ("Sporting") is a small retail sporting goods business founded in 1971 by Richard Shank. At all times, Sporting operated out of a single location on Stemmers Run Road in Essex, Maryland. The store sold hunting and fishing gear including clothing, hunting and fishing licenses, bait, archery equipment, guns, and ammunition. In May 1998, Sporting closed its store.

In January 1948, Richard Stack founded Dick's Clothing [*3] & Sporting Goods, Inc. ("Clothing") and opened its first store in Binghamton, New York. As of 1995, Clothing operated approximately 51 stores across several states including New York, Connecticut, Pennsylvania, Massachusetts, Illinois, Ohio, Kentucky, New Jersey, Michigan, and Maryland. Clothing's stores sell general sports apparel, sporting goods, and children's apparel.

On May 9, 1988, Clothing applied to the United States Patent and Trademark Office seeking registration for the trade name "Dick's Clothing & Sporting Goods, Inc." On June 27, 1989, Clothing's proposed trade name was published in the federal register. On September 19, 1989, the United States Patent and Trademark Office issued registration number 1557325 for "Dick's Clothing & Sporting Goods." In 1994, the trade name "Dick's Clothing & Sporting Goods" became incontestible under the Lanham Act. At no time has Sporting contested the trademark sought by Clothing or obtained a federally registered trademark of its own.

On October 6, 1995, Clothing opened retail stores in the State of Maryland. Upon seeking to register as a foreign corporation with the state, Clothing learned that Sporting had filed articles of incorporation [*4] with the Maryland State Department of Assessment and Taxation in July 1995, gaining incorporation as "Dick's Clothing & Sporting Goods, Inc." Sporting sought and gained incorporation in the name of "Dick's Clothing & Sporting Goods, Inc." although the record contains no evidence that Sporting had ever conducted business in that name. Thereafter, Clothing registered with the state as "Richard's Sporting & Goods, Inc. a/k/a Dick's Clothing and Sporting Goods, Inc." Although Sporting concedes that it incorporated a shell entity, it denies infringing upon Clothing's federally registered trade name and contends that it registered the shell corporation preemptively merely to avoid confusion of its business name with that of Clothing.

To promote the opening of its Maryland stores, Clothing organized an advertising campaign in which it employed the names "Dick's" and "Dick's Sporting Goods." Sporting claims that it was barraged with over 7,500 misdirected telephone calls and a plethora of misdirected mail as a result of Clothing's advertising campaign. In addition, Sporting asserts that several customers visited its store believing they were visiting Clothing's store.

We review *de novo* [*5] the holding of the district court that Sporting failed to demonstrate that its trade name, "Dick's" or "Dick's Sporting Goods" had acquired secondary meaning in the minds of a substantial portion of

the consuming public as of 1989, the year in which Clothing registered its trademark.

## II. *STANDARD OF REVIEW*

We review a district court's grant of summary judgment *de novo* and apply the same standards employed by the district court. *See Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1127-28 (4th Cir. 1987).* Summary judgment is appropriate only where there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c).* In other words, to grant summary judgment the court must determine that no reasonable jury could find for the nonmoving party on the evidence before it. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* "In passing on a summary judgment motion, the court must view the record and draw inferences most favorably to the opposing party." *Pignons S.A. de Mecanique v. Polaroid Corp., 657 F.2d 482, 486 (1st Cir. 1981).* [*6]

## III. *TRADEMARK PROTECTION AND CLASSIFICATION*

Section 43(a) of the Lanham Act, prohibiting the use of false descriptions, representations, or designations of origin, has been construed to protect against trademark, service mark, and trade name infringement even though the mark or name has not been federally registered. *15 U.S.C. § 1125(a)*; *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 799 F.2d 867, 871 (2d Cir. 1986).* In order to prevail in an action for trademark infringement and unfair competition under sections 32(1) and 43(a) of the Lanham Act, respectively, "a complainant must demonstrate: (1) that it has a valid, protectable trademark; and (2) that the defendant's use of a colorable imitation of the trademark is likely to cause confusion among consumers." *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc., 43 F.3d 922, 930 (4th Cir. 1995)*; *see also 15 U.S.C. § 1114(1).*

In the instant appeal, Sporting merges the above requirements in its arguments to the Court despite the fact that the district court did not hinge its ruling on a finding of likelihood of confusion. Rather, [*7] the district court found that Sporting did not own common law rights to the trade name, "Dick's" or "Dick's Sporting Goods" in that Sporting had failed to demonstrate that the trade name had acquired secondary meaning in the minds of the consuming public by 1989, the year Clothing registered its trademark. For this reason, the district court was not required to examine the issue of likelihood of confusion. *See Spartan Food Systems, Inc. v. HFS Corp., 813 F.2d 1279, 1284 (4th Cir. 1987)*; *Thompson Medical Co. v. Pfizer, 753 F.2d 208, 216 (2d Cir. 1985).* Such an inquiry would have been superfluous because a determination that

1999 U.S. App. LEXIS 19942, *

a mark is ineligible for protection establishes that consumers do not associate that mark with a particular source.

The Lanham Act affords nationwide trademark protection to registered users, regardless of the area in which the registrant actually uses the mark. *15 U.S.C. § 1072*; *Armand Subway, Inc. v. Doctor's Associates, Inc., 604 F.2d 849, 849 (4th Cir. 1979)*. However, the protection is only potential in areas where the registrant does not do business. A competing user could use the mark [*8] in those areas until the registrant extended its business to the area in question. Thereupon, the registrant would be entitled to exclusive use of the mark in that area unless the prior user could show that it acquired a local, common law right to the mark before the date of the mark's registration. *15 U.S.C. § 1065*; *see also Armand Subway, 604 F.2d at 849-50*; *First Bank v. First Bank System, Inc., 84 F.3d 1040, 1044 (8th Cir. 1996)*. Accordingly, Clothing may prevent Sporting from using the trade name "Dick's" or "Dick's Sporting Goods" in the Baltimore, Maryland area unless Sporting can show that it acquired a local, common law right in the trade name by 1989.

The protection accorded trademarks is directly related to the mark's distinctiveness. In *Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4 (2d Cir. 1976)*, the Court classified the word "marks" into four categories: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful. *Id. at 9*. If a term is generic (the common descriptive name for a thing), then it is ineligible for trademark protection as the public has [*9] an inherent right to call a product by its generic name. *Kellogg Co. v. Nat'l Biscuit Co.*, 305 U.S. 111, 119, 83 L. Ed. 73, 59 S. Ct. 109 (1938). If terms are suggestive (words partially descriptive and partially fanciful), arbitrary (common words applied in unfamiliar ways), or fanciful (words invented solely for their use as trademarks), then the association between the mark and its source is presumed and the mark is eligible for trademark protection. *Abercrombie & Fitch, 537 F.2d at 9-11*.

However, if a mark is merely descriptive, then proof of secondary meaning in the marketplace is required for the mark to be eligible for protection. *Thompson Medical, 753 F.2d at 212-13* & n.9. Both surnames and first names are regarded as descriptive terms and, therefore, one who claims federal trademark rights in a name must prove that the name has acquired a secondary meaning. *Tonawanda Street Corp. v. Fay's Drug Co., 842 F.2d 643, 648-49 (2d Cir. 1988)*. "Secondary meaning" is defined as "the consuming public's understanding that the mark, when used in context, refers not to what the descriptive word ordinarily describes, but [*10] to the particular business that the mark is meant to identify." *Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 125 (4th Cir. 1990)*. In the case of a trade name, secondary meaning is "the power of a name ... to symbolize a particular business."

*Ideal Toy Corp. v. Kenner Products Div'n of General Mills Fun Group, Inc., 443 F. Supp. 291, 305 n. 14 (S.D.N.Y. 1977)*. If a trade name has not acquired secondary meaning, the purchaser will not make an association with a particular producer and thus will not be misled by an identical or similar mark.

A. *Secondary Meaning*

Proof of secondary meaning entails a rigorous evidentiary standard. "The burden of proving secondary meaning is on the party asserting it, whether he is the plaintiff in an infringement action or the applicant for federal trademark registration." *Yamaha Int'l. Corp. v. Hoshino Gakki Co., Ltd., 840 F.2d 1572, 1578-79 (Fed. Cir. 1988)*; *accord 815 Tonawanda Street Corp. v. Fay's Drug Co., Inc., 842 F.2d 643, 647-48 (2d Cir. 1988)* (noting that the burden of proving secondary meaning is on the party seeking to obtain legal protection for its mark). Moreover, [*11] a certificate of registration constitutes prima facie evidence of the validity of the registered mark and relieves the holder of the burden of proving secondary meaning. *15 U.S.C. § 1057(b) (1997)*; *Qualitex Co. v. Jacobson Products Co., Inc., 13 F.3d 1297, 1301 (9th Cir. 1994), rev'd on other grounds, 514 U.S. 159, 131 L. Ed. 2d 248, 115 S. Ct. 1300 (1995)*. The burden of proof, therefore, is on Sporting to prove that it is entitled to common law trademark protection.

The Second Circuit has promulgated six factors adopted by this Court as relevant to, though not dispositive of, secondary meaning: (1) advertising expenditures; (2) consumer studies linking the mark to a source; (3) sales success; (4) unsolicited media coverage; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the mark's use. *Thompson Medical, 753 F.2d at 217*; *Perini, 915 F.2d at 125*. "In assessing the existence of secondary meaning, no single factor is determinative ... and every element need not be proved. Each case, therefore, must be resolved by reference to the relevant factual calculus." *Thompson Medical, 753 F.2d at 217.* [*12]

B. *Evaluation of the Evidence*

Sporting concedes that the district court properly relied upon *Perini* as the relevant law. In support of its claim, Sporting proffered the following evidence to the district court: (1) a trade name survey conducted by Robert L. Mead ("Mead Report"); (2) the expert witness opinion of Gary D. Krugman ("Krugman Opinion"); (3) its gross sales and advertising figures for the years 1984 through 1989; (4) fifteen customer affidavits; (5) sixty five customer checks made payable to "Dick's"; (6) details regarding a waterfowl calling seminar organized in 1982; and (7) a 1982 newspaper article mentioning its store in reporting on the increasing use of decoys by Maryland

1999 U.S. App. LEXIS 19942, *

hunters. For the reasons explained below, we affirm the district court's grant of summary judgment to Clothing on the complaint and on Clothing's counterclaim. Evaluating Sporting's evidence separately, the Court will first address the Mead Report. The Mead Report is a telephone survey conducted by the staff of Robert L. Mead on November 26 and 27, 1996. Mead's staff interviewed 200 men over the age of 25 who had lived in the Baltimore area for more than three years and who expressed an [*13]  interest in hunting or fishing. Mead submits that 48 of these men were licensed hunters and 22 of them associated the name "Dick's" with Sporting's store. In addition, Mead reports that 32% of 126 men who bought hunting and/or fishing licenses (i.e., 40 individuals) associated the name "Dick's" with Sporting's store. Finally, Mead claims that 56% of 18 gun permit buyers (i.e., 10 individuals) associated the name "Dick's" with Plaintiff's store.

In the proceedings below, Clothing moved to exclude the Mead Report from evidence. In a Memorandum dated March 31, 1998, the district court found that the Mead Report fell short of establishing secondary meaning for the following reasons: (1) it failed to address the relevant time period (1989); (2) it focused unjustifiably on license and gun permit buyers; and (3) it excluded substantial portions of the relevant population. Mem. at 9. Consequently, the district court discounted Mead's findings, but did not rule on the report's admissibility.

Survey evidence is admissible as an exception to the hearsay rule only if the survey is "material, more probative on the issue than other evidence and if it has guarantees of trustworthiness." *Harolds Stores, Inc., et al. v. Dillard Dept. Stores, Inc., 82 F.3d 1533, 1544 (10th Cir. 1996)* [*14]  (citing *Brunswick Corp. v. Spinit Reel Co., 832 F.2d 513, 522 (10th Cir. 1987)); accord* 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* P 901(b)(9)[03] at 901-140 (1995) ("The admissibility of survey or sampling results depends upon two factors: necessity and trustworthiness."). "A survey is trustworthy if it is shown to have been conducted according to generally accepted survey principles." *Brunswick Corp., 832 F.2d at 522.* "The survey should sample an adequate or proper universe of respondents." *Harold's Stores, 82 F.3d at 1544* (citing *Exxon Corp. v. Texas Motor Exchange of Houston, Inc., 628 F.2d 500, 507 (5th Cir. 1980)).* "That is, the persons interviewed must adequately represent the opinions which are relevant to the litigation." *Amstar Corp. v. Domino's Pizza, Inc., 615 F.2d 252, 264 (5th Cir.), cert. denied, 449 U.S. 899, 66 L. Ed. 2d 129, 101 S. Ct. 268 (1980).* The district court should exclude the survey "when the sample is clearly not representative of the universe it is intended to reflect." *Harold Stores, 82 F.3d at 1544* (citing [*15]  *Bank of Utah v. Commercial Sec. Bank, 369 F.2d 19, 27 (10th Cir. 1966), cert. denied, 386 U.S. 1018 (1967)).*

After careful review of the Mead Report, this Court finds that the district court would have abused its discretion had it admitted the report into evidence. *See Eisenstadt v. Centel Corp., 113 F.3d 738, 742 (7th Cir. 1997)* (noting that hearsay is inadmissible in summary judgment proceedings save affidavits and depositions). An analysis of the Mead Report reveals that its findings are unreliable for purposes of establishing secondary meaning. For example, only 126 of the 200 men surveyed were aware of a store named "Dick's" in the Baltimore area, and only 19 of the original 200 men surveyed identified goods sold by "Dick's" as hunting or fishing equipment. Mead Report at 10. In addition, only 21 individuals overall (i.e., 10.5% of the original 200) identified Essex, Maryland as the location of a "Dick's" store in the Baltimore area. *Id.*

In addition, the fact that the Mead Report excluded men under the age of 25 and all women regardless of age from its sample of 200 individuals contributes to its unreliability. The report's [*16]  unreliability is corroborated by the findings of Marshall G. Greenberg, Ph.D., who found that nearly 38% of all prospective buyers of hunting and fishing gear and guns were female and 9% of all prospective buyers were males between the ages of 18 and 24. Greenberg Op. at 3. Dr. Greenberg's survey also revealed that awareness of Sporting's store was extremely low. In 1997, fewer than 2% of 414 potential customers in the Baltimore area were aware of Sporting's store on an unaided basis, and only 9.9% of potential customers indicated awareness of the store after its location was disclosed. J.A. at 489.

Dr. Greenberg also discovered that only 1.7% of Sporting's potential customers indicated an awareness of Sporting's store prior to February 1995. Based upon this evidence, the district court reasoned that the only reasonable inference was that there was low awareness of Sporting's store among potential consumers in 1989. This Court agrees. For the foregoing reasons, we find the Mead Report to be inadmissible hearsay and note that the record fails to contain any other consumer study linking Sporting's trade name to its Essex, Maryland store.

The opinion of trademark attorney Gary [*17]  D. Krugman also fails to bolster Sporting's claim that its trade name had acquired secondary meaning by 1989. On October 3, 1996, Krugman opined in an expert witness report that the mark "Dick's Sporting Goods" had acquired secondary meaning and was entitled to protection from an infringing mark or name likely to cause confusion. Krugman Report at 8. Krugman based his opinion upon the fact that Sporting had been selling and advertising sporting goods for "some 25 years" and upon the "substantial sales volume" enjoyed by Sporting "for at least the last six years. . . ." *Id.* This Court is unpersuaded by Krugman's opinion and finds that it lacks the foundation

necessary to render it probative of secondary meaning for the following reasons.

First, Krugman concedes in his deposition that he failed to familiarize himself with the sporting goods market prior to rendering his opinion. Second, he admits that he failed to consider any consumer studies or other pertinent information relevant to the sporting goods industry, the sporting goods market, or Sporting's prospective buyers. Third, he admits that he did not attempt to ascertain the amount of money expended by Sporting on advertising, [*18] the frequency of Sporting's advertising, or the effectiveness of Sporting's advertising. Fourth, he concedes that he did not consider media coverage of any kind. Finally, Krugman admits that in evaluating Sporting's "substantial sales volume," he obtained no information regarding the total sales volume of sporting goods in the Baltimore area or elsewhere, but simply believed that annual gross profits of $ 100,000 must be "substantial." Krugman Dep. at 97-100. In short, Krugman failed adequately to evaluate the factors articulated by this Court in *Perini* as relevant to secondary meaning. As a result, his opinion that the trade name "Dick's Sporting Goods" had acquired secondary meaning must be rejected. Even if this Court were to accept Krugman's opinion, he has presented no evidence that Sporting's trade name acquired secondary meaning as of the year in question, 1989.

Likewise, Sporting's advertising expenditures fail to establish that its trade name had acquired secondary meaning in the minds of a substantial portion of the consuming public by 1989. In accordance with *Perini*, the district court properly held that "substantial advertising expenditures may establish a retailer's [*19] name in the market and, under appropriate circumstances, support an inference that such advertising had been successful at creating name recognition among a significant portion of the consuming public." Mem. at 12. In the instant case, however, Sporting spent only $ 14,206.00 on advertising from 1984 to 1989. Of that amount, Sporting spent less than one thousand dollars annually from 1987 to 1989. Based upon this evidence, the district court held that Sporting may have been a "healthy local retail store" but that its advertising expenditures did not suggest "the kind of campaign that would create secondary meaning in a trade name." Mem. at 13-14.

On appeal, Sporting argues that the district court failed to consider its advertisements featured in the Yellow Pages and on the cover of a retail sporting goods catalog. However, it is clear that the district court not only considered Sporting's Yellow Pages advertisements, but also Sporting's advertisements featured in local brochures. Finding that Sporting has presented no evidence that its advertising expenditures exceeded a total of $ 14,206.00 for the years 1984 through 1989, inclusive of costs for

advertising in the Yellow Pages or [*20] otherwise, this Court concludes that Sporting's advertising expenditures were *de minimis*.

Even if this Court were to conclude that Sporting's advertising expenditures were significant, Sporting has failed to show that its expenditures were effective in causing consumers in the Baltimore, Maryland geographic area to associate the trade name "Dick's" or "Dick's Sporting Goods" with Sporting's business. *See FM 103.1, Inc. v. Universal Broadcasting of New York, Inc., et al., 929 F. Supp. 187, 196 (D.N.J. 1996)* ("Large advertising or promotional expenditures do not contribute to establish a secondary meaning unless the moving party explains how its efforts were effective in causing the relevant group of consumers to associate the mark with itself."). "While evidence of advertising may be relevant," the mere expenditure of money is not, in itself, determinative of the actual result in buyers' minds." 2 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 15:51 (4th ed. 1997). A third factor cited by *Perini* as relevant to the establishment of secondary meaning is sales success. The record in this case shows that Sporting failed to achieve a level [*21] of sales from which secondary meaning may be inferred. For example, a national survey submitted by Sporting shows that Marylanders spent approximately $ 111 million on fishing equipment and $ 78 million on hunting equipment in any given year. [2] By contrast, Sporting's tax returns reflect gross sales of $ 641,976 in 1984, $ 658,782 in 1985, $ 684,765 in 1986, $ 609,664 in 1987, $ 557,358 in 1988, and $ 558,177 in 1989. The district court held that these figures revealed that Sporting's sales "were a small portion of total sales of hunting and fishing equipment in Maryland," and, therefore, "did not suggest the kind of market penetration which would reasonably support an inference of secondary meaning." Mem. at 13-14. For the following reasons, this Court concurs with the finding of the district court.

> 2   1991 National Survey of Fishing, Hunting and Wildlife Associated Recreation (J.A. at 754). Although 1991 is the only year for which the parties have submitted information of this kind, the Court finds that it is reasonable to assume that annual fluctuations, if any, have not been significant.

[*22]   Sporting argues that it enjoyed substantial sales for over 18 years in the retail sporting goods industry prior to Clothing's registration of its trade name. While one may concede that Sporting maintained a thriving local business during the years in question, its sales simply do not constitute a significant portion of the $ 111 million and $ 78 million Marylanders spent on fishing and hunting equipment, respectively. Indeed, the record reflects

that Sporting's sales decreased from $ 684,765 in 1986 to $ 558,177 in 1989, nearly twenty percent. Moreover, Sporting's gross sales decreased from $ 509,206 in 1990 to $ 367,562 in 1994. In other words, from its high water mark in 1986, Sporting's sales diminished by nearly half without any competition from Clothing. Based upon this evidence, this Court cannot find that Sporting's gross sales support a reasonable inference that the trade name "Dick's" or "Dick's Sporting Goods" had acquired secondary meaning in the minds of actual or prospective consumers by 1989.

As evidence of unsolicited media coverage, Sporting asserts that it received frequent, unsolicited media attention on the radio and in various Baltimore newspapers prior to 1990. [*23] Specifically, Sporting argues that its business was featured in the *Sun Paper*, *News American*, *Bill Burton's Reports*, and in *Fishing in Maryland*. Clothing argues that this Court should exclude Sporting's allegations of unsolicited media attention because Sporting failed to disclose any publicity, other than paid advertising, in its response to interrogatories. Clothing also asserts that Sporting never supplemented or corrected its response. Because Clothing's arguments are persuasive, we find that evidence of Sporting's alleged incidents of unsolicited media coverage is not properly before this Court. Moreover, we note that the district court's order of November 24, 1997, did not grant Sporting leave to supplement the record with evidence of unsolicited media coverage.

Therefore, the only evidence concerning unsolicited media coverage properly before this Court is public attendance at a waterfowl calling seminar organized by Sporting in 1982 and a newspaper article mentioning the Sporting's store on January 17, 1982. After careful consideration, the Court concludes that neither event is probative of secondary meaning. First, both events occurred well before 1989. Second, [*24] the record is devoid of evidence indicating that Sporting organized any other seminar or was featured in any other newspaper articles after 1982. Accordingly, the only reasonable inference is the one reached by the district court: that these events were isolated incidents. Had Sporting's trade name acquired secondary meaning by 1989, one would have expected similar events to have occurred after 1989. The fact that future events did not occur undermines Sporting's claim of secondary meaning and tends to indicate that Sporting did not enjoy widespread recognition in the minds of the consuming public, as alleged.

As additional evidence of secondary meaning, Sporting asserts that Clothing attempted to plagiarize its mark, a fifth factor relevant to secondary meaning under *Perini*. From this proposition, Sporting also argues that the district court erred in refusing to shift the burden of proof to Clothing to show a lack of secondary meaning.

For the following reasons, we conclude that these arguments must fail.

In trademark infringement cases, "the courts have held that evidence of deliberate copying establishes a prima facie case of secondary meaning, subject to rebuttal by the defendant, [*25] with the defendant bearing the ultimate burden of proof once deliberate copying is proven." *M. Kramer Mgf. Co. v. Andrews, 783 F.2d 421, 449 (4th Cir. 1986)*; *Audio Fidelity, Inc. v. High Fidelity Recordings, Inc., 283 F.2d 551, 558 (9th Cir. 1960)* (quoting *My-T Fine Corp. v. Samuels, 69 F.2d 76, 77 (2d Cir. 1934)* (L. Hand, Jr.)), *cert. denied, 371 U.S. 934 (1962)*. "The rationale for this presumption is that when a defendant copies the trademark of a competitor, it is likely that he intended to appropriate some commercial advantage or benefit that his competitor derived from the use of the mark." *M. Kramer Mfg., 783 F.2d at 449*; *Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc., 659 F.2d 695, 704 (5th Cir. 1981)* (quoting *American Chicle Co. v. Topps Chewing Gum, Inc., 208 F.2d 560, 563 (2d Cir. 1953)* (L. Hand, J.)), *cert. denied*, 457 U.S. 1126 (1982).

A review of the record evidence compels the conclusion that Clothing did not deliberately copy Sporting's alleged common law trade name. Generally, intentional copying must involve more than simply [*26] using the same name. For example, in *Polo Fashions, Inc. v. Extra Special Productions, Inc., 451 F. Supp. 555 (S.D.N.Y. 1978)*, the district court held that while the defendant could not be enjoined from using the descriptive name "Polo" on its clothing products, it had engaged in intentional copying by labeling its clothing "POLO by Marco Polo" and utilizing the image of a polo player in a manner strikingly similar to that used in the plaintiff's "POLO BY RALPH LAUREN" clothing line. Therefore, the fact that Clothing utilizes the trade name "Dick's" to promote its sporting goods merchandise does not, standing alone, support a finding of intentional copying.

Moreover, the record reveals no evidence that Clothing intended to palm off the reputation or goodwill of Sporting by employing the trade name "Dick's" or "Dick's Sporting Goods." The fact that Clothing has been in business for over 40 years and operates in excess of 50 retail stores nationwide renders Sporting's argument weak from the outset. Because no evidence exists that Clothing intentionally copied Sporting's trade name, the district court properly refused to shift the burden to Clothing to show a lack of [*27] secondary meaning.

As to the final *Perini* factor, length and exclusivity of the mark's use, the district court found that Sporting had been "neither specific nor consistent in identifying the area for which it claims to have acquired common law rights to its trade name." Mem. at 7. Sporting does not

1999 U.S. App. LEXIS 19942, *

contest this finding but attempts to minimize its failure to do so:

> The Sporting accepts this point as to the lack of consistent identification up to the point in time of Sporting's Cross Motion for Summary Judgment filed June 24, 1997. The market area claimed by the Sporting was well defined by specific by (sic) zip code in that document.

Sporting's Br. at 32.

Contrary to this argument Sporting did not assert in its Cross Motion for Summary Judgment that its use of the trade name "Dick's" or "Dick's Sporting Goods" had been *exclusive* in any geographic region. Rather, Sporting argued in that document only that its use of the trade name had been *continuous*. It was not until Sporting filed its Supplemental Memorandum in Support of its Motion for Summary Judgment on January 16, 1998, that it argued that its use had been both continuous and exclusive in the Baltimore, [*28] Maryland area. Sporting also argued that Clothing had an affirmative duty to rebut Sporting's claim of exclusivity. Supplemental Mem. in Supp. of Plaintiff's Motion for Summary Judgment at 11. Sporting's argument is unpersuasive for the following reasons.

In *Celotex Corp. v. Catrett, 477 U.S. 317, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*, the district court had entered summary judgment for the defendant. The D.C. Circuit Court reversed because the defendant had failed to support its motion for summary judgment with evidence tending to negate the plaintiff's claim. The Supreme Court reversed, upholding the district court's entry of summary judgment. As a leading treatise on federal procedure explains, under *Celotex*, "the moving party on a summary judgment motion need not produce evidence, but simply can argue that there is an absence of evidence by which the nonmovant can prove his case." 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE § 2720, at 10 (2d ed. Supp. 1994); *see Celotex, 477 U.S. at 325* ("The burden on the moving party may be discharged by 'showing' -- that is, pointing out to the district [*29]  court -- that there is an absence of evidence to support the nonmoving party's case."); *accord Cray Communications, Inc. v. Novatel Cmptr. Systems, Inc., 33 F.3d 390 (4th Cir. 1994)*. In sum, it is clear under *Celotex* and *Cray* that Clothing bears no burden of production. Instead, Clothing may simply assert, as it has done, that Sporting has presented insufficient evidence to establish secondary meaning.

Moreover, this Court notes that the district court's order of November 24, 1997, did not grant Sporting leave

to present evidence regarding exclusivity. That order granted Sporting limited leave to supplement the summary judgment record with evidence of the following only:

> 1. Copies of newspaper advertisements from 1989;
>
> 2. Copies of Plaintiff's tax returns for the years 1985 to 1989;
>
> 3. An affidavit from an attendee to a waterfowl conference; and
>
> 4. Supplemental affidavits from 18 affiants already contained in the record.

J.A. at 572.

Notwithstanding the district court's order, Sporting argued in its Supplemental Memorandum that its use of the trade name "Dick's" or "Dick's Sporting Goods" had been exclusive. Specifically, Sporting paints the picture [*30]  that it guarded its trade name by compelling a competing business, Dick's Sports Center, Inc., to cease using the trade name "Dick's." As a result, Sporting contends, the competitor went out of business. Supp. Mem. at 8-9. In other words, Sporting would have this Court believe that but for a short interval of time, it alone utilized the trade name "Dick's" in the Baltimore, Maryland geographic region. To the contrary, records from the Maryland Department of Assessments and Taxation reveal that Dick's Sports Center, Inc. conducted business in the State of Maryland for 11 years and was dissolved for failure of its owner to file a personal property tax return. J.A. at 798. Because Dick's Sports Center, Inc. utilized the trade name "Dick's" simultaneously with Sporting from 1985 to 1996, Sporting's claim of exclusivity must fail. Although Sporting utilized the trade name "Dick's" for many years, length of use and exclusivity are not synonymous.

Sporting also argues on appeal that the district court "abused its discretion by refusing to allow [it] discovery of supplemental proof of name recognition offered to show secondary meaning as of 1989...." Sporting's Br. at 33. A review of the [*31]  record shows that Sporting argued in its original Motion for Summary Judgment that its trade name had acquired secondary meaning as of 1995--the year Clothing opened its first store in Maryland. Clothing argued in response that Sporting's proof of secondary meaning was inadequate in that it had failed to proffer evidence of secondary meaning as of the relevant year, 1989. Following a telephone conference with the parties, the district court entered the order of November 24, 1997, granting Sporting limited leave to supplement the summary judgment record with the specific items

1999 U.S. App. LEXIS 19942, *

noted heretofore. Sporting now asserts that the district court erred in refusing to allow it to supplement the record with the following additional evidence: (1) consumer studies; (2) expert witness reports; (3) the market area claimed by Sporting; and (4) "a review of any additional factors." Sporting's Br. at 33.

This Court finds that the district court acted within its discretion in refusing to allow Sporting to start over from square one. "District courts enjoy nearly unfettered discretion to control the timing and scope of discovery...." *Hinkle v. City of Clarksburg, 81 F.3d 416, 426 (4th Cir. 1996).* [*32] In fact, had the district court allowed Sporting to supplement the summary judgment record more extensively, it may have abused its discretion. In *Cray Communications, Inc. v. Novatel Cmptr. Systems, Inc., 33 F.3d 390 (4th Cir. 1994)*, this Court affirmed the exercise of the district court's discretion in refusing to consider new evidentiary matters and reasoned:

> Novatel contends, in essence, that dismissal of its fraud claim because of its counsel's mistake imposes an unjust penalty on the client. As Justice Harlan once explained, such contentions are "wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of [its lawyer]...." Keeping this suit alive merely because plaintiff should not be penalized for the omissions of his own attorney would be visiting the sins of plaintiff's lawyer upon the *defendant*.

*Id. at 395* (emphasis in original).

Similarly, in the instant case, it appears that Sporting's failure to submit cogent evidence in its original motion for summary judgment may have been attributable to oversight. It is well settled law and undisputed by Sporting that the appropriate [*33] date for proof of secondary meaning in this case is 1989, the date Clothing obtained federal registration of its trademark. *See Armand's Subway, Inc. v. Doctor's Assocs., 604 F.2d 849, 849-50 (4th Cir. 1979)* (noting that registration constitutes constructive notice to competing users). Accordingly, the district court granted Sporting only limited leave to supplement the summary judgment record and did not abuse its discretion in refusing to allow Sporting to reopen the entire record.

Because Sporting has failed to satisfy any of the factors relevant to secondary meaning under *Perini*, we find that Sporting's trade name is ineligible for trademark protection. Sporting's evidence of 65 customer checks made payable to "Dick's" and 15 customer affidavits does not change our conclusion. No reasonable juror could find that 65 checks and 15 affidavits connote that a substantial portion of the consuming public associated the trade name "Dick's" or "Dick's Sporting Goods" with Sporting's business as of 1989. We note that none of the checks proffered by Sporting were written before the year 1996, and only some of the affiants claim to have patronized Sporting's store on [*34] or before 1989. For these reasons, Sporting's checks and affidavits are insufficient to establish secondary meaning. Indeed, none of Sporting's admissible evidence, considered separately or in the aggregate, suffices to establish secondary meaning under *Perini*.

Finally, we address Sporting's argument that the doctrine of reverse confusion is applicable to lower or shift Sporting's burden of proving secondary meaning. "Reverse confusion occurs when a larger, more powerful company uses the trademark of a smaller, less powerful senior owner and thereby causes likely confusion as to the source of the senior user's goods or services." *Fisons Horticulture,* 18 *Inc. v. Vigoro Industries, Inc., 30 F.3d 466, 474 (3d Cir. 1994)*. To date, this Court has not adopted the doctrine of reverse confusion. However, even if we were to adopt the doctrine, it would not apply to the instant case because Sporting is not a "trademark holder." In *DeCosta v. Viacom International, Inc., 981 F.2d 602 (1st Cir. 1992)*, the United States Court of Appeals for the First Circuit discussed the leading case on reverse confusion, *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co., 561 F.2d 1365 (10th Cir. 1977)*, [*35] *cert. dismissed*, 434 U.S. 1052 (1978), and noted that only a "*trademark holder* could base a claim on ... 'reverse confusion.'" *DeCosta, 981 F.2d at 608* (emphasis added). In other words, the doctrine of reverse confusion is a damages theory, expanding the relief available to a plaintiff who has already established exclusive right to its trade name. Because Sporting failed to establish that its trade name acquired secondary meaning in the minds of a substantial portion of the consuming public as of 1989, Sporting is not a "trademark holder" and cannot avail itself of the doctrine of reverse confusion.

Because Sporting has failed to establish that its trade name acquired secondary meaning in the minds of the consuming public by 1989, we affirm the district court's denial of summary judgment to Sporting on the Complaint and grant of summary judgment to Clothing on the Complaint and on Clothing's counterclaim.

*AFFIRMED*



**MASTERCARD INTERNATIONAL INCORPORATED, Plaintiffs, -against-
NADER 2000 PRIMARY COMMITTEE, INC., NADER 2000 GENERAL COM-
MITTEE, INC., and RALPH NADER, Defendants.**

**00 Civ. 6068 (GBD)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

*2004 U.S. Dist. LEXIS 3644; 70 U.S.P.Q.2D (BNA) 1046; Copy. L. Rep. (CCH) P28,781*

**March 8, 2004, Decided
March 8, 2004, Filed**

**DISPOSITION:**      [*1]  Defendants' motion for summary judgment granted in its entirety.

**COUNSEL:** For Mastercard International Incorporated, Plaintiff: Russell H. Falconer, Jeanne M. Hamburg, LEAD ATTORNEYS, Baker, Botts, L.L.P., New York, NY.

For Nader 2000 Primary Committee, Inc., Defendant: Anthony L. Fletcher, LEAD ATTORNEY, Fish & Richardson, P.C., New York, NY.

**JUDGES:** GEORGE B. DANIELS, United States District Judge.

**OPINION BY:** GEORGE B. DANIELS

**OPINION**

MEMORANDUM OPINION AND ORDER

GEORGE B. DANIELS, District Judge:

Plaintiff MasterCard filed an action against defendants Ralph Nader and his political committee, alleging unfair competition, misappropriation, trademark infringement and dilution of MasterCard's trademarks under the *Federal Trademark Act and* state and common law. Plaintiff also alleged infringement of plaintiff's copyright under the *Copyright Act of 1976.* Defendants filed a motion for summary judgment. Defendants' motion for summary judgment is hereby GRANTED in its entirety.

**BACKGROUND**

MasterCard, a Delaware corporation with its principle place of business in New York, is a large financial institution that engages in the interchange of funds by credit and debit payment cards through [*2]  over 23,000 banks and other foreign and domestic member financial institutions. Since Fall of 1997, MasterCard has commissioned the authorship of a series of advertisements that have come to be known as the "Priceless Advertisements." These advertisements feature the names and images of several goods and services purchased by individuals which, with voice overs and visual displays, convey to the viewer the price of each of these items. At the end of each of the Priceless Advertisements a phrase identifying some priceless intangible that cannot be purchased (such as "a day where all you have to do is breathe") is followed by the words or voice over: "Priceless. There are some things money can't buy, for everything else there's MasterCard."

In August 2000, MasterCard became aware that Ralph Nader and his presidential committee were broadcasting an allegedly similar advertisement on television that promoted the presidential candidacy of Ralph Nader in the 2000 presidential election. That political ad included a sequential display of a series of items showing the price of each ("grilled tenderloin for fund-raiser; $ 1,000 a plate;" "campaign ads filled with half-truths: $ 10 million;  [*3]  " "promises to special interest groups: over $ 100 billion"). The advertisement ends with a phrase identifying a priceless intangible that cannot be purchased ("finding out the truth: priceless. There are some things that money can't buy"). The resulting ad (the "Nader ad") was shown on television during a two week period from August 6-17, during the 2000 presidential campaign, and

Appeal: 14-1568    Doc: 16    Filed: 10/06/2014    Pg: 85 of 110

Page 2
2004 U.S. Dist. LEXIS 3644, *; 70 U.S.P.Q.2D (BNA) 1046;
Copy. L. Rep. (CCH) P28,781

also appeared on the defendants' web site throughout that campaign. Plaintiff sent defendants a letter explaining its concern over the similarity of the commercials, and suggested that defendants broadcast a more "original" advertisement. When plaintiff contacted representatives of defendants a few days later, plaintiff MasterCard advised defendants to cease broadcasting their political advertisement due to its similarity with MasterCard's own commercial advertisement and resulting infringement liability.

When the parties could not come to an agreement, on August 16, 2000, MasterCard filed a complaint alleging the following counts against Ralph Nader and his presidential committee; trademark infringement and false designation of origin in violation of *Section 43(a) of the Lanham Act*; infringement of a registered [*4] trademark in violation of *Section 32(1) of the Lanham Act*; dilution in violation of *Section 43(c) of the Lanham Act*; copyright infringement in violation of the Copyright Act; unfair competition; misappropriation; infringement of New York Common Law Trademark Rights; dilution under New York law; and deceptive trade practices. Plaintiff sought a preliminary injunction during the 2000 presidential campaign which was denied by this Court. Thereafter, defendants moved for summary judgment on all nine of plaintiff's counts.

## DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*; *Nebraska v. Wyoming, 507 U.S. 584, 590, 113 S. Ct. 1689, 1694, 123 L. Ed. 2d 317 (1993)*. The burden of demonstrating that no factual dispute exists is on the moving party. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*. Once the moving party has met this burden, [*5] the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Fed. R. Civ. P. 56(e)*. In deciding a motion for summary judgment, a court must resolve all ambiguities and draw all reasonable inferences in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. Summary judgment should be granted only when no reasonable trier of fact could find in favor of the nonmoving party. *Gallo v. Prudential Residential Services, Ltd., 22 F.3d 1219, 1224 (2d Cir. 1994)*.

### 1. Trademark Infringement

MasterCard's first count is based on Section 43(a) of the Trademark Act, *15 U.S.C. Section 1125(a)*. Plaintiff claims that defendants have used two of MasterCard's

service marks-"THERE ARE SOME THINGS MONEY CAN'T BUY. FOR EVERYTHING ELSE THERE'S MASTERCARD," and "PRICELESS" to misrepresent that the 2000 presidential candidacy of Ralph Nader for the office of President of the United States was endorsed by MasterCard. (Complaint P 23). Plaintiff's second count also pleads a claim for trademark infringement [*6] due to defendants' use of the two federally registered trademarks, ("THERE ARE SOME THINGS MONEY CAN'T BUY. FOR EVERYTHING ELSE THERE'S MASTERCARD," and "PRICELESS"), pursuant to Section 32(1) of the Trademark Act, *15 U.S.C. Section 1114(1)*.

In trademark infringement cases, the Court must apply the undisputed facts to the balancing test outlined in *Polaroid Corp. v. Polarad Elecs., Corp., 287 F.2d 492, 495 (2d Cir. 1961)*, and may grant summary judgment where it finds, as a matter of law, that there is no likelihood of confusion to the public. See *Lois Sportswear, USA, Inc. v. Levi Strauss & Co., 799 F.2d 867 (2d Cir. 1986)*; *Lang v. Retirement Living Publ'g Co., 949 F.2d 576, 580 (2d Cir. 1991)*. In determining whether there is a likelihood of confusion between MasterCard's Priceless Advertisements and Ralph Nader's Political Ad, the Court weighs eight factors, as articulated in *Polaroid, 287 F.2d at 495*: (1) strength of the Plaintiff's mark; (2) degree of similarity between the two marks; (3) proximity of the products or services; (4) likelihood that the prior owner will "bridge the gap" into [*7] the newcomer's product or service line; (5) evidence of actual confusion between the marks; (6) whether the defendant adopted the mark in good faith; (7) the quality of defendants' products or services; and (8) sophistication of the parties' consumers. See *Time, Inc. v. Petersen Publishing Co., 173 F.3d 113, 117 (2d Cir. 1999)*; See also *Morningside Capital Group, 182 F.3d 133, 137 (2d Cir. 1999)*.

In demonstrating the strength of the trademark, the plaintiff must establish either that the mark is inherently distinctive or alternatively, that the mark has acquired secondary meaning. See *McGregor-Doniger Inc. v. Drizzle, Inc., 599 F.2d 1126, 1131 (2d Cir. 1979)*. MasterCard's marks, "priceless" and "there are some things money can't buy, for everything else there's MasterCard", are registered. MasterCard asserts that their marks have attained secondary meaning. Defendants concede that MasterCard's Priceless Advertisements are strong enough to have become a part of present-day American popular culture. (Def.'s Mem. in Supp. of Mot. for Summ. J., p. 19). The strength of MasterCard's trademarks is indisputable.

In determining the second [*8] factor, the similarity of the marks in issue, a court must consider whether the marks create the same overall commercial impression when viewed separately. See *Nikon, Inc. v. Ikon Corp., 803 F. Supp. 910, 926 (S.D.N.Y. 1992)*. A court may rely

2004 U.S. Dist. LEXIS 3644, *; 70 U.S.P.Q.2D (BNA) 1046;
Copy. L. Rep. (CCH) P28,781

upon its own visual inspection in making this determination. See e.g., *Venetianaire Corp. v. A & P Import Co., 429 F.2d 1079, 1081 (2d Cir. 1970)*. In this instance, it is not necessary for the Court to do so, because once again, defendants do not dispute that the Nader Ad employs the word "priceless" in the same manner used by MasterCard in its television advertisements. (Zopoth Aff. PP304, Exs. 9 and 10). The Nader Ad also employs the phrase "there are some things money can't buy," which is part of a MasterCard trademark. Defendants do not dispute that they employ that phrase in the same look, sound and commercial impression as employed by MasterCard. Id.

The third and fourth factors, the proximity of the products or services and the likelihood that the prior user will bridge the gap, respectively, weigh in favor of defendants. There is little similarity between MasterCard's credit and debit card business [*9] and Ralph Nader's political candidacy. There is little likelihood and no evidence that MasterCard, a financial services company, would have any direct involvement in supporting a candidate in a political presidential campaign. Similarly, neither Ralph Nader nor his political campaign committee have expressed any desire or intent to enter the credit card business or offer the public any direct financial services. (Def's Mem. in Supp. of Summ. J., p. 20).

Evidence of actual confusion, the fifth factor, also weighs in favor of defendants. This factor is perhaps the most significant when considering the overall likelihood of confusion by the public. "The best evidence of likelihood of confusion is the occurrence of actual confusion and mistakes." *Lambda Electronics Corporation, et al. v. Lambda Technology, Inc., 515 F. Supp. 915, 926 (S.D.N.Y. 1981)*. While it is not essential for a finding of trademark infringement to demonstrate actual confusion, "there can be no more positive proof of likelihood of confusion than evidence of actual confusion." *Id., at 926-27* (citing *Grotrian, et al. v. Steinway & Sons, 365 F. Supp. 707, 715-16 (S.D.N.Y. 1973)*, [*10] aff'd, *523 F.2d 1331 (2d Cir. 1975))*. In *Lang v. Retirement Living Publishing Co., 949 F.2d 576 (2d Cir. 1991)*, the Second Circuit affirmed the trial court's grant of summary judgment to the defendants on the ground that plaintiff had failed to raise a genuine issue of fact on likelihood of confusion. In that case, where the plaintiff, whose trade name was similar to that of defendants, received 400 phone calls and several letters from third parties attempting to reach the defendant, the Court explained that the Lanham Act seeks to prevent consumer confusion that enables a seller to pass off his goods as the goods of another, not to protect against confusion generally. *Id., at 583*. As evident by the present record, out of 452 e-mails to MasterCard regarding the Nader Ad, only two are relied upon as possibly reflecting confusion. (Grossman Aff. P9, Exs. 4). This is certainly not enough to show

actual confusion or that such confusion inflicted commercial injury to MasterCard. In support of its argument that actual confusion exists, MasterCard also relies on the written transcript of a broadcast of CNN's Late Edition, during which [*11] Connecticut Senator Christopher Dodd stated that he thought the Nader Advertisement was a credit card ad. A viewing of a tape of that program shows Senator Dodd laughing at his own joke, while speaking the words on which MasterCard relies to establish actual confusion. It is little or no evidence of actual confusion. Even if Senator Dodd had actually been confused, a few isolated instances of actual confusion are not sufficient to defeat a motion for summary judgment. *Brockmeyer v. Hearst Corp., 248, F. Supp.2d 281, 298 (S.D.N.Y. 2003)* ("one anecdotal instance of purported actual confusion is at best de minimis, indeed infinitesimal, and insufficient;" a survey revealing a less than 3% rate of confusion was insufficient to show a likelihood of confusion.); See also *Cumberland Packing Corp. v. Monsanto Co., 140 F. Supp.2d 241, 254 (E.D.N.Y. 2001)* (a survey showing a 7.84% confusion rate found to be insufficient to raise a material fact as to the likelihood of confusion). The plaintiff should be able to demonstrate a reasonable likelihood that reasonable people will be confused.

The sixth factor regarding good faith adoption of the mark also [*12] favors defendants. The relevant intent in this inquiry is whether the alleged infringer intended "to palm off his products as those of another." See *Miss Universe, Inc. v. Patricelli, 408 F.2d 506, 509 (2d Cir. 1969)*; See also *Maternally Yours, Inc. v. Your Maternity Shop, Inc., 234 F.2d 538, 542 (2d Cir. 1956)*. In the present case, there is no evidence that defendants intended to confuse the public. There is no basis to argue that the Ralph Nader political ad which has the clear intent to criticize other political candidates who accept money from wealthy contributors, at the same time, attempts or intends to imply that he is a political candidate endorsed by MasterCard. There is uncontradicted testimony that neither Ralph Nader, nor his committees, had any such intent. (Nader Aff. P21; Zopoth Aff. P7, Ex. 16).

The seventh factor, the quality of defendants' products or services, is of insignificant weight in this case. There is no reasonable comparison to be made between the quality of the products and services provided by MasterCard and the value of defendants' politics. MasterCard provides a quality of financial services which can readily be compared [*13] to its commercial competitors. However, it is purely the public's subjective opinion of the appeal and attractiveness of a political candidate's ideas and record which determines whether the public will buy the politics any candidate for office is selling.

The eighth and final factor to be weighed is the level of consumer sophistication in either of the relevant mar-

2004 U.S. Dist. LEXIS 3644, *; 70 U.S.P.Q.2D (BNA) 1046;
Copy. L. Rep. (CCH) P28,781

kets for credit card services or for political candidates. Unless otherwise demonstrated, it is reasonable to conclude that the general American public is sophisticated enough to distinguish a Political Ad from a commercial advertisement. Rarely, if ever, is there a realistic opportunity to confuse the two. Indeed, as previously discussed, out of the 452 e-mails received by MasterCard regarding Ralph Nader's Political Ad, only 2-3 questioned MasterCard's involvement with Ralph Nader's campaign. This sampling of American consumers, which is the only proof offered on the record, is a sufficient indication that consumers are generally sophisticated enough to decipher between MasterCard's commercial purposes and Ralph Nader's political agenda.

When balancing the eight Polaroid factors, no one factor can determine the ultimate [*14] issue of likelihood of confusion to the consumer. See *W.W.W. Pharm. Co. v. The Gillette Co., 808 F. Supp. 1013, 1022 (S.D.N.Y. 1992)*, aff'd, *984 F.2d 567 (2d Cir. 1993)*. To properly weigh these factors requires the court to view each factor in light of the totality of the evidence. Id. Thus, after balancing the *Polaroid* factors, this Court finds that there is no genuine issue of material fact with regard to any likelihood of confusion between MasterCard's Priceless Advertisements and Ralph Nader's Political Ad which could constitute a violation of the Trademark Act. Defendants' summary judgment motion to dismiss Counts One and Two of plaintiff's complaint is therefore granted.

MasterCard also alleges a state law claim under New York common law for trademark infringement in Count Seven of the complaint. Under New York common law, as is required under federal law, a plaintiff must show a likelihood of confusion between the two products in order to prevail. See *Nabisco v. Warner-Lambert Co., 32 F. Supp.2d 690, 701 (S.D.N.Y. 1999)*. As with plaintiff's federal Lanham Act claims, there is no likelihood of confusion between MasterCard's [*15] Priceless Ads and Ralph Nader's Political Ad. As a matter of law, plaintiff has failed to show a genuine issue of material fact as to the existence of a likelihood of confusion between MasterCard's financial services and Ralph Nader's 2000 presidential political campaign. Therefore, defendants are granted summary judgment on plaintiff's New York common law trademark infringement claim in Count Seven of the complaint.

2. Unfair Competition and Misappropriation

In its fifth and sixth counts, MasterCard alleges state law claims under New York common law for unfair competition and misappropriation. Under Section 301(a) of the Copyright Act, *17 U.S.C. § 301(a)*, all legal or equitable state rights that are equivalent to any of the exclusive rights granted within the general scope and subject matter of the Copyright Act are preempted by the Copyright Act. Courts have used a two-part test to determine whether a state cause of action will be preempted by the Copyright Act: (1) what is the nature of the work in question; and (2) what are the rights claimed in that work under state law. See *Harper & Row, Publishers, Inc. v. Nations Enters., 501 F. Supp. 848, 850 (S.D.N.Y. 1980)*, [*16] aff'd. *723 F.2d 195 (2d Cir. 1983)*, rev'd on other grounds, *471 U.S. 539, 85 L. Ed. 2d 588, 105 S. Ct. 2218 (1985)*; See also *Mayer v. Josiah Wedgwood & Sons, Ltd., 601 F. Supp. 1523, 1532 (S.D.N.Y. 1985)*.

The first prong for preemption is met when the nature of the work protected comes within the subject matter of copyright as defined by *§ § 102and 103* of the Copyright Act. See *§ 301(b)(1)*. Because MasterCard owns copyright registrations for several of its "Priceless" television advertisements, and because "advertisements are generally capable of receiving copyright protection," *Raffoler, Ltd. v. Peabody & Wright, Ltd., 671 F. Supp. 947, 950 (E.D.N.Y. 1987)*, MasterCard's advertisements clearly fall within the subject matter of the Copyright Act.

The second prong for preemption is met when the right granted under state law is "equivalent to any of the exclusive rights within the general scope of copyright as specified in *Section 106*." *17 U.S.C. § 301(a)*. See also *Harper, 501 F. Supp. at 850*; *Mayer, 601 F. Supp. at 1532*. The federal rights granted by the Copyright Act [*17] include the right "to prepare derivative works based upon the copyrighted work." *17 U.S.C. § 106*. As evident in the Complaint, MasterCard claims that the Nader Ad violated MasterCard's rights because it was derived form MasterCard's "Priceless" advertising. (Compl. P 50). The Second Circuit Court of Appeals has held that misappropriation and unfair competition claims "grounded solely in the copying of plaintiff's protected expression are deemed preempted by *Section 301*." *Computer Assocs. Int'l, Inc. v. Altai, Inc., 982 F.2d 693, 717 (2d Cir. 1992)* (citations omitted); See also *American Movie Calssics Co. v. Turner Entm't Co., 922 F. Supp. 926, 933 (S.D.N.Y. 1996)*. Thus, Counts Five and Six are dismissed on defendants' motion for summary judgment as those claims are preempted by federal copyright law.

In pleading its sixth count, along with its misappropriation claim, MasterCard also alleges the state law violation of "Palming off" by defendants. (Compl. P 62). "Palming off" or passing off, "occurs when a producer misrepresents his own goods or services as someone else's." *Dastar Corporation v. Twentieth Century Fox Film Corporation, et al., 539 U.S. 23, 123 S. Ct. 2041, 2045, n.1, 156 L. Ed. 2d 18 (2003).* [*18] Lack of likely consumer confusion is independently sufficient to defeat a claim of palming off. See *Towle Mfg. Co. v. Godinger Silver Art Co., Ltd., 612 F. Supp 986, 995-96 (S.D.N.Y. 1985).* Therefore, this claim also fails for the same reason MasterCard's trademark infringement claim fails: there is

2004 U.S. Dist. LEXIS 3644, *; 70 U.S.P.Q.2D (BNA) 1046;
Copy. L. Rep. (CCH) P28,781

no likelihood of confusion as a matter of law. Dismissal of Count Six is therefore warranted on this basis as well.

3. Dilution

Counts Three and Eight of plaintiff's complaint allege against defendants federal and state dilution of plaintiff's trademarks. The Federal Trademark Dilution Act, *15 U.S.C. § 1125(c)* and the New York anti-dilution law, *New York Gen. Bus. Law § 360-1*, protect against the unauthorized use of marks that impairs the goodwill and value of plaintiff's mark. "Dilution" is defined as "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of (1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake, or deception." *15 U.S.C. § 1127. Section 1125(c)* provides that the owner [*19] of a famous mark is entitled to an injunction against another person's "commercial use in commerce of a mark if such use begins after the mark or trade name has become famous and causes dilution of the distinctive quality of the mark." Under federal law, the elements for a claim of dilution are that "1) plaintiff's mark is famous; 2) it is inherently distinctive; 3) defendant's use of the junior mark is a commercial use in commerce; 4) defendant's use began after plaintiff's mark became famous; and 5) defendant's use of the junior mark causes dilution of the distinctive quality of the plaintiff's mark." Playtex Products, Inc. v. Georgia-Pacific, Inc., et al., 2003 U.S. Dist. LEXIS 1398, 2003 WL 21939706, 8 (S.D.N.Y. 2003). Moreover, a plaintiff must show "actual dilution, rather than a likelihood of dilution." *Moseley, et al., v V Secret Catalogue, Inc., et al., 537 U.S. 418, 433, 155 L. Ed. 2d 1, 123 S. Ct. 1115 (2003).* Under both federal and New York law, dilution can involve either blurring or tarnishment. *New York Stock Exchange, Inc., v. New York, New York Hotel, LLC, 293 F.3d 550, 557 (2d Cir. 2002);* See also *Perkins School for the Blind v. Maxi-Aids, Inc., et al., 274 F. Supp.2d 319, 325 (E.D.N.Y. 2003);* [*20] *World Wrestling Federation Entertainment, Inc. v. Bozelli, 142 F. Supp.2d 514, 529 (S.D.N.Y. 2001).*

Blurring has typically involved "the whittling away of an established trademark's selling power through its unauthorized use by others upon dissimilar products." *Mead Data Central, Inc. v. Toyota Motor Sales, U.S.A., Inc., 875 F.2d 1026, 1031 (2d Cir. 1989)* (describing such "'hypothetical anomalies' as 'Dupont shoes, Buick aspirin tablets, Schlitz varnish, Kodak pianos, Bulova gowns, and so forth'") (quoting legislative history of *section 368-d*) (citation omitted). That is, trademark dilution statutes are designed to cover those situations where the public knows that the defendant is not connected to or sponsored by the plaintiff, but the ability of the plaintiff's mark to serve as a unique identifier of the plaintiff's goods or services is weakened because the relevant public now also associates that designation with a new and different source. See *Federal Express Corp. v. Federal Espresso, Inc., 201 F.3d 168, 174 (2d Cir. 2000)* (quoting *Sports Auth. v. Prime Hospitality Corp., 89 F.3d 955, 965-66 (2d Cir. 1996)*) (discussing [*21] New York law) (internal quotation marks and brackets omitted).

In New York Stock Exchange, the Second Circuit held that blurring occurs when "'the defendant uses or modifies the plaintiff's trademark to identify the defendant's goods or services, raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product. To determine the likelihood of blurring, [courts] have looked to six factors, including: (i) the similarity of the marks; (ii) the similarity of the products covered; (iii) the sophistication of the consumers; (iv) the existence of predatory intent; (v) the renown of the senior mark; and (vi) the renown of the junior mark." *New York Stock Exchange, Inc., v. New York, New York Hotel, LLC, 293 F.3d 550, 558 (2d Cir. 2002)* (citing *Deere & Co. v. MTD Prods., Inc., 41 F.3d 39, 43 (2d Cir. 1994));* See also *Katz, et al. v. Modiri, et al., 283 F. Supp.2d 883, 901 (S.D.N.Y. 2003).*

Tarnishment occurs when the plaintiff's mark is "'linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context,' with the end result that 'the public will associate [*22] the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods.'" *Id.* "The sine qua non of tarnishment is a finding that the plaintiff's mark will suffer negative associations through defendant's use." *Hormel Foods Corp. v. Jim Henson Productions, Inc., 73 F.3d 497, 507 (2d Cir. 1996).*

The Federal Trademark Dilution Act specifically exempts noncommercial uses of a mark from its coverage. *Section 1125(c)(4)* provides that "the following shall not be actionable under this section: ... (B) Noncommercial use of a mark." Therefore, prior to even addressing whether defendants have actually diluted plaintiff's marks under the federal law, the Court must first determine whether defendants' use of the marks is "commercial," and thereby, whether that use is even covered by the statute. [1]

1   Black's Law Dictionary defines 'commercial' as "Relates to or is connected with trade and traffic or commerce in general; is occupied with business and commerce. Generic term for most all aspects of buying and selling."

The Lanham Act defines 'use in commerce' as the "use of a mark in the ordinary course of trade ... For purposes of this chapter, a mark shall be deemed to be in use in commerce--(1) on goods when--(A) it is placed in any manner on the goods

Appeal: 14-1568    Doc: 16    Filed: 10/06/2014    Pg: 89 of 110

Page 6

2004 U.S. Dist. LEXIS 3644, *; 70 U.S.P.Q.2D (BNA) 1046;
Copy. L. Rep. (CCH) P28,781

or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and (B) the goods are sold or transported in commerce, and (2) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services." *15 U.S.C. § 1127.*

[*23]  Plaintiff argues that Ralph Nader's Political Ad is commercial in nature even though it neither sells products or services, is not designed to entice consumers to buy products or services, and does not propose any kind of commercial transaction. MasterCard asserts that contributions to the Nader 2000 General Committee "increased from $ 5125 before the Ad ran to $ 818,000 in August 2000, after the Ad ran through the "DONATE ON-LINE" icon or otherwise." (Pl's. Mem. in Opp. to Summ. J. 26) (emphasis added). Although the Nader Ad ran before a large sum of contributions were made to his campaign, plaintiff offers no evidence of a causal connection between the Ad and the contributions. There is nothing in the record other than the inference to be drawn from the proximity in time that advances the notion that the contributions Ralph Nader and his political committee received were a direct result of the Ad.

Even assuming the Nader Ad caused greater contributions to be made to his political campaign, this would not be enough to deem Ralph Nader's Ad "commercial." If so, then presumably, as suggested by defendants, all political campaign speech would also be "commercial speech" since all [*24]  political candidates collect contributions. Ralph Nader's Political Ad attempts to communicate that other presidential candidates can be bought, but that the "truth," represented by himself, cannot. The Nader Ad is a strong political message which expresses his personal opinion on presidential campaigning. The legislative history of the Lanham Act clearly indicates that Congress did not intend for the Act to chill political speech. In speaking about the amendments to *Section 43(a)* that expanded what was actionable as deceptive advertisements, one of the new law's sponsors, United States Representative Robert Kastenmeier, pointed out that political advertising and promotion are not meant to be covered by the term "commercial." He stated that the statute

> uses the word "commercial" to describe advertising or promotion for business purposes, whether conducted by for-profit

or non-profit organizations or individuals. Political advertising and promotion is political speech, and therefore not encompassed by the term "commercial." This is true whether what is being promoted is an individual candidacy for public office, or a particular political issue or point of view ...

134 [*25]  Cong. Rec. H. 1297 (daily ed. April 13, 1989) (statement of Wisconsin Rep. Kastenmeier) (emphasis added).

Plaintiff MasterCard urges the Court to rely on *United We Stand America, Inc. v. United We Stand, America New York, Inc., 128 F.3d 86 (2d Cir. 1997)* to conclude that Ralph Nader's activities are "commercial" in nature. That case is not instructive in determining whether or not MasterCard has a basis to bring a claim against defendants under the Federal Trademark Dilution Act. In United We Stand, the Court was determining whether a certain political activity fell under the scope and the meaning of the word "services" and "use in commerce" of the Lanham Trademark Act, § 32(1)(a), *15 U.S.C.A. § 1114(1)(a).* [2] That particular section of the Lanham Act does not have a commercial activity requirement, nor does it exempt from liability noncommercial use of a mark. See *Planned Parenthood Federation of America Inc. v. U.S. District Court Southern District of New York, 1997 U.S. Dist. LEXIS 3338, 42 U.S.P.Q.2d 1430, 1434 (S.D.N.Y. 1997).* However, the Federal Trademark Dilution Act, *15 U.S.C.A. § 1125* [*26]  *(c),* specifically exempts from the scope of all provisions of *Section 1125* the "noncommercial use of a mark." See *Id., at 1433.*

> 2   "Any person who shall, without the consent of the registrant use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered trademark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive, shall be liable in a civil action by the registrant for the remedies hereinafter provided." *15 U.S.C.A. § 1114(1)(a).*

Though not binding, this Court finds the analysis in *American Family Life Insurance Company v. Hagan, et al., 266 F. Supp.2d 682 (N.D.Ohio 2002),* to be relevant and persuasive. In that case, similar to the case at hand, the plaintiff, American Family Life Insurance Company, or AFLAC, ran well-known "AFLAC Duck" commercials which featured a white duck quacking [*27]  the company's name "AFLAC." *Id., at 684.* One of the defendants was a candidate for Governor of the State of Ohio running

Appeal: 14-1568      Doc: 16      Filed: 10/06/2014      Pg: 90 of 110

Page 7

2004 U.S. Dist. LEXIS 3644, *; 70 U.S.P.Q.2D (BNA) 1046;
Copy. L. Rep. (CCH) P28,781

against the incumbent Governor Robert Taft. The candidate and his Campaign, developed internet commercials that "'borrow[ed]' from AFLAC's commercials. Specifically, the internet commercials included a crudely animated character made up of the incumbent Governor's head sitting on the body of a white cartoon duck; the duck quacks 'TaftQuack' several times during each commercial," which defendants ran on their website, www.taftquack.com. Id. Defendants' website also contained a link which visitors could use to make campaign contributions. Id. at 686-87. Among other claims, plaintiff sued defendants for federal trademark dilution and moved for a preliminary injunction.

In denying the plaintiff's motion for a preliminary injunction, and finding that the plaintiff was not likely to prevail on its dilution claim, the court also found that defendants' speech was political, rather than commercial. Specifically, the court stated that the candidate was "using a quacking cartoon character, which admittedly brings to mind AFLAC's marks,  [*28]  *as part of his communicative message,* in the context of expressing political speech." *Id., at* 700 (emphasis in original). The court added that though "the consuming public may associate the AFLAC Duck and the TaftQuack character-a proposition the Court accepts-[this] is an insufficient predicate to support injunctive relief of political speech." *Id., at* 701. The court further noted that though defendants included in their website a mechanism for visitors to make campaign contributions, "it is arguable whether [the candidate's] speech proposes a commercial transaction at all." *Id., at* 697. The court stated that defendants' solicitation of contributions, and the resulting making of contributions, "is much more than merely a commercial transaction. Indeed, this exchange is properly classified not as a commercial transaction at all, but completely noncommercial, political speech." *Id.*

This Court finds that Ralph Nader's use of plaintiff's trademarks is not commercial, but instead political in nature and that therefore, it is exempted from coverage by the Federal Trademark Dilution Act. However, even if Ralph Nader's use of  [*29]  plaintiff's trademarks could be deemed commercial in nature, such use did not dilute plaintiff's marks. Defendants do not dispute that plaintiff's marks are famous, distinctive, or that they used plaintiff's marks after such marks became famous. However, there is no evidence in the record that defendants' use of plaintiff's marks actually caused dilution of the distinctiveness of plaintiff's marks. Plaintiff does not offer evidence that defendants' limited use of the Priceless marks lessened its value or the capacity of these marks to identify and distinguish plaintiff's goods or services. Further, plaintiff does not claim, nor is there any evidence in the record, that due to defendant's use of plaintiff's marks, plaintiff

altered or lessened its use of the marks to identify MasterCard's products or services.

Count Three of plaintiff's complaint alleging dilution of plaintiff's trademarks is dismissed on defendants' motion for summary judgment. Ralph Nader's use of plaintiff's trademarks is political in nature, not within a commercial context, and is therefore exempted from coverage by the Federal Trademark Dilution Act. Furthermore, there is no evidence on the record that Ralph Nader's  [*30]  use of plaintiff's trademarks diluted plaintiff's trademarks.

Count Eight, alleging dilution of MasterCard's trademarks under state law, is based on *N.Y.G.B.L. § 360-1. Section 360-1* provides that "likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services." In order to show state trademark dilution under *section 360-1,* MasterCard must demonstrate that it's "trademark is of truly distinctive quality or has acquired secondary meaning, and, second, that there is a 'likelihood of dilution.'" *Brennan's, Inc. v. Brennan's Restaurant, LLC, et al., 360 F.3d 125, 2004 U.S. App. LEXIS 3671, 2003 WL 1338681, 6 (S.D.N.Y. 2003)* (citing *Deere & Co. v. MTD Prods., Inc., 41 F.3d 39, 42 (2d Cir. 1994)).*

Again, it is not in dispute that plaintiff's marks are of a distinctive quality, and have acquired secondary meaning. Yet, there is no evidence on the record that defendants' use of plaintiff's  [*31]  marks created even a likelihood of dilution of such marks. There is no evidence that defendants' limited and political use of plaintiff's marks could weaken those marks' ability to serve as a unique identifier of plaintiff's goods or services. Therefore, there is no evidence of possible dilution by "blurring." Further, there is no evidence that plaintiff's marks could be tarnished or suffer from negative associations in the eyes of the public due to defendants' use of those marks. Therefore, there is no evidence of dilution of plaintiff's marks by tarnishment. As with plaintiff's federal dilution claim, summary judgment for defendants on plaintiff's Count Eight alleging state law dilution of plaintiff's trademarks is hereby granted.

4. Copyright Infringement

In Count Four, plaintiff alleges copyright infringement of its Priceless Advertisements. In response, defendants argue the Nader Ad is a fair use of the Priceless Advertisements because it is a parody of the Priceless Advertisements.

2004 U.S. Dist. LEXIS 3644, *; 70 U.S.P.Q.2D (BNA) 1046;
Copy. L. Rep. (CCH) P28,781

"From the infancy of copyright protection," the fair use doctrine "has been thought necessary to fulfill copyright's very purpose, 'to promote the Progress of Science and useful Arts.'" *Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 575, 127 L. Ed. 2d 500, 114 S. Ct. 1164 (1994)* [*32] (quoting *U.S. Const., art. I, § 8, cl. 8*). In Campbell, defendants Luther R. Campbell, Christopher Wongwon, Mark Ross, and David Hobbs, collectively known as 2 Live Crew, a rap music group, created a song entitled "Pretty Woman" that parodied Roy Orbison's copyrighted song, "Oh, Pretty Woman." *Id., at 571-72.* Plaintiff Acuff-Rose Music, Inc., who owned the rights to Orbison's song, sued defendants for copyright infringement. *Id., at 573.* The District Court for the Middle District of Tennessee granted summary judgment in favor of defendants, finding that 2 Live Crew's song was a fair use parody of the Orbison song and that the commercial purpose of 2 Live Crew's song was not a bar to a finding of fair use. Id. The Court of Appeals for the Sixth Circuit reversed, holding that a finding of fair use was barred by the song's commercial character and excessive borrowing of the Orbison song. *Id., at 573-74.* In reversing the Court of Appeals' decision, the United States Supreme Court held that a parody's commercial nature is not a bar to a finding of fair use and is in fact only one element to be considered in a fair use analysis. [*33] It held that the Court of Appeals gave insufficient consideration to the nature of a parody in assessing the degree to which a parody copies. *Id., at 572, 594.*

As noted in Campbell, "in truth, in literature, in science and art, there are, and can be, few, if any, things, which in an abstract sense, are strictly new and original throughout. Every book in literature, science and art, borrows, and must necessarily borrow, and use much which was well known and used before." Id. (quotation marks omitted). Until the 1976 Copyright Act, the doctrine of fair use grew exclusively out of the common law. See *Id., at 576*; *Folsom v. Marsh, 9 F.Cas 342, 348, F. Cas. No. 4901 (C.D.Mass. 1900)* (CCD Mass. 1841) (Story, J.) (Stating fair use test). With the Copyright Act, Congress restated the common law tradition of fair use. The statute provides that the use or reproduction of a copyrighted work is "not an infringement of copyright" if it is used "for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research." *17 U.S.C.A. § 107.* In determining whether the work [*34] has been used for such a purpose, the statute lists four nonexclusive factors to consider: 1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; 2) the nature of the copyrighted work; 3) the amount and substantiality of the portion used; and 4) the effect of the use upon the potential market for, or value of, the copyrighted work. *17 U.S.C. § 107(1) - (4).* It has been found that "once a work

is determined to be a parody, the second, third, and fourth factors are unlikely to militate against a finding of fair use."*Abilene Music, Inc., et al. v. Sony Music Entertainment, Inc., et al., 320 F. Supp. 2d 84, 2003 U.S. Dist. LEXIS 10366, 2003 WL 21415311, 4 (S.D.N.Y. 2003).*

This section of the Copyright Act "intended that courts continue the common law tradition of fair use adjudication" and "permits and requires courts to avoid rigid application of the copyright statute, when, on occasion, it would stifle the very creativity which that law is designed to foster." *Campbell, 510 U.S. at 577* (quotation marks omitted). Fair use analysis, therefore, always "calls for case-by-case analysis." Id. The [*35] fair use examples provided in *§ 107* are "illustrative and not limitative" and "provide only general guidance about the sorts of copying that courts and Congress most commonly had found to be fair uses." Id.; See Nimmer § 13.05[A ], at 13-153 ("The factors contained in *Section 107* are merely by way of example, and are not an exhaustive enumeration."). The ultimate test of fair use, therefore, is whether the copyright law's goal of "promoting the Progress of Science and useful Arts," *U.S. Const., art. I, § 8, cl., 8,* "would be better served by allowing the use than by preventing it." *Arica Inst., Inc. v. Palmer, 970 F.2d 1067, 1077 (2d Cir. 1992)* (quoting *Peter Pan Fabrics, Inc. v. Martin Weiner Corp., 274 F.2d 487, 489 (2d Cir. 1960)* (L.Hand, J.)). The burden of proof is on the defendants to demonstrate fair use. *Infinity Broadcast Corp. v. Kirkwood, 150 F.3d 104, 107 (2d Cir. 1998).* Though recognizing that fair use is a "mixed question of law and fact," courts regularly resolve fair use issues at the summary judgment stage where there are no genuine issues of material fact. *Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc. 150 F.3d 132, 136 (2d. Cir. 1998).* [*36]

Before considering these factors in detail, it is important to note the difference between an advertisement that promotes a parody of a copyrighted work and an advertisement that itself actually infringes a copyright. An advertisement which uses elements of a copyrighted work "does not necessarily ... [infringe] the copyright, if the product that it advertises constitutes a fair use of the copyrighted work." *Steinberg v. Columbia-Delphi Productions, 663 F. Supp. 706, 714 (S.D.N.Y. 1987)* (citing *Warner Bros. v. American Broadcasting Cos., 720 F.2d 231, 242-44 (2d. Cir. 1983)* (finding that promotional broadcasts for a television series legally parodying the Superman comic strip character did not infringe copyright in Superman character)). On the other hand, an advertisement infringes a copyright when what is being advertised "bears no relationship to the copyrighted work." *Steinberg, 663 F. Supp. at 714.* In such a case, "no matter how well known a copyrighted phrase becomes, its author is entitled to guard against its appropriation to promote the

Appeal: 14-1568    Doc: 16    Filed: 10/06/2014    Pg: 92 of 110

Page 9

2004 U.S. Dist. LEXIS 3644, *; 70 U.S.P.Q.2D (BNA) 1046;
Copy. L. Rep. (CCH) P28,781

sale of commercial products." Id. (citing *Warner Bros., 720 F.2d at 242*). [*37] However, even a wholly commercial advertisement may itself constitute a fair use. *Leibovitz v. Paramount Pictures Corp., 137 F.3d 109 (2d Cir. 1998)* (finding a poster of a pregnant Leslie Nielson, used to advertise "Naked Gun 33 1/3," to be a fair use of the photograph of Demi Moore it parodied).

The first fair use factor to consider is "the purpose and character of the [allegedly infringing] use, including whether such use is of a commercial nature or is for nonprofit educational purposes." *17 U.S.C. § 107(1)*. As this Court has already discussed, the Ralph Nader Political Ad's use is not commercial. The stated purpose of the defendants' advertisement was to raise public awareness of Ralph Nader's desire to be included in the upcoming, televised Presidential candidate debates. (Nader Aff. P14; Amato Aff. P11; Exs. 12-15). The Nader Ad depicted that the two major party candidates were beholden to special interests, which was the reason that Ralph Nader, who was not so beholden, should be included in the debates. (Defs.' Mem. in Supp. of Summ. J. 26).

The more important question under the first factor, and in fair use analysis generally, is [*38] whether the allegedly infringing work "merely supersedes" the original work "or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning or message," *Campbell, 510 U.S. at 579*, in other words "whether and to what extent the new work is 'transformative.'" *Id., at 579* (quoting Leval, *Toward a Fair Use Standard*, 103 Harv.L.Rev. 1105, 1111 (1990)). If "the secondary use adds value to the original-if [copyrightable expression in the original work] is used as raw material, transformed in the creation of new information, new aesthetics, new insights and understandings this is the very type of activity that the fair use doctrine intends to protect for the enrichment of society." Id. As stated in Campbell, the goal of copyright "is generally furthered by the creation of transformative works." *Id., at 579*.

One such transformative use that is typically found to be fair use is a parody. Defendants' argument that Ralph Nader's Political Ad is transformative of MasterCard's Priceless Advertisements is as follows: Defendants believe that the MasterCard commercials' underlying [*39] message is "that MasterCard is the best way to pay for everything that matters." (Defs' Mem in Supp. for Summ. J. 27). The Nader Ad, on the other hand, portrays the cold, big-money arena of Presidential politics and contrasts Ralph Nader's "truth" as the remedy for the bought and paid-for positions of others. Through this message, defendants claim that the Nader Ad "lays bare the artifice of the original, which cloaks its materialistic message in warm, sugar-coated imagery that purports to elevate in-

tangible values over the monetary values it in fact hawks" through parody (Defs' Mem. in Supp. of Summ. J. 27).

Parody has an obvious claim to transformative value. See *Campbell, 510 U.S. at 577*. A parody is characterized by an attempt to mimic an original, expressive, and usually famous work. See *Id., at 586* ("parodies invariably copy publicly known, expressive works"). Focusing particularly on the fair use protection to which parodies are entitled, the Court in Campbell initially noted that "parody may or may not be fair use," *Id., at 581*, and "like any other use, has to work its way through the relevant factors, and be judged case [*40] by case, in light of the ends of the copyright law," Id. The Court went on to say, "The heart of any parodist's claim to quote from existing material is the use of some elements of a prior author's composition to create a new one that, at least in part, comments on that author's works." *Id., at 580*. The comment must have some "critical bearing on the substance or style of the original composition." Id. The relevant inquiry is "whether a parodic character may reasonably be perceived." *Id*. (emphasis added).

Plaintiff claims that because there is nothing in the Nader Ad which "comments on or refers to MasterCard or its Priceless Ads" (Pl.'s Mem. in Opp'n to Summ. J. 11), it cannot be classified as a parody. However, the Supreme Court in Campbell stated "parody serves its goals whether labeled or not, and there is no reason to require parody to state the obvious (or even the reasonably perceived)." Id., n.17. The Court also added, "while we might not assign a high rank to the parodic element here, we think it fair to say that [defendant's] song reasonably could be perceived as commenting on the original or criticizing it, to some degree." *Id.,* [*41] *at 583*. In fact, the Court declined to evaluate the parody, stating that "the threshold question when fair use is raised in defense of parody is whether the parodic character may reasonably be perceived. Whether, going beyond that, parody is in good taste or bad does not and should not matter to fair use." *Id., at 582*. In finding a parodic element in defendant's infringement of plaintiff's song, the Court also commented that the defendants in that case would have even more easily met the requirement had there been less risk of "market substitution" of the parody for the original:

> A parody that more loosely targets an original than the parody presented here may still be sufficiently aimed at an original work to come within our analysis of parody. If a parody whose wide dissemination in the market runs the risk of serving as a substitute for the original ..., it is more incumbent on one claiming fair use to establish the extent of transformation and the parody's critical relationship to the

Appeal: 14-1568    Doc: 16    Filed: 10/06/2014    Pg: 93 of 110

Page 10

2004 U.S. Dist. LEXIS 3644, *; 70 U.S.P.Q.2D (BNA) 1046;
Copy. L. Rep. (CCH) P28,781

original. By contrast, when there is little or no risk of market substitution, whether because of the large extent of transformation of the earlier work, the new work's minimal distribution [*42] in the market, the small extent to which it borrows from the original, or other factors, taking parodic aim at an original is a less critical factor in the analysis, and looser forms of parody may be found to be fair use ...

*Campbell, 510 U.S. at 580, n.14.*

Where, as here, the parody really has no demonstrative capacity to divert sales from the original, as was stated in *Campbell,* a showing of "the parody's critical relationship to the original" is less vital in the fair use analysis.

The Nader Ad does add something new and qualifies as a "transformative" work. Whether it "comments" on the original is the issue in question. MasterCard's message depicted in its Priceless Advertisements is very plain and straightforward. In a series of advertisements, MasterCard presents various intangible moments that are highly valuable, yet unable to be "purchased" or are "priceless." Hence, "there are some things that money can't buy." [3] This idea is followed by the message, that the viewer-consumer can purchase everything else with their MasterCard credit card--"for everything else, there's MasterCard." Ralph Nader's Political Ad attempts to show various ways [*43] different Presidential candidates can be bought in the "big-money arena of Presidential politics" (Def's Mem. in Supp. Summ. J. 27) and contrasts the "priceless" truth represented by Ralph Nader as the remedy for the bought and paid for positions of others. Through this depiction, Ralph Nader argues that he not only sends across his own message, but that he wittingly comments on the craft of the original, "which cloaks its materialistic message in warm, sugar-coated imagery that purports to elevate intangible values over the monetary values it in fact hawks." Id. This commentary "may reasonably be perceived." The message need not be popular nor agreed with. It may be subtle rather than obvious. It need only be reasonably perceived. Ralph Nader's Political Ad is sufficiently a parody for the purposes of a fair use analysis, and consequently, is transformative.

[3] It should be noted that with regard to the phrase "there are some things that money can't buy," not even MasterCard claims that phrase is its original creation.

[*44] The second statutory factor, "the nature of the copyrighted work," § 107(2), relates to whether the original work is "'creative' as opposed to 'factual,' as well

as to whether the work has been previously published." *Feiner v. H.R. Industries, 10 F. Supp.2d 310, 314 (S.D.N.Y. 1998).* Original works that are creative in nature will generally receive greater copyright protection. See e.g. *Ringgold v. Black Entertainment Television, Inc., 126 F.3d 70, 80 (2d Cir. 1997).* A previously published work available to the general public will receive less protection under the fair use doctrine than an unpublished work which has not yet been released to the general public by its author. *Feiner, 10 F. Supp.2d at 314; Arica Institute, Inc. v. Palmer, 970 F.2d 1067, 1078 (2d Cir. 1992).*

The creative nature of plaintiff's Priceless Advertisements places these advertisements in the "core of intended copyright protection." *Campbell, 510 U.S. at 586.* Although this seems to favor plaintiff, courts have recognized that "this factor may be of less (or even of no) importance when assessed in the context of certain transformative [*45] uses." *Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc., 150 F.3d 132, 144 (2d Cir. 1998);* See also Leibovitz v. Paramount Pictures Corporation, 2000 U.S. Dist. LEXIS 10173, 2000 WL 1010830, 4 (S.D.N.Y. 2000) ("It is well established that the second factor-the nature of the copyrighted work-is not very important to the fair use analysis."); *Abilene Music, Inc., et al. v. Sony Music Entertainment, Inc., et al., 2003 U.S. Dist. LEXIS 10366, [WL] 4 (S.D.N.Y. 2003)* ("the second factor, the nature of the original work, is not heavily weighted in cases involving parodies"). In particular, giving this factor undue weight in a fair use analysis would prevent findings of fair uses which advance science and art through criticism or commentary. See e.g. *Campbell, 510 U.S. at 586* (finding second factor unlikely to "help in separating the fair use sheep from the infringing goats in a parody case since parodies almost invariably copy publicly known, expressive works."). This factor is without much force in most cases, and its relevance here is slight.

In assessing the third factor, the Court must focus on only the protected phrases of the Priceless Advertisements. [*46] Further, the amount and substantiality of the portion used in relation to the copyrighted work as a whole must be examined in context to determine whether the extent of the copying is consistent with or more than necessary to further the purpose and character of the use. See *Campbell, 510 U.S. at 586-587.* In the parody context, this concerns "what else the parodist did besides go to the heart of the original." *Liebowitz v. Paramount Pictures Corp., 137 F.3d 109 (2d Cir. 1998)* (quoting *Campbell, 510 U.S. at 589).* Although the Ralph Nader Political Ad copied the word "priceless" and the phrase "there are some things money can't buy" and used them in a similar manner, the greater part of the Nader Ad is original-the narration, the supertitles, and the film imagery is rather different from the MasterCard commercials. The sub-

Appeal: 14-1568    Doc: 16    Filed: 10/06/2014    Pg: 94 of 110

Page 11

2004 U.S. Dist. LEXIS 3644, *; 70 U.S.P.Q.2D (BNA) 1046;
Copy. L. Rep. (CCH) P28,781

stance of the message is different from the message communicated by the advertisement it copies. In order for the Ralph Nader Political Ad to be considered a legitimate parody of the Priceless Advertisement, it necessarily must take enough from MasterCard's advertisement to assure that the viewer will be reminded of [*47] the ad that it borrows from.

As outlined in *Leibovitz, 137 F.3d at 113*, the Court in Campbell made three important points concerning the third-factor. First, consideration must be given not only to the quantity of the materials taken but also to "their quality and importance" to the original work. *Campbell, 510 U.S. at 587*. Second, "the parody must be able to 'conjure up' at least enough of the original to make the object of its critical wit recognizable." *Id., at 588*. Third, the court explained that "once enough has been taken to assure identification, how much more is reasonable will depend, say, on the extent to which the [copying work's] overriding purpose and character is to parody the original or, in contrast, the likelihood that the parody may serve as a market substitute for the original." Id. Thus, as the Court in Campbell noted, the third factor "enquiry will harken back to the first of the statutory factors," *Id., at 586*, with the consideration of the purpose and character of the copying, as well as look to the fourth statutory factor in addressing the potential for market substitution. *Id., at 587*. [*48] "That approach leaves the third factor with little, if any, weight against fair use so long as the first and fourth factors favor the parodist." *Liebovitz, 137 F.3d at 116*. As this Court has already found, the first factor is in favor of the defendants in that defendants' use of the Priceless Advertisements is not commercial in nature and is a transformative parody of those advertisements.

The fourth factor looks at "the effect of the use upon the potential market for or value of the copyrighted work." *Campbell, 510 U.S. at 588*. As the Campbell opinion explained, if the secondary work harms the market for the original through criticism or parody, rather than by offering a market substitute for the original that supersedes it, it does not produce a harm cognizable under the Copyright Act." *Id., at 592*. If the secondary copied use offers itself as a market substitute and in that way harms the market value of the original, this factor argues strongly against a finding of fair use. See *On Davis v. The Gap, Inc., 246 F.2d 152, 175 (2nd Cir. 2001)*. In this case, the Nader Ad is sufficiently transformative of MasterCard's [*49] Priceless Advertisements. The Ralph Nader Political Ad may serve a general overlapping market, the viewing public. However, it serves an entirely different purpose than the Priceless Advertisements, a political non-commercial purpose. For this reason, the fourth factor also weighs heavily in the defendant's favor for a finding of fair use.

There is no genuine issue of material fact after weighing the factors pertinent to a finding of fair use. The Nader Ad is a non-infringing fair use parody of MasterCard's Priceless Advertisements under *Section 107 of the Copyright Act. Accordingly*, defendants' motion for summary judgment dismissing Count Four of MasterCard's complaint is granted. [4]

4 Defendants also argue that they are entitled to summary judgment on plaintiff's Count Four because the Nader Ad did not copy any "protected expression" from the Priceless Advertisements. Since this Court finds the Nader Ad to be a non-infringing fair use parody of MasterCard's Priceless Advertisements under *Section 107* and grants summary judgment in favor of defendants on this basis, it is not necessary for the Court to address this argument.

[*50] 5. Deceptive Trade Practices

In Count Nine, plaintiff claims that through defendants' use of plaintiff's marks in the Nader Ad, defendants intentionally deceived and misled the public in violation of *N.Y. Gen. Bus. Law § 349*. Defendants argue that plaintiff's Count Nine should be dismissed again because the Nader Ad is political, rather than commercial in nature. Defendants also contend that the requirements of the statute are not met, in that the defendants did not intend to deceive and there is no evidence of actual deception.

*Section 349* prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service." *N.Y. Gen. Bus. Law § 349(a)*. In order to establish a claim under *Section 349*, it must be shown that the defendant committed "a material deceptive act or practice directed to consumers that caused actual harm." *Boule, et al. v. Hutton, et al., 328 F.3d 84, 93-94 (2d Cir. 2003)* (citing *Marcus v. AT&T Corp., 138 F.3d 46, 63 (2d Cir. 1998)*). An act is considered deceptive within the meaning of *Section 349* only if it is of such a nature [*51] to mislead a reasonable consumer. *Id. at 94* (citing *Marcus, 138 F.3d at 64*.). Further, in order to prevail on a *Section 349* claim, it must be shown that the defendant intentionally deceived consumers. *Eastern Am. Trio Prods. v. Tang Elec. Corp., 97 F. Supp.2d 395, 423 (S.D.N.Y. 2000)*; See also *Samara Bros., Inc. v. Wal-Mart Stores, Inc., 165 F.3d 120, 131 (2d Cir. 1998)*, rev'd on other grounds, *529 U.S. 205, 146 L. Ed. 2d 182, 120 S. Ct. 1339 (2000)*.

In the present case, as previously discussed, defendants' use of plaintiff's marks in the Nader Ad is political, not commercial, in nature. The Ad was not being used in connection with the sale or promotion of a product or service, nor in the conduct of business, trade or commerce. There is no evidence the defendants intended to

2004 U.S. Dist. LEXIS 3644, *; 70 U.S.P.Q.2D (BNA) 1046;
Copy. L. Rep. (CCH) P28,781

deceive, nor any evidence of actual consumer deception. Both are required showings under *Section 349*. Therefore, MasterCard's Count Nine is dismissed and defendants' motion for summary judgment on this count is granted.

**CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment is [*52] hereby GRANTED in its entirety.

Dated: March 8, 2004

SO ORDERED:

GEORGE B. DANIELS

United States District Judge



PLANNED PARENTHOOD FEDERATION OF AMERICA, INC., Plaintiff,
-against- RICHARD BUCCI, d/b/a CATHOLIC RADIO, Defendant.

97 Civ. 0629 (KMW)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

*1997 U.S. Dist. LEXIS 3338; 42 U.S.P.Q.2D (BNA) 1430*

March 19, 1997, Decided
March 24, 1997, FILED

**DISPOSITION:** [*1] Plaintiff's motion for a preliminary injunction granted.

**COUNSEL:** For PLANNED PARENTHOOD FEDERATION OF AMERICA, INC., plaintiff: Elizabeth A. McNamara, William S. Adams, Lankenau Kovner Kurtz & Outten, LLP, New York, NY.

For RICHARD BUCCI, doing business as CATHOLIC RADIO, defendant: Thomas M. Gibson, Hedman Gibson & Costigan, NY, NY.

**JUDGES:** Kimba M. Wood, United States District Judge

**OPINION BY:** Kimba M. Wood

**OPINION**

OPINION & ORDER

WOOD, U.S.D.J.

Plaintiff Planned Parenthood Federation of America, Inc. ("Planned Parenthood") has moved to preliminarily enjoin defendant Richard Bucci ("Bucci"), doing business as Catholic Radio, from using the domain name "plannedparenthood.com," and from identifying his web site on the Internet under the name "www.plannedparenthood.com." The Court held a hearing on February 20, 1997 and February 21, 1997, [1] and now issues the preliminary injunction sought by Planned Parenthood.

1 The Court held a hearing on plaintiff's request for a temporary restraining order on February 5, 1997.

[*2] I. Undisputed Facts

The parties do not dispute the following facts. Plaintiff Planned Parenthood, founded in 1922, is a non-profit, reproductive health care organization that has used its present name since 1942. Plaintiff registered the stylized service mark "Planned Parenthood" on the Principal Register of the United States Patent and Trademark Office on June 28, 1955, and registered the block service mark "Planned Parenthood" on the Principal Register of the United States Patent and Trademark Office on September 9, 1975. Plaintiff's 146 separately incorporated affiliates, in 48 states and the District of Columbia, are licensed to use the mark "Planned Parenthood." Plaintiff expends a considerable sum of money in promoting and advertising its services. The mark "Planned Parenthood" is strong and incontestable.

Plaintiff operates a web site at "www.ppfa.org," using the domain name "ppfa.org." Plaintiff's home page offers Internet users resources regarding sexual and reproductive health, contraception and family planning, pregnancy, sexually transmitted diseases, and abortion, as well as providing links to other relevant web sites. In addition, plaintiff's home page offers Internet [*3] users suggestions on how to get involved with plaintiff's mission and solicits contributions. [2]

2 Plaintiff's Houston affiliate owns the domain name "plannedparenthood.org," and is in the process of transferring that domain name to plaintiff. Tr. 2/20/97 at 14.

1997 U.S. Dist. LEXIS 3338, *; 42 U.S.P.Q.2D (BNA) 1430

Defendant Bucci is the host of "Catholic Radio," a daily radio program broadcast on the WVOA radio station in Syracuse, New York. Bucci is an active participant in the anti-abortion movement. Bucci operates web sites at "www.catholicradio.com" and at "lambsofchrist.com." On August 28, 1996, Bucci registered the domain name "plannedparenthood.com" with Network Solutions, Inc. ("NSI"), a corporation that administers the assignment of domain names on the Internet. After registering the domain name, Bucci set up a web site and home page on the Internet at the address "www.plannedparenthood.com."

Internet users who type in the address "www.plannedparenthood.com," or who use a search engine such as Yahoo or Lycos to find web sites containing the term "planned [*4] parenthood," can reach Bucci's web site and home page. Once a user accesses Bucci's home page, she sees on the computer screen the words "Welcome to the PLANNED PARENTHOOD HOME PAGE!" [3] These words appear on the screen first, because the text of a home page downloads from top to bottom. Tr. 2/20/97 at 47. Once the whole home page has loaded, the user sees a scanned image of the cover of a book entitled The Cost of Abortion, by Lawrence Roberge ("Roberge"), under which appear several links: "Foreword," "Afterword," "About the Author," "Book Review," and "Biography."

3    The text of defendant's home page is part of the record before the Court, as Pl. Ex. 2.

After clicking on a link, the user accesses text related to that link. By clicking on "Foreword" or "Afterword," the Internet user simply accesses the foreword or afterword of the book The Cost of Abortion. That text eventually reveals that The Cost of Abortion is an anti-abortion book. The text entitled "About the Author" contains the curriculum [*5] vitae of author Roberge. It also notes that "Mr. Roberge is available for interview and speaking engagements," and provides his telephone number. The "Book Review" link brings the Internet user to a selection of quotations by various people endorsing The Cost of Abortion. Those quotations include exhortations to read the book and obtain the book. "Biography" offers more information about Roberge's background.

II. Disputed Facts

The parties dispute defendant's motive in choosing plaintiff's mark as his domain name. Plaintiff alleges that defendant used plaintiff's mark with the "specific intent to damage Planned Parenthood's reputation and to confuse unwitting users of the Internet." Pl. Rep. Mem. at 2. Discussing the difference between the domain name at issue here and defendant's other web sites, defendant's counsel states that "the WWW-PLANNNEDPARENTHOOD.COM [sic] website . . .

enables Defendant's message to reach a broader audience." Def. Mem. in Opp. at 3. Defendant's counsel made the following statement to the Court regarding defendant's use of plaintiff's mark to designate his web site:

> My belief is that it was intended to reach people who would be sympathetic [*6] to the proabortion position . . . . It is an effort to get the . . . political and social message to people we might not have been otherwise able to reach. I think it's analogous to putting an advertisement in the New York Times rather than The National Review. You are more likely to get people who are sympathetic to the proabortion position, and that's who you want to reach. I believe that is exactly what Mr. Bucci did when he selected Planned Parenthood. Tr. 2/5/97 at 23.

Defendant did not dispute that his counsel was correct in that statement. Tr. 2/21/97 at 35. Defendant's counsel also admitted that Bucci was trying to reach Internet users who thought, in accessing his web site, that they would be getting information from plaintiff. Id. at 23-24.

Defendant stated that his motive in using plaintiff's mark as his domain name was "to reach, primarily, Catholics that are disobedient to the natural law." Id. at 21. In an affidavit submitted to the Court, defendant stated that he wanted his "anti-abortion message to reach as many people as possible, and particularly the people who do not think that abortion has an inimical effect on society." Def. Aff. at P 3. [4] Defendant [*7] conceded that he was aware that by using plaintiff's mark to identify his web site, he was likely to draw in Internet users who are "pro-abortion." Tr. 2/21/97 at 36. [5] Defendant demonstrated full knowledge of plaintiff's name and activities, and admitted to an understanding that using plaintiff's mark as his domain name would attract "pro-abortion" Internet users to his web site because of their misapprehension as to the site's origin. Id. [6] I therefore now make the factual finding that defendant's motive in choosing plaintiff's mark as his domain name was, at least in part, to attract to his home page Internet users who sought plaintiff's home page.

4    In light of defendant's sworn affidavit, the Court does not find Bucci's statement that he "never gave [his] audience a thought," Tr. 2/21/97 at 26, credible.
5    The Court notes that defendant has submitted, as Exhibit 1 to his affidavit, a statement by his "spiritual adviser," Father Norman Weslin, that defendant wants to place on

Appeal: 14-1568    Doc: 16    Filed: 10/06/2014    Pg: 98 of 110

Page 3

1997 U.S. Dist. LEXIS 3338, *; 42 U.S.P.Q.2D (BNA) 1430

"www.plannedparenthood.com" web site. In that statement, Father Weslin explains that the web site "is considered a highly effective instrument by the Roman Catholic Church in exposing [plaintiff's] efforts which seek to impose the culture of death upon the culture of life and to inform not only the Roman Catholic faithful *but also those who are opposed to God's "planned parenthood...."* (emphasis added).

[*8]

6   In addition, after plaintiff contacted defendant about the use of its mark as a domain name, defendant made the following statement on his radio show, Catholic Radio: "Of course, we knew this would happen. We knew we would draw the fire of Planned Parenthood . . . . So we've got ourselves into a real fight. Hey listen, we're asking for it." Pl. Ex. 6A at 1.

## III. Analysis

### A. Standard for Preliminary Injunction

In order to obtain a preliminary injunction, a movant must demonstrate "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary injunction." *Hasbro, Inc. v. Lanard Toys, Ltd., 858 F.2d 70, 73 (2d Cir. 1988)*(internal citations omitted). In cases brought under the Lanham Act, a showing of likelihood of confusion establishes both a likelihood of success on the merits and irreparable harm, once the plaintiff has established that it has a protectible mark. *Id. at 73.* Because [*9] defendant concedes that plaintiff's mark is protectible, the inquiry before me is twofold: (1) whether the Lanham Act is applicable here, and (2) is there a likelihood of confusion? I now address these questions.

### B. Whether the Lanham Act is Applicable

Defendant argues that his use of plaintiff's mark cannot be reached under the Lanham Act because it is non-commercial speech. Planned Parenthood has brought suit under §§ *1114, 1125(a)*, and *1125(c)* of the Lanham Act, Title *15, United States Code. Section 1114* of the Lanham Act forbids a party to "*use in commerce* any reproduction, counterfeit, copy, or colorable imitation of a registered mark *in connection with the sale, offering for sale, distribution, or advertising of any goods or services* on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." (Emphasis added). An injunction under *§ 1125(c)* is proper to stop "*commercial use in commerce* of a mark or trade name" if that use causes dilution of a famous mark. (Emphasis added). Finally, with respect to *§ 1125(a)*, defendant. may be liable if he has used the plaintiff's mark "*in commerce*" in a way that either "is [*10]  likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her *goods, services, or commercial activities*" by another person," § *1125(a)(1)(A)*, or "*in commercial advertising or promotion*, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's *goods, services, or commercial activities*," § *1125(a)(1)(B)*. (Emphasis added). *Section 1125(c)(4)(B)* specifically exempts from the scope of all provisions of *§ 1125* the "*noncommercial use* of a mark." (Emphasis added).

As a preliminary matter, I note that although the parties agreed at a hearing before me on February 21, 1997 that defendant's use of plaintiff's mark is "in commerce" within the meaning of the Lanham Act, Tr. 2/21/97 at 77, defendant now argues that his activities are not subject to the Lanham Act because they are not "in commerce." I find this argument meritless. The "use in commerce" requirement of the Lanham Act is a jurisdictional predicate to any law passed by Congress. It is well settled that the scope of "in commerce"  [*11]  as a jurisdictional predicate of the Lanham Act is broad and has a sweeping reach.  *Steele v. Bulova Watch Co., 344 U.S. 280, 283, 97 L. Ed. 319, 73 S. Ct. 252 (1952).* The activity involved in this action meets the "in commerce" standard for two reasons. First, defendant's actions affect plaintiff's ability to offer plaintiff's services, which, as health and information services offered in forty-eight states and over the Internet, are surely "in commerce." Thus, even assuming, arguendo, that defendant's activities are not in interstate commerce for Lanham Act purposes, the effect of those activities on plaintiff's interstate commerce activities would place defendant within the reach of the Lanham Act. See *Franchised Stores of New York, Inc. v. Winter, 394 F.2d 664, 669 (2d Cir. 1968).* Second, Internet users constitute a national, even international, audience, who must use interstate telephone lines to access defendant's web site on the Internet. The nature of the Internet indicates that establishing a typical home page on the Internet, for access to all users, would satisfy the Lanham Act's "in commerce" requirement. See *Intermatic v. Toeppen, 947 F. Supp. 1227,*  [*12]  *1239 (N.D. Ill. 1996)*, quoting 1 *Gilson, Trademark Protection and Practice, § 5.11[2]*, p.5-234 ("there is little question that the 'in commerce' requirement would be met in a typical Internet message"). Therefore, I conclude that defendant's actions are "in commerce" within the meaning of that term for jurisdictional purposes. [7] I now turn to the specific language of each provision of the Lanham Act under which plaintiff has brought suit.

Appeal: 14-1568     Doc: 16     Filed: 10/06/2014     Pg: 99 of 110

Page 4
1997 U.S. Dist. LEXIS 3338, *; 42 U.S.P.Q.2D (BNA) 1430

7    Defendant argues that the Court should define "use in commerce" as it is defined in *15 U.S.C. § 1127*. There, Congress defines the "use [of a mark] in commerce" as, inter alia, its use "on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services."

Plaintiff notes that the narrower definition of "use in commerce" as set out in *§ 1127* has been used by the Patent and Trademark office in initially determining whether a mark qualifies for federal registration. See, e.g., *ConAgra, Inc. v. George A. Hormel & Co., 990 F.2d 368, 371 (8th Cir. 1993)*; 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 25:57 (3d ed. 1996)("It is difficult to conceive of an act of infringement which is not 'in commerce' in the sense of the modern decisions . . . . However, the Patent and Trademark Office still appears to adopt a higher standard of use in commerce for purposes of qualifying for federal registration in the first instance.")

In any event, I note that defendant satisfies the requirements of *§ 1127*. First, his activities over the Internet occur everywhere that Internet users may access his web site. Testimony has shown that Internet users in Texas, Tr. 2/20/97 at 17, Massachusetts, id. at 46, and Delaware, id. at 52, have accessed defendant's home page. Second, defendant is "engaged in commerce" in connection with his web site due to his use of the Internet and his effect on plaintiff's activities, because those activities constitute commerce within the meaning of *§ 1127*, which defines "commerce" as "all commerce which may lawfully be regulated by Congress."

[*13]    1. *Section 1114*

Notwithstanding its jurisdictional "in commerce" requirement, *Section 1114* contains no commercial activity requirement; rather, it prohibits any person from, without consent of the registrant of a mark, using the mark "in connection with the sale, offering for sale, distribution, or advertising of any good or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." The question the Court must decide, then, is whether defendant's use of plaintiff's mark is properly viewed as in connection with the distribution or advertising of goods or services.

Defendant's use of plaintiff's mark satisfies the requirement of *§ 1114* in a variety of ways. First, defendant has stated that he chose to place materials about The Cost of Abortion on the "www.plannedparenthood.com" web site because he wanted to help Roberge "plug" his book. Tr. 2/21/97 at 25. In addition, defendant agreed that he, by this activity, was helping the author sell his book. Id. at 30. Although defendant receives no money from any sales of the book that result from its exposure on his home page, there is no personal profit requirement in [*14] *§ 1114*. The materials on the home page, which are similar to a publisher's publicity kit, certainly relate to the advertisement and distribution of The Cost of Abortion.

Second, defendant's home page is merely one portion of his, and Catholic Radio's, broader effort to educate Catholics about the anti-abortion movement. With respect to that effort, defendant solicits funds and encourages supporters to join him in his protest activities. Id. at 16. Much like plaintiff, defendant has a practical as well as a political motive. While plaintiff seeks to make available what it terms "reproductive services," including, inter alia, birth control and abortion services, defendant offers informational services for use in convincing people that certain activities, including the use of plaintiff's services, are morally wrong. In this way, defendant offers his own set of services, and his use of plaintiff's mark is in connection with the distribution of those services over the Internet. See *MGM-Pathe Communications v. Pink Panther Patrol, 774 F. Supp. 869 (S.D.N.Y. 1991)* (holding that a group formed to offer the free service of protecting gay individuals from assault was subject [*15] to *§ 1114*).

In addition, defendant's use of plaintiff's mark is "in connection with the distribution of services" because it is likely to prevent some Internet users from reaching plaintiff's own Internet web site. Prospective users of plaintiff's services who mistakenly access defendant's web site may fail to continue to search for plaintiff's own home page, due to anger, frustration, or the belief that plaintiff's home page does not exist. One witness explained, "We didn't resume the search [for plaintiff's web site] after [finding defendant's web site] because . . . we were pretty much thrown off track." Tr. 2/20/97 at 49. Therefore, defendant's action in appropriating plaintiff's mark has a connection to plaintiff's distribution of its services. For these reasons, *§ 1114* is applicable to defendant's use of plaintiff's mark.

2. *Section 1125(c)*

*Section 1125(c)*, the Lanham Act's anti-dilution provision, provides that the owner of a famous mark is entitled to an injunction against another person's "commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes

dilution of the distinctive quality of the mark." The [*16] provision has no requirement that there be advertising or a sale of goods or services. Defendant argues that his use is not "commercial" within the meaning of *§ 1125(c)*. I hold, however, that defendant's use of plaintiff's mark is "commercial" for three reasons: (1) defendant is engaged in the promotion of a book, (2) defendant is, in essence, a non-profit political activist who solicits funds for his activities, and (3) defendant's actions are designed to, and do, harm plaintiff commercially.

First, as discussed above, defendant's home page is a showcase for The Cost of Abortion, offering excerpts of the book, information about the author (specifically including how to contact the author for speaking engagements), and endorsements of the book (including statements such as "I want to see this book in the hands of EVERY Catholic priest and Protestant minister in the country"). This showcase is surely commercial in nature, despite the fact that defendant derives no monetary gain from these activities. Although defendant does not seek a profit from his actions, *§ 1125(c)* carries no "for-profit" requirement. Therefore, defendant's use of plaintiff's mark to further his self-styled [*17] effort to "plug" The Cost of Abortion falls within the purview of the commercial use requirement of *§ 1125(c)*.

Second, defendant's use of plaintiff's mark to identify his web site is one part of defendant's sustained effort, through his radio show and other means, to achieve his end of persuading the public to eschew birth control and abortion. Defendant is a vocal supporter of the anti-abortion movement. Tr. 2/21/97 at 14. Defendant also opposes the use of contraceptives. Id. at 15. Through his radio program, he seeks to educate his listeners about the teachings of the Catholic church, specifically trying to discourage his audience from using birth control and obtaining abortions. Id. at 14-15. In this connection, defendant is a vocal critic of plaintiff and plaintiff's activities. Id. at 15-16.

In *MGM-Pathe, 774 F. Supp. 869*, Judge Leval considered whether a non-profit group that uses another's trademark in support of its own non-profit aims is subject to the Lanham Act. Specifically, he examined whether a group whose aim was to provide protection to the gay community and to educate the general public about violence against that community could appropriate [*18] a part of the name of a movie produced by plaintiff ("Pink Panther"). After finding that there was a likelihood of confusion, Judge Leval concluded that defendant's goal of political activism did not confer immunity from the Lanham Act, noting that "the seriousness and virtue of a cause do not confer any right to the use of the trademark of another." *Id. at 877*. Defendant attempts to distinguish MGM-Pathe from the case now before the Court on the ground that defendant in this action has used plaintiff's

mark in an effort to criticize plaintiff, while the MGM-Pathe defendants had no intent to criticize the Pink Panther movies. The Court finds this distinction unhelpful. The mere fact that defendant seeks to criticize plaintiff cannot automatically immunize a use that is otherwise prohibited by the Lanham Act.

Additionally, defendant has testified that he solicits contributions on his "Catholic Radio" radio show and has solicited contributions on the air in connection with the instant lawsuit. Tr. 2/21/97 at 16. Defendant's ownership of the domain name "plannedparenthood.com" is part and parcel of Catholic Radio's broader efforts in the anti-abortion movement. Specifically, [*19] defendant has told his radio listeners that "Catholic Radio owns the name 'Planned Parenthood.'" Pl. Ex. 6A. [8] Courts have found that fund-raising activities may bring a defendant's actions within the scope of the Lanham Act. See *Cancer Research Institute, Inc. v. Cancer Research Society, Inc., 694 F. Supp. 1051 (S.D.N.Y. 1988)* (enjoining defendant from using plaintiff's name for soliciting funds for cancer research); *Girls Clubs of Am., Inc. v. Boys Clubs of Am., Inc., 683 F. Supp. 50, 53 (S.D.N.Y.), aff'd, 859 F.2d 148 (2d Cir. 1988)* (enjoining defendant from adding plaintiff's name to its own for broad range of non-profit activities including fund-raising); Brach van *Houten Holding v. Save Brach's Coalition, 856 F. Supp. 472 (N.D. Ill. 1994)* (enjoining defendant from use of plaintiff's name in soliciting funds); *American Diabetes Assoc. v. National Diabetes Assoc., 533 F. Supp. 16, 20 (E.D. Pa. 1981)* (enjoining defendant from use of similar name in relation to its non-profit fund-raising). I find that defendant's use of plaintiff's mark is sufficiently tied to defendant's fund-raising efforts for the use to be deemed "commercial" within the meaning of *§ 1125(c)*. [*20]

> 8   Plaintiff's Exhibit 6A is a transcript of a cassette tape, Pl. Ex. 6, labeled "Bucci Catholic Radio January 9, 1997." That tape contains a portion of defendant's Catholic Radio broadcast describing Catholic Radio's ownership of the domain name "plannedparenthood.com." Defendant, on that broadcast, asks his audience for "suggestions on how to make the most of this Web site," and says, "if any of you folks out there have any, any ideas how we can make the most of this Web site, please contact me." Pl. Ex. 6A at 1-2.

Finally, defendant's use is commercial because of its effect on plaintiff's activities. First, defendant has appropriated plaintiff's mark in order to reach an audience of Internet users who want to reach plaintiff's services and viewpoint, intercepting them and misleading them in an attempt to offer his own political message. Second, defendant's appropriation not only provides Internet users with competing and directly opposing information, but

Appeal: 14-1568      Doc: 16      Filed: 10/06/2014      Pg: 101 of 110

Page 6

1997 U.S. Dist. LEXIS 3338, *; 42 U.S.P.Q.2D (BNA) 1430

also prevents those users from reaching plaintiff and [*21] its services and message. In that way, defendant's use is classically competitive; he has taken plaintiff's mark as his own in order to purvey his Internet services -- his web site -- to an audience intending to access plaintiff's services.

I note that although defendant relies on the holding of *Panavision, Int'l, L.P. v. Toeppen, 945 F. Supp. 1296 (C.D. Cal. 1996)* for the proposition that registering a domain name is not a commercial use within the meaning of the anti-dilution provision of the Lanham Act, Panavision is not controlling in this case. Defendant simply ignores the fact that he has done more than merely register a domain name; he has created a home page that uses plaintiff's mark as its address, conveying the impression to Internet users that plaintiff is the sponsor of defendant's web site. The Panavision court noted that the "exception for non-commercial use of a famous mark is intended to prevent courts from enjoining constitutionally-protected speech." *Id. at 1303*. However, whether defendant's use of the mark is commercial within the meaning of the Lanham Act is a distinct question from whether defendant's use of the mark is protected by the *First* [*22] *Amendment*; I reach the latter question below. The holding of Panavision does not suggest that defendant's use of plaintiff's mark is not commercial.

### 3. Section 1125(a)(1)(A)

In relevant part, *§ 1125(a)(1)(A)* prohibits a person from using in commerce any term or false designation of origin which "is likely to cause confusion . . . as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." *Section 1125(a)(1)* is also limited by *§ 1125(c)(4)(B)*, which states that "noncommercial use of a mark" is not actionable under the Lanham Act.

Here, as discussed above, defendant offers informational services relating to the anti-abortion and anti-birth control movement, specifically providing his audience with relevant literature and the means to contact Roberge. In addition, defendant's solicitation of funds in relation to his anti-abortion efforts are commercial in nature. Therefore, because defendant's labelling of his web site with plaintiff's mark relates to the "origin, sponsorship, or approval" by plaintiff of defendant's web site, [*23] I find that *§ 1125(a)(1)(A)* may govern defendant's actions in this case.

### 4. Section 1125(a)(1)(B)

With respect to *§ 1125(a)(1)(B)*, defendant can be liable only if he has used the plaintiff's mark "in commercial advertising or promotion." Courts have disagreed as to the scope and meaning of "commercial advertising

and promotion." Compare *Seven-Up Co. v. Coca-Cola Co., 86 F.3d 1379, 1384 (5th Cir. 1996)* (defining commercial advertising as commercial speech, by a defendant in commercial competition with plaintiff, for purpose of influencing consumers to buy defendant's goods or services) with *Semco, Inc. v. Amcast, Inc., 52 F.3d 108, 111-12 (6th Cir. 1995)* (noting conflicting legislative history of *§ 1125(a)(1)(B)* as to whether commercial advertising is merely coextensive with commercial speech, or includes all speech that is not political). Because I have concluded that defendant's activity is subject to the provisions of the Lanham Act discussed above, I need not reach the issue of whether his activity is subject to *§ 1125(a)(1)(B)*. I therefore do not address the issue of the meaning of "commercial advertising and promotion."

I therefore determine that *§ 1114, § [*24] 1125(c),* and *§ 1125(a)(1)(a)* of the Lanham Act are applicable here. I turn now to whether defendant's use of plaintiff's mark results in a likelihood of confusion.

### C. The Likelihood of Confusion

#### 1. The Polaroid Factors

The Second Circuit set out the factors a court must consider in determining the likelihood of consumer confusion in *Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492, 495 (2d Cir. 1961)*. Those factors include: the strength of plaintiff's mark, the degree of similarity between the two marks, the competitive proximity of the products or services, the likelihood that the plaintiff will bridge the gap between the two markets, the existence of actual confusion, the defendant's good faith in adopting the mark, the quality of the defendant's product, and the sophistication of the purchasers.

#### a. The Strength of the Mark

The strength of plaintiff's mark is conceded by defendant, which is reasonable in light of plaintiff's trademark registration of the mark and plaintiff's continued use of the mark for over 50 years. Tr. 2/20/97 at 7-9. The strength of plaintiff's mark weighs in favor of likelihood of confusion.

#### b. The Degree of Similarity Between the Marks

[*25] The two marks, "Planned Parenthood" and "plannedparenthood.com" are nearly identical; the only distinctions are the latter's lack of initial capitalization, the lack of a space between words, and the ".com" that is necessary to designate a domain name. The degree of similarity between defendant's domain name and the domain name owned by plaintiff's affiliate, Planned Parenthood of Houston, "plannedparenthood.org," is even stronger. [9] Plaintiff was originally under the impression that according to Internet usage, it could operate using only a ".org" designation. Tr. 2/20/97 at 14. Currently,

Appeal: 14-1568    Doc: 16    Filed: 10/06/2014    Pg: 102 of 110

Page 7

1997 U.S. Dist. LEXIS 3338, *; 42 U.S.P.Q.2D (BNA) 1430

however, NSI allows non-profit corporations, as well as for-profit businesses and individuals, to use the ".com" designation. Id. The ".com" designation is commonly used by businesses. *Id. at 48.* The degree of similarity between the marks thus increases the likelihood of confusion among Internet users.

> 9    In comparing plaintiff's product with defendant's product, the Court looks to the "www.ppfa.org" web site and the "www.plannedparenthood.com" website.

[*26]  c. The Competitive Proximity of the Products or Services

The web sites of plaintiff and defendant are both located on the World Wide Web. Therefore, defendant's web site at "www.plannedparenthood.com" is close in proximity to plaintiff's own web site, "www.ppfa.org." Both sites compete for the same audience -- namely, Internet users who are searching for a web site that uses plaintiff's mark as its address. The degree of competitive proximity, therefore, increases the likelihood of confusion among Internet users.

d. The Likelihood that Plaintiff Will Bridge the Gap Between the Markets

Because plaintiff's web site and defendant's web site are both on the Internet, the parties are vying for users in the same "market." Where the market for competing goods or services is the same, there is no need to consider whether plaintiff will bridge the gap between the markets. *Paddington Corp. v. Attiki Importers & Distributors, Inc., 996 F.2d 577, 586 (2d Cir. 1993).* I therefore do not consider this factor in determining the likelihood of confusion.

e. The Existence of Actual Confusion

Plaintiff has produced testimony demonstrating that actual confusion has occurred among [*27] Internet users. Tr. 2/20/97 at 47-49, 54-57. The confusion has occurred both in a user who attempted to go directly to "www.plannedparenthood.com," thinking that it was likely to be plaintiff's web address, *Id. at 46,* and in a user who used a search engine to find web sites containing, or designated by, plaintiff's mark. *Id. at 53-54.*

This specific testimony exemplifies the likelihood of confusion due to the nature of domain names and home page addresses. First, because ".com" is a popular designation for Internet domain names, an Internet user is likely to assume that ".com" after a corporation's name will bring her to that corporation's home page, if one exists. [10] Second, an Internet user cannot immediately determine the content of a home page maintained by the owner of a particular domain name or located at a specific address. Only after a user has seen or entered "plannedparenthood.com" can she access the web site; such access occurs after at least a temporary delay. In addition, there is a delay while the home page "loads" into the computer. Because the words on the top of the page load first, the user is first greeted solely with the "Welcome to the Planned Parenthood [*28]  Home Page!" It is highly likely that an Internet user will still believe that she has found plaintiff's web site at that point.

> 10    A vast number of corporations use their corporate name, or some easily recognizable variant thereof, followed by ".com," as a domain name and home page address. Therefore, a typical Internet user who wants to go to a corporation's home page may attempt to find the page by simply typing into her computer "www.[corporation name].com". Examples of such home page addresses include: "www.nytimes.com," "www.mtv.com," "www.randomhouse.com," "www.sony.com," "www.harrys-shoes.com," and "www.mercuryvehicles.com."

Even when the picture of The Cost of Abortion finally does appear on the screen, the user is unlikely to know that she is not at plaintiff's home page. *Id. at 19, 47, 55-56.* The book's ambiguous title "The Cost of Abortion," alone, cannot disabuse every Internet user of the notion that she has found plaintiff's home page. The Internet user must actually click on a link to [*29]  read excerpts from the book, biographical information about the author, or book endorsements. Only in the course of reading those items can she determine that she has not reached plaintiff's home page. Depending on which link the user has chosen to access, there may be an additional delay before the user can grasp that plaintiff is not the true provider of the home page. [11] This lengthy delay between attempting to access plaintiff's home page and learning that one has failed to do so increases the likelihood of consumer confusion.

> 11    Defendant himself agreed that after clicking on the first link listed on the home page, the "Foreword," a user would not ascertain the anti-abortion message until the middle of the second paragraph. Tr. 2/21/97 at 42-43.
>
> Similarly, the "Book Review" link contains endorsements that are ambiguous. "The concerns which [the author] raises affect EVERY American who cares about this country's future prosperity," reads one quote; another notes, "This well reasoned exposition should be read by thoughtful people on both sides of the issue."

[*30]  f. The Defendant's Good Faith in Adopting the Mark

Defendant's testimony, and his counsel's admission at the hearing before this Court on the temporary restraining order, show that defendant chose his domain name and home page name with full knowledge and intent that some Internet users seeking to find plaintiff's home page would instead encounter his. However, defendant may have acted under the good faith assumption that his actions were protected by the *First Amendment*. I need not conclude that defendant acted in bad faith to conclude that there is a likelihood of confusion, and I therefore make no such finding at this time.

### g. The Quality of Defendant's Product

A comparison of the quality of plaintiff's and defendant's products -- their web sites -- is irrelevant; the Court cannot compare the two web sites in terms of superior or inferior quality. However, I note that the two products are vastly different and convey quite divergent messages. Plaintiff's web site offers educational resources, suggests ways to get involved in plaintiff's activities, to join plaintiff in its advocacy mission, and to contribute to plaintiff, and offers links to plaintiff's local [*31] affiliates, related organizations, and job listings. In sum, plaintiff's web site provides Internet users with an array of information and services related to Planned Parenthood's mission of providing reproductive choice for women. Defendant's home page bearing plaintiff's mark offers users information, including an advertisement for a book, and ways to contact a vocal anti-abortion advocate. Any ensuing confusion resulting from defendant's use of plaintiff's mark as his domain name and home page address is likely to be destructive to the image that plaintiff, the senior user of the mark, has established. See *MGM-Pathe, 774 F. Supp. at 876*.

### h. The Sophistication of the Purchasers

Plaintiff argues that its primary purchasers are low income, relatively unsophisticated women. I note that those with access to the Internet may not be coextensive with the segment of the population to whom plaintiff normally offers its services; those with Internet access may be more sophisticated. However, testimony has shown that even sophisticated Internet users were confused by defendant's web site. Although the sophisticated Internet user may discover, after reading the text of one of the links [*32] on defendant's home page, that she has not reached plaintiff's web site, some users may not be so immediately perspicacious. Because the sophistication of the user is no guarantee, here, that the consumer will not be confused, I find that this factor is of limited value in determining whether the consumer is likely to be confused.

In sum, I find that the bulk of the Polaroid factors demonstrate that there is a significant likelihood of con-

fusion that warrants the granting of a preliminary injunction.

### D. Defendant's Additional Defenses

Defendant also argues that his use of plaintiff's mark is protected from injunction because (1) it is a parody, and (2) it is protected speech under the *First Amendment*. I consider these arguments in turn.

### 1. The Parody Exception

Defendant argues that his use of the "planned parenthood" mark is not likely to confuse because it is similar to a parody. A parody "depends on a lack of confusion to make its point," and "'must convey two simultaneous -- and contradictory -- messages: that it is the original, but also that it is not the original and is instead a parody.'" *Hormel Foods Corp. v. Jim Henson Productions, Inc., 73 F.3d 497, 503* [*33] *(2d Cir. 1996)*(internal citations omitted). Here, an Internet user may either find the defendant's web site through a search engine or may simply enter the words "planned parenthood" in the expectation that she will find the plaintiff's web site. Seeing or typing the "planned parenthood" mark and accessing the web site are two separate and non-simultaneous activities. Furthermore, the greeting "Welcome to the Planned Parenthood Home Page!" does not immediately contradict an Internet user's assumption that she has accessed the plaintiff's home page. Only when an Internet user actually "clicks" on one of the topics and accesses commentary on The Cost of Abortion does she encounter defendant's message.

I am not persuaded by defendant's argument that the message of the home page provides an ironic and contrasting allusion to plaintiff, nor do I find convincing his argument that the banner heading of the home page is sarcastic. Similarly, I do not conclude that defendant's use of the term "planned parenthood" in the context described above is intended not to confuse the user into an association with plaintiff, but rather "to reference Plaintiff as the 'enemy.'" [12] Because defendant's [*34] use of "planned parenthood" does not convey the simultaneous message that the home page and web site are those of plaintiff and those of defendant, defendant's argument that his use of the mark is a parody fails. Thus, the Polaroid factors must govern the issue of whether there is a likelihood of confusion. Here, I have found that the Polaroid factors demonstrate that there is a likelihood of confusion that arises from defendant's use of the domain name "plannedparenthood.com," the home page address "www.plannedparenthood.com," and the banner at the top of the home page stating, "Welcome to the Planned Parenthood Home Page!"

Appeal: 14-1568    Doc: 16    Filed: 10/06/2014    Pg: 104 of 110

Page 9
1997 U.S. Dist. LEXIS 3338, *; 42 U.S.P.Q.2D (BNA) 1430

12    Although counsel for defendant argued that defendant's use of plaintiff's mark was "merely to reference plaintiff as the enemy," Def. Mem. in Opp. at 14, defendant could not point to any portion of the home page that referred to plaintiff as the enemy. Tr. 2/21/97 at 45.

2. The *First Amendment* Exception

Defendant also argues that his use of the "planned parenthood" mark is [*35]    protected by the *First Amendment*. As defendant argues, trademark infringement law does not curtail or prohibit the exercise of the *First Amendment* right to free speech. I note that plaintiff has not sought, in any way, to restrain defendant from speech that criticizes Planned Parenthood or its mission, or that discusses defendant's beliefs regarding reproduction, family, and religion. The sole purpose of the Court's inquiry has been to determine whether the use of the "planned parenthood" mark as defendant's domain name and home page address constitutes an infringement of plaintiff's trademark. Defendant's use of another entity's mark is entitled to *First Amendment* protection when his use of that mark is part of a communicative message, not when it is used to identify the source of a product. *Yankee Publishing, Inc. v. News America Publishing, Inc., 809 F. Supp. 267, 275 (S.D.N.Y. 1992)*. By using the mark as a domain name and home page address and by welcoming Internet users to the home page with the message "Welcome to the Planned Parenthood Home Page!" defendant identifies the web site and home page as being the product, or forum, of plaintiff. I therefore determine that, because [*36]    defendant's use of the term "planned parenthood" is not part of a communicative message, his infringement on plaintiff's mark is not protected by the *First Amendment*.

Defendant argues that his use of the "Planned Parenthood" name for his web site is entitled to *First Amendment* protection, relying primarily on the holding of *Yankee Publishing, 809 F. Supp. at 275*. In that case, Judge Leval noted that the *First Amendment* can protect unauthorized use of a trademark when such use is part of an expression of a communicative message: "the Second Circuit has construed the Lanham Act narrowly when the unauthorized use of the trademark is for the purpose of a communicative message, rather than identification of product origin." Id. Defendant argues that his use of the "Planned Parenthood" name for his web site is a communicative message.

However, Yankee Publishing carefully draws a distinction between communicative messages and product labels or identifications:

When another's trademark. . . is used without permission for the purpose of

source identification, the trademark law generally prevails over the *First Amendment*. Free speech rights do not extend to labelling or [*37]    advertising products in a manner that conflicts with the trademark rights of others.

*Id. at 276*. Defendant offers no argument in his papers as to why the Court should determine that defendant's use of "plannedparenthood.com" is a communicative message rather than a source identifier. His use of "plannedparenthood.com" as a domain name to identify his web site is on its face more analogous to source identification than to a communicative message; in essence, the name identifies the web site, which contains defendant's home page. The statement that greets Internet users who access defendant's web site, "Welcome to the Planned Parenthood Home Page," is also more analogous to an identifier than to a communication. For those reasons, defendant's use of the trademarked term "planned parenthood" is not part of a communicative message, but rather, serves to identify a product or item, defendant's web site and home page, as originating from Planned Parenthood.

Defendant's use of plaintiff's mark is not protected as a title under *Rogers v. Grimaldi, 875 F.2d 994, 998 (2d Cir. 1989)*. There, the Court of Appeals determined that the title of the film "Ginger and Fred" was not a [*38]    misleading infringement, despite the fact that the film was not about Ginger Rogers and Fred Astaire, because of the artistic implications of a title. The Court of Appeals noted that "filmmakers and authors frequently rely on word-play, ambiguity, irony, and allusion in titling their works." Id. The Court of Appeals found that the use of a title such as the one at issue in Rogers was acceptable "unless the title has no artistic relevance to the underlying work"; even when the title has artistic relevance, it may not be used to "explicitly mislead[] [the consumer] as to the source or content of the work." Id. Here, even treating defendant's domain name and home page address as titles, rather than as source identifiers, I find that the title "plannedparenthood.com" has no artistic implications, and that the title is being used to attract some consumers by misleading them as to the web site's source or content. Given defendant's testimony indicating that he knew, and intended, that his use of the domain name "plannedparenthood.com" would cause some "pro-abortion" Internet users to access his web site, Tr. 2/21/97 at 36, he cannot demonstrate that his use of "planned parenthood" [*39]    is entitled to *First Amendment* protection.

Because defendant's use of plaintiff's mark is subject to the Lanham Act, because the Polaroid factors demon-

Appeal: 14-1568    Doc: 16    Filed: 10/06/2014    Pg: 105 of 110

Page 10

1997 U.S. Dist. LEXIS 3338, *; 42 U.S.P.Q.2D (BNA) 1430

strate that there is a likelihood of confusion arising from defendant's use of plaintiff's mark, and because defendant has not raised a defense that protects his use of the mark, plaintiff has met its burden of demonstrating that a preliminary injunction against defendant's use of plaintiff's mark is warranted. *Hasbro, 858 F.2d at 73.*

E. Whether A Disclaimer Will Cure the Confusion

Defendant argues that a disclaimer, rather than an injunction, is the appropriate remedy here. I disagree. Due to the nature of Internet use, defendant's appropriation of plaintiff's mark as a domain name and home page address cannot adequately be remedied by a disclaimer. Defendant's domain name and home page address are external labels that, on their face, cause confusion among Internet users and may cause Internet users who seek plaintiff's web site to expend time and energy accessing defendant's web site. Therefore, I determine that a disclaimer on defendant's home page would not be sufficient to dispel the confusion induced by his home [*40] page address and domain name.

F. Attorneys' Fees

Plaintiff has requested costs, including attorneys' fees. When an injunction is granted pursuant to *15 U.S.C. § 1125,* the court may award the relief provided in *§§ 1117(a),* including reasonable attorneys' fees in "exceptional cases" under *15 U.S.C. § 1117(a).* According to the Second Circuit, "exceptional" circumstances include cases of willful infringement. *Bambu Sales, Inc. v. Ozak Trading Inc., 58 F.3d 849, 854 (2d Cir. 1995).*

There is insufficient evidence and/or legal briefing before me to determine that defendant's use of plaintiff's mark constitutes willful infringement. I therefore order plaintiff to submit to the Court, no later than April 7, 1997, any memorandum of law or factual submissions in support of its request for attorneys' fees. Defendant shall

reply to that submission no later than April 21, 1997. Plaintiff's response, if any, is due on May 5, 1997. The parties are, of course, encouraged to settle the costs issue between themselves, if possible.

IV. Conclusion

For the foregoing reasons, I grant plaintiff's motion for a preliminary injunction. I hereby enjoin defendant, his agents, servants, employees, [*41] representatives, attorneys, related companies, successors, assigns, and all others in active concert or participation with him, (1) from using to identify defendant's web site, home page, domain name or in any other materials available on the Internet or elsewhere the Planned Parenthood(R) mark, any colorable imitation of the Planned Parenthood(R) mark, and any thing or mark confusingly similar thereto or likely to cause dilution of the distinctiveness of the Planned Parenthood(R) mark or injury to the business reputation of the Planned Parenhood Federation of America, Inc. or any of its affiliates; and (2) from representing by any means whatsoever that defendant, or any products or services offered by defendant, including information services provided via defendant's web site or the Internet, are associated in any way with plaintiff or its products or services, and from taking other action likely to cause confusion or mistake on the part of Internet users or consumers.

The remaining relief sought by plaintiff will be the subject of further proceedings herein.

SO ORDERED:

Kimba M. Wood

United States District Judge

New York, New York

March 19, 1997



1 of 2 DOCUMENTS

**NANCY CHERYL WEHLING, formerly known as Nancy Cheryl Strowd, Plaintiff-Appellant, v. SANDOZ PHARMACEUTICALS CORPORATION, a Delaware Corporation; CAREMARK, INCORPORATED, a California corporation, Defendants-Appellees.**

No. 97-2212

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

*1998 U.S. App. LEXIS 38866; 1998 wl 546097*

**June 5, 1998, Argued**
**August 20, 1998, Decided**

**NOTICE:** [*1] RULES OF THE FOURTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** Appeal from the United States District Court for the Eastern District of North Carolina, at Wilmington. James C. Fox, District Judge. (CA-96-84-F).
*Wehling v. Sandoz Pharms. Corp., 162 F.3d 1158, 1998 U.S. App. LEXIS 38876 (4th Cir. N.C., 1998)*

**COUNSEL:** ARGUED: David Henry Rogers, Raleigh, North Carolina, for Appellant.

Hayden Judson Silver, III, MOORE & VAN ALLEN, P.L.L.C., Raleigh, North Carolina; William Howard Moss, SMITH, ANDERSON, BLOUNT, DORSETT, MITCHELL & JERNIGAN, Raleigh, North Carolina, for Appellees.

ON BRIEF: Curtis J. Shipley, MOORE & VAN ALLEN, P.L.L.C., Raleigh, North Carolina; Deanna L. Davis, SMITH, ANDERSON, BLOUNT, DORSETT, MITCHELL & JERNIGAN, Raleigh, North Carolina, for Appellees.

**JUDGES:** Before NIEMEYER and LUTTIG, Circuit Judges, and SMITH, United States District Judge for the Eastern District of Virginia, sitting by designation.

**OPINION**

PER CURIAM:

Plaintiff appeals the district court's ruling barring plaintiff's expert witness from testifying. Plaintiff also appeals the grant of summary judgment on all claims. Because we find no abuse of discretion and determine that [*2] summary judgment was appropriate, we affirm.

I.

These facts, drawn from the record, are expressed in the light most favorable to plaintiff as the non-moving party. *See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* Plaintiff, Nancy Cheryl Wehling (Wehling), brought suit against defendants alleging claims of negligence, breach of implied warranty, and negligent infliction of emotional distress for injuries stemming from an alleged interaction of the prescription drug "Clorazil," a drug manufactured and distributed by defendants, and the prescription drug "Klonopin," a type of benzodiazepine (BZD).

Plaintiff has suffered from severe and chronic paranoid schizophrenia for approximately twenty-five years. She has been institutionalized for this illness at least twenty-seven times, including numerous admissions to Dorothea Dix Hospital (Dix Hospital) in Raleigh, North Carolina. On March 1, 1991, plaintiff was admitted to Dix Hospital for treatment of her schizophrenia. From the time of her admission on March 1, 1991, through March 21, 1991, plaintiff was administered several types of prescription drugs commonly used to [*3] treat paranoid schizophrenia, namely, Prolixin, Cogentin, Ativan (a BZD), and Klonopin (a BZD). These more traditional antipsychotic medications failed to improve plaintiff's

1998 U.S. App. LEXIS 38866, *;

condition. Accordingly, on March 20, 1991, plaintiff's treating physician initiated treatment with Clorazil, an antipsychotic medication manufactured by defendant Sandoz Pharmaceuticals Corporation (Sandoz) and distributed by defendant Caremark, Incorporated (Caremark).

Plaintiff received her first 25-milligram dose of Clorazil at approximately 10:30 a.m. on March 20, 1991. Approximately two hours later, plaintiff allegedly suffered respiratory arrest while eating lunch in the cafeteria at Dix Hospital. An emergency team was summoned to the scene and woke plaintiff by stimulating her breastbone. Plaintiff was placed in the critical care unit, from which she was discharged approximately two weeks later. Plaintiff claims that her condition has worsened since the March 20, 1991, incident. However, two physicians on staff at Dix Hospital contend that plaintiff suffered no permanent injury as a result of the incident.

Clorazil was created as a chemical compound in 1960. Psychiatrists in Europe have prescribed [*4] the drug since 1974. The drug was first marketed in the United States in February, 1990. Prior to plaintiff's incident on March 20, 1991, Clorazil had been administered to approximately 10,000 patients in the United States. In 1991, the possibility of an interaction between Clorazil and BZD medications was not widely known. Two articles by German authors were published in 1990, describing six anecdotal cases of cardiorespiratory arrest in patients who had simultaneously received BZD medications and clozapine (the generic name for Clorazil). However, the authors emphasized that no statistically valid and controlled clinical studies had been performed, and only a small number of patients were involved. Consequently, the authors could not conclude that an interaction between BZD medications and clozapine had been established.

Despite the inconclusory nature of these articles, defendant Sandoz, at the suggestion of the Food and Drug Administration, added a warning to Clorazil's package insert in January, 1991. The revised package insert advised physicians that orthostatic hypotension in patients taking clozapine could be accompanied by profound collapse and respiratory depression, [*5] and in some cases, concomitant BZD medications had been administered, although it had not been established there was a drug interaction.

Plaintiff filed the complaint in this action on April 5, 1996. The complaint alleged that the warning added to Clorazil's package insert in January, 1991, did not adequately warn physicians of the risk of cardiorespiratory collapse when Clorazil was used with BZD medications. The complaint further alleged that defendants did not adequately test Clorazil for use in the United States, or

require that its usage be subject to necessary safety precautions, thus causing plaintiff's collapse on March 20, 1991.

Defendant Sandoz filed a motion to exclude the proposed testimony of plaintiff's expert, Arthur J. McBay, Ph.D. (McBay), and a motion for summary judgment pursuant to *Federal Rule of Civil Procedure 56*. Defendant Caremark filed a motion to dismiss for failure to state a cause of action pursuant to *Federal Rule of Civil Procedure 12(b)(6)*, or alternatively, for summary judgment pursuant to *Federal Rule of Civil Procedure 56*. Following a hearing on defendants' motions, the court determined that McBay's testimony was not sufficiently [*6] reliable to be admissible as expert opinion testimony. Accordingly, the court excluded McBay's testimony in its entirety and granted defendants' motions for summary judgment, from which rulings this appeal results.

II.

Plaintiff challenges the court's ruling excluding McBay's testimony in its entirety. The district court applied the criteria set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993)*, and ruled that McBay's testimony was obviously relevant to the issues of negligence and causation, but his testimony was insufficiently reliable to be admissible into evidence.

A trial court has broad discretion in determining whether to admit expert testimony and should not be reversed absent a clear abuse of discretion. *Thomas J. Kline, Inc. v. Lorillard, Inc., 878 F.2d 791, 799 (4th Cir. 1989)*, cert. denied, *493 U.S. 1073, 107 L. Ed. 2d 1027, 110 S. Ct. 1120 (1990)*. An appellate court should not apply a more stringent standard of review where the court's ruling regarding the admissibility of expert testimony results in summary judgment. *General Elec. Co. v. Joiner , 522 U.S. 136, 118 S. Ct. 512, 517-19, 139 L. Ed. 2d 508 (1997).* [*7] In applying the abuse of discretion standard, the appellate court may not categorically distinguish between rulings that allow expert testimony and rulings that disallow it. *Id. 522 U.S. 136, 118 S. Ct. at 517, 139 L. Ed. 2d 508*.

*Rule 702 of the Federal Rules of Evidence* governs the admissibility of expert opinion testimony. Under *Rule 702*,

if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify

thereto in the form of an opinion or otherwise.

*Fed. R. Evid. 702*. The touchstone of admissibility is whether the testimony will assist the trier of fact. *Fox v. Dannenberg, 906 F.2d 1253, 1256 (8th Cir. 1990)*.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc. , 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993)*, the Supreme Court established a test for trial courts to apply in exercising their "gatekeeping responsibility" under *Rule 702*. The standard is designed to ensure that admitted expert testimony is both relevant and reliable. In order to meet the reliability prong of the Daubert [*8] test, "proposed testimony must be supported by appropriate validation." *Daubert, 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. at 2795*. Toward this end, the Court in Daubert provided these guidelines for lower courts to follow in making reliability determinations: (1) whether the expert's theory or technique has been or can be tested; (2) whether the expert's theory or technique has been subjected to "peer review and publication;" (3) whether the expert's theory or technique has a known or potential rate of error; (4) whether standards exist to control the technique's operation; and, (5) whether the technique is generally accepted in the scientific community. *Id. 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. at 2796-97, 2799*; see *Cavallo v. Star Enter., 100 F.3d 1150, 1158-59 (4th Cir. 1996)*, cert. denied , *522 U.S. 1044, 139 L. Ed. 2d 631, 118 S. Ct. 684 (1998)*.

Courts have also looked to the qualifications of the witness in determining whether his proffered opinions are reliable. See, e.g., *In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 749 (3d Cir. 1994)*, cert. denied sub nom., *General Elec. Co. v. Ingram, 513 U.S. 1190 , 115 S. Ct. 1253, 131 L. Ed. 2d 134 (1995)*. [*9]  Another significant fact weighing against admitting the testimony is where, as here, the expert developed his opinions expressly for the purposes of testifying. *See e.g., Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311, 1317 (9th Cir.)*, cert. denied, *516 U.S. 869, 133 L. Ed. 2d 126, 116 S. Ct. 189 (1995)*.

Plaintiff relied primarily on the testimony of McBay to establish the elements of negligence and causation. Specifically, McBay proposed to testify that Clorazil interacted with the BZD Klonopin in plaintiff's body, causing plaintiff to experience respiratory arrest; the Clorazil label and package insert were inadequate to warn plaintiff's physician of Clorazil's potential interaction with BZDs; and, had the warning been more explicit regarding a possible interaction with BZDs, plaintiff would not have suffered respiratory arrest, or alternatively, her physicians would have responded to her collapse more quickly.

Having carefully reviewed the entire record, we find that the district court did not abuse its discretion in excluding McBay's testimony in its entirety. McBay is a retired pharmacist and toxicologist; he is neither a pharmacologist [*10]  nor a medical doctor. His background focuses on assisting medical examiners in determining causes of death. He has also developed an expertise in drug and alcohol testing, particularly in the context of automobile accidents. None of this experience is relevant to the issues of causation and negligence in the context of an alleged drug interaction. As the trial court concluded, McBay was not qualified to testify on the issues in dispute in this suit.

Further, McBay has no education, training, or experience in the treatment of patients with schizophrenia, or in the prescription, use, or administration of Clorazil. He has not published articles or conducted research in the treatment of schizophrenia, or the two prescription drugs in question. In fact, McBay testified that he has no knowledge of how Clorazil works in the brain, or how it could interact with a BZD medication. He testified that he knows very little about Klonopin, the drug that allegedly interacted with Clorazil and caused plaintiff's collapse. McBay further testified that he does not consider himself an expert in the pharmological treatment of schizophrenic patients, and he has never been involved in any way with [*11]  the treatment of a schizophrenic patient. Without prior training, education, or experience in the field, McBay's review of the literature, after he was retained as an expert witness in this suit, was insufficient to qualify him as an expert on the issues in dispute.

The record supports the conclusion that McBay was unqualified to testify as to the adequacy of the warning appearing on Clorazil's package insert. McBay testified that he has never been involved with the drafting, regulation, or approval of product labeling for any prescription medication, and he has no training in this area. Without more, his experience as a pharmacist, reading prescription labels and dispensing drugs, does not qualify him to testify about the adequacy of drug warnings. McBay expressed the opinion that Clorazil's label should have recommended an initial dosage of 12.5 milligrams, rather than 25 milligrams as plaintiff received, but his opinion is primarily based on defendants' revision of the Clorazil label in 1992. As this is not the type of subsequent remedial measure reasonably relied upon by experts in the field in forming their opinions or inferences, the district court properly concluded that [*12]  the methodology and reasoning underlying McBay's opinions are not scientifically valid.

McBay was likewise unqualified to testify as to whether plaintiff's physician would have followed a different course of action, had defendants provided a more explicit warning regarding a possible interaction between

1998 U.S. App. LEXIS 38866, *;

Clorazil and BZD medications. To create a jury question, the evidence must be of sufficient weight to establish, by the preponderance of the evidence, at least some reasonable likelihood that an adequate warning would have prevented the plaintiff from receiving the drug. *Thomas v. Hoffman-LaRoche, Inc., 949 F.2d 806, 812 (5th Cir.)*, cert. denied, *504 U.S. 956, 119 L. Ed. 2d 226, 112 S. Ct. 2304 (1992)*. Lacking any sound basis whatsoever, McBay's opinion that plaintiff's treating physician would have followed a different course of treatment is purely speculative. McBay testified that he had no knowledge about the standard practices of physicians treating patients with Clorazil.

The Court in Daubert defined the "scientific knowledge" requirement of *Rule 702* as "establishing a standard of evidentiary reliability" or "trustworthiness," which essentially [*13] means "scientific validity." *509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2795 n.9*. To be scientifically valid, an expert's opinion must be "grounded in the methods and procedures of science" and "supported by appropriate validation." Id.; see *United States v. Dorsey, 45 F.3d 809, 813 (4th Cir.)*, cert. denied, *515 U.S. 1168, 132 L. Ed. 2d 871, 115 S. Ct. 2631 (1995)*.

In the instant case, the reasoning and methodology underlying McBay's opinions regarding negligence and causation were speculative and not scientifically valid. An "expert" opinion is considered unreliable and inadmissible under Daubert where, as here, the expert has developed the opinions expressly for purposes of testifying in the case, has himself performed no tests or studies that support his opinions, has cited no peer-reviewed, controlled studies substantiating his opinions, and fails to "point to some objective source ? to show that [he has] followed the scientific method." *Daubert, 43 F.3d at 1316-18*; see *Cabrera v. Cordis Corp., 134 F.3d 1418, 1420 (9th Cir. 1998)*. McBay based his opinion regarding causation primarily on the correlation in time between the administration [*14] of Klonopin to plaintiff, and the administration of Clorazil. Since conjecture, hypothesis, subjective belief, or unsupported speculation are impermissible grounds on which to base an expert opinion, such "expert" opinions as McBay's must be excluded. See *Daubert, 509 U.S. at 589, 125 L. Ed. 2d 469, 113 S. Ct. 2795*.

For the foregoing reasons, we find the court did not abuse its discretion in excluding McBay's testimony in its entirety.

### III

We review a grant of summary judgment de novo. See *Higgins v. E.I. DuPont de Nemours & Co., 863 F.2d 1162, 1167 (4th Cir. 1988)*. Summary judgment is appropriate only when the court, viewing the record as a whole and in the light most favorable to the non-moving party, finds there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*; see, e.g., *Celotex Corp. v. Catrett, 477 U.S. 317, 322-24, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*; *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*; *Terry's Floor Fashions, Inc. v. Burlington Indus., 763 F.2d 604, 610 (4th Cir. 1985)*.

Plaintiff relied almost [*15] exclusively on the proffered testimony of McBay in establishing negligence and causation, two essential elements of her claims against defendants. We have already determined that the district court properly excluded McBay's testimony in its entirety. The only other evidence offered by plaintiff on the element of causation would have been inadmissible at trial, or was insufficient to raise a genuine issue of material fact. For example, plaintiff submitted, as an exhibit to her response to defendants' motions for summary judgment, articles published by two German authors. This academic literature might have been admissible at trial under the learned treatise exception to the hearsay rule. However, as previously discussed, the articles were not based on statistically valid and controlled clinical studies, and only a small number of patients were involved. Consequently, the authors could not conclude that an interaction between BZD medications and clozapine had been established.

The other evidence offered by plaintiff on the issue of causation, namely her medical records, also failed to raise a genuine issue of material fact. While these records likely would have been admissible [*16] at trial as an exception to the hearsay rule, they did not tend to establish that plaintiff's injuries were caused by an interaction between a BZD medication and Clorazil.

Finally, the press releases submitted as an exhibit to plaintiff's response to defendants' motion for summary judgment would have been inadmissible at trial, as would the evidence of subsequent remedial measures taken by defendant Sandoz, also submitted as an exhibit to plaintiff's response to defendants' summary judgment motions. Likewise, the correspondence between plaintiff's treating physician and various European physicians, in which they discuss their opinions on the topic, would be inadmissible hearsay at trial.

Thus, even viewing the record in the light most favorable to plaintiff as the non-moving party, there are no genuine issues of material fact and defendants are entitled to judgment as a matter of law. Accordingly, the court properly granted summary judgment in favor of defendants on all claims.

### IV.

1998 U.S. App. LEXIS 38866, *;

Because we determine that the court did not abuse its discretion in excluding McBay's testimony in its entirety, and that summary judgment on all claims was appropriate, we affirm.

[*17]   AFFIRMED